Nos. 19-1382 (L), 19-1425 (Cross-Appeal)

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

————————

**La Unión Del Pueblo Entero,** *et al.*,

*Plaintiffs-Appellees/Cross-Appellants,*

**v.**

**Wilbur L. Ross,** *et. al.*,

*Defendants-Appellants/Cross-Appellees.*

————————

On Appeal from the United States District Court
for the District of Maryland (8:18-cv-01570-GJH and 8:18-cv-01410-GJH)

————————

PLAINTIFFS-APPELLEES' OPENING BRIEF

————————

Thomas A. Saenz, Denise Hulett,
Andrea Senteno, Burth G. Lopez, Tanya
Pellegrini & Julia A. Gomez
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
1016 16th Street NW, Suite 100
Washington, DC 20036
(202) 293-2828

John C. Yang, Terry Ao Minnis,
Niyati Shah, & Eri Andriola
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
(202) 296-2300

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and Local Rule 26.1, all of the Plaintiffs hereby disclose the following:

1. No party is a publicly held corporation or other publicly held entity.

2. No party has any parent corporations.

3. No publicly held company owns 10% or more of the stock of a party.

4. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

5. No party is a trade association.

6. The case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF CASE AND FACTS ....................................................1

    A.   Genesis of the Plan to Add the Citizenship Question.............................2

    B.   Anti-Immigrant Statements By Officials ...............................10

    C.   The Secretary Was Not the Sole Decision-maker ..................11

    D.   Newly Discovered Evidence....................................................12

SUMMARY OF ARGUMENT ...............................................................14

ARGUMENT ......................................................................................19

  I.   Standard of Review.............................................................................19

 II.  The District Court Failed to Undertake the Sensitive Inquiry into the Totality of the Circumstances, as Required Under *Arlington Heights*. ........20

    A.   *Arlington Heights* Factor 1: The District Court Findings Demonstrate  That Plaintiffs Will Be Disparately Impacted by the Addition of a Citizenship Question to the 2020 Census.................22

    B.   *Arlington Heights* Factor 2: The District Court Findings Confirm that the Historical Background Leading to the Addition of the Citizenship Question Is Replete with Ulterior Motives, Connivance, Falsehood, and Secrecy. ...................................24

    C.   *Arlington Heights* Factor 3: The District Court Found that Defendants Departed, Procedurally and Substantively, From Past Practice..................................................................................27

    D.   *Arlington Heights* Factor 4: The Record Contains Contemporary Statements by Those Involved in Ensuring that the Secretary Carried out the Administration's Intent to Discriminate Against Immigrants and Communities of Color. ................................31

III. The District Court Failed to Properly Take Into Account the Complete Absence of a Non-Discriminatory Rationale for the Addition of the Citizenship Question under *Arlington Heights* ............................................... 35

IV. Invalidation Without Remand to the District Court is the Proper Remedy; This Court May Enjoin the Addition of a Citizenship Question to the 2020 Decennial Census. ............................................................... 37

CONCLUSION ................................................................................ 40

REQUEST FOR ORAL ARGUMENT ................................................. 40

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ................. 42

CERTIFICATE OF SERVICE ............................................................. 43

# TABLE OF AUTHORITIES

**Case**             **Page**

*Anderson v. City of Bessemer City, N.C,*
470 U.S. 564 (1985) ..................................................................20

*Batalla Vidal v. Nielsen,*
291 F. Supp. 3d 260 (E.D.N.Y. 2018) ............................ 33, 34, 35

*Brinkman v. Gillian,*
583 F.2d 243 (6th Cir. 1978) .................................................37

*California v. Ross,*
358 F. Supp. 3d 965 (N.D. Cal. 2019) ....................................38

*CASA de Maryland, Inc. v. Trump,*
355 F. Supp. 3d 307 (D. Md. 2018) ........................................34

*Centro Presente v. United States Dep't of Homeland Sec.,*
332 F. Supp. 393 (D. Mass. 2018) ..........................................33

*City of Richmond v. United States,*
422 U.S. 358 (1975) ...............................................................38

*Dayton Bd. of Educ. v. Brinkman,*
443 U.S. 526 (1979) ...............................................................20

*Easley v. Cromartie,*
532 U.S. 234 (2001) ...............................................................37

*Hunt v. Cromartie,*
526 U.S. 541 (1999) .................................................. 17, 19, 21

*Hunter v. Underwood,*
471 U.S. 222 (1985) .................................................. 20, 36, 37

*In re Dep't of Commerce,*
139 S. Ct. 16 (2018) ...............................................................16

*Innovative Health Sys., Inc. v. City of White Plains,*
117 F.3d 37 (2d Cir. 1997) ............................................. 32, 36

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ................................................................................39

*New York v. United States Dep't of Commerce*,
   315 F. Supp. 3d 766 (S.D.N.Y. 2018) .................................................33

*New York v. United States Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ........................................ 23, 38

*North Carolina State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ...................................................... passim

*Pullman-Standard v. Swint*,
   456 U.S. 273 (1982) ................................................................................37

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) .................................. 33, 34, 35

*Smith v. Town of Clarkton, N.C.*,
   682 F.2d 1055 (4th Cir. 1982) ............................................................32

*Sylvia Dev. v. Calvert Cnty.*,
   48 F.3d 810 (4th Cir. 1995) .................................................................24

*U.S. v. Gypsum Co.*,
   333 U.S. 364 (1948) ................................................................................19

*U.S. v. Windsor*,
   570 U.S. 744 (2013) ................................................................................18

*United States v. Yellow Cab Co.*,
   338 U.S. 338 (1949) ................................................................................20

*Va. Uranium, Inc. v. Warren*,
   848 F.3d 590 (4th Cir. 2017) ..............................................................17

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*
   429 U.S. 252 (1977) ....................................................................... passim

*Wisconsin v. City of New York*,
   517 U.S. 1 (1996) ...................................................................................39

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) .................................................................33

## Statutes

13 U.S.C. § 141(f) .................................................................................3

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

42 U.S.C. § 1985 .................................................................................1

5 U.S.C § 701 .................................................................................1

5 U.S.C. § 702 .................................................................................1

5 U.S.C. § 704 .................................................................................1

United States Constitution, Amend. V ................................................1

United States Constitution, Art. I, §2, Cl. 3 .......................................1

## Rules

Fed. R. Civ. P. 52(a)(6).......................................................................19

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C § 701, and the United States Constitution, Art. I, §2, Cl. 3, and Amend. V.  The district court exercised subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and 5 U.S.C. §§ 702 and 704.  Plaintiffs filed a timely notice of cross-appeal on April 16, 2019.  This Court's appellate jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether the district court erred in denying Plaintiffs' equal protection claim under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## STATEMENT OF CASE AND FACTS

Plaintiffs challenge the inclusion of a citizenship question on the 2020 Census.  Plaintiffs in this appeal, *LUPE v. Ross*, No. 8:18-cv-1570-GJH (D. Md.), were consolidated in the district court with plaintiffs in *Kravitz v. Department of Commerce*, No. 8:18-cv-1041-GJH (D. Md.).  Plaintiffs' claims arose under the APA and the Enumeration and Due Process Clauses of the Constitution.  *LUPE* Plaintiffs also alleged a conspiracy to violate their civil rights under 42 U.S.C. § 1985.  Following trial, the district court ruled in favor of Plaintiffs on their claims under the APA and the Enumeration Clause, and denied Plaintiffs' claims under the Due Process Clause and 42 U.S.C. § 1985.  JA 2844.  The district court entered

1

its final judgment and its order enjoining the addition of the citizenship question on April 5, 2019. JA 2963. Defendants timely appealed, and the *LUPE* Plaintiffs timely cross-appealed. This briefing addresses only the *LUPE* Plaintiffs' equal protection claim under the Due Process Clause of the Fifth Amendment.

### A. Genesis of the Plan to Add the Citizenship Question

On March 26, 2018, Secretary Wilbur Ross issued a directive to the Census Bureau to add a citizenship question to the 2020 Census (the "Ross Memo"), a directive he claimed was prompted by a December 2017 request from the Department of Justice ("DOJ"). JA 2851. The district court made extensive findings as to the actual genesis of the plan to add the citizenship question, and the multiple individuals involved in the plan. The court found that the Secretary's interest in the question surfaced on March 10, 2017, a few weeks after his confirmation, when the Secretary and his Deputy Chief of Staff Earl Comstock exchanged emails regarding whether "undocumented residents" are "included in the apportionment population counts," and Comstock included the text of a Wall Street Journal article titled "The Pitfalls of Counting Illegal Immigrants." JA 2851-52. Indeed, very early in his tenure, the Secretary spoke with various "senior Administration officials" about adding the citizenship question. JA 2852. The following month, in April 2017, at the behest of then-White House Chief Strategist Steve Bannon, the Secretary spoke with Kansas Secretary of State Kris Kobach

2

about the "potential effect adding 'one simple question' to the Census would have on 'congressional apportionment.'" *Id.* The district court found that in April 2017, Comstock was also communicating with the Census point person for President Donald J. Trump's transition team and the Secretary's "trusted" advisor, A. Mark Neuman, about the congressional notification process to add the question. JA 2852, 2857.[1] Secretary Ross sent an email one week later insisting that the citizenship question issue be resolved, and in early May 2017 he complained to Comstock that he was "mystified why nothing [has] been done in response to my months old request that we include the citizenship question," and that "worst of all [the Census Bureau] emphasized that they have settled with congress on the questions to be asked."[2] JA 2853. Comstock responded that he would "work with Justice to get them to request" the addition of the citizenship question to the Census, and he and other Department of Commerce ("Commerce") staff immediately began to implement the plan and to search for a willing federal agency to make the request. JA 2853.

---

[1] Recently discovered evidence detailed in Plaintiffs' pending Rule 62.1 motion before the district court confirms that the Trump transition team was already pressuring Commerce to add the question. *See infra* Sec, D, Newly Discovered Evidence; JA 2968 (Rule 62.1 motion).

[2] Consistent with Census Act requirements, 13 U.S.C. § 141(f), Commerce timely transmitted to Congress in early April 2017 the five planned subjects for the 2020 Census: age, gender, race/ethnicity, relationship, and tenure (owner/renter). JA 2852-53. The report did not include citizenship. *Id.*

The district court made extensive findings regarding Comstock's subsequent meetings and conversations with agencies he hoped would agree to make the request, including the White House Liaison at DOJ, the head of DOJ's Executive Office of Immigration Review, and staff at the Department of Homeland Security ("DHS")—all of whom declined to participate in the plan.  JA 2853-60, 2875-76, 2951.  The district court's findings also include exchanges between the Secretary and other Commerce staff, and between Commerce and Census Bureau staff, echoing the concern that "illegal immigrants" are counted in the Census.  JA 2854-55.

By mid-July 2017, Kobach again implored the Secretary to add the question to address the "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  JA 2855.  Noting that his discussion about the citizenship question was "at the direction of Steve Bannon," Kobach contacted the Secretary a few days later, by email and by phone.  JA 2855-56.  By August, the Secretary told Comstock that he would call then-Attorney General Jeff Sessions personally.  JA 2856.  In response, Comstock emailed the Secretary that a memorandum and full briefing were being prepared on the citizenship question, and that "[s]ince the issue will go to the Supreme Court we need to be diligent in preparing the administrative record."  *Id*.  The Secretary admonished that the team "should be very careful, about everything, whether or

not it is likely to end up in the [Supreme Court]." *Id*. Further exchanges followed

between the Secretary and Commerce senior staff, until finally, "impatient with

[Commerce's] failed efforts, Secretary Ross implemented his earlier promise to

take the matter of inquiring whether DOJ would request inclusion of a citizenship

question into his own hands by involving Attorney General Jeff Sessions." JA

2856-57 (internal citation omitted). All of the calls to DOJ were initiated by

Commerce. JA 2858 n.9. At least one of several calls from the Secretary to

Sessions occurred on September 18, 2017. JA 2858. On November 27, 2017, the

Secretary wrote to his General Counsel, Peter Davidson, "We are out of time.

Please set up a call for me tomorrow with whoever is the responsible person at

Justice. We must have this resolved." JA 3792.

Finally, on December 12, 2017, the DOJ sent a letter to the Census Bureau

"requesting" that they add a question to the Census (the "DOJ Letter"). JA 2858,

3532 (DOJ Letter). In the letter, the DOJ stated that it needed a citizenship

question to collect citizenship data to better enforce the Voting Rights Act of 1965

("VRA"). JA 2859. The author of the letter, according to evidence discovered

during the district court proceedings, was then-acting Assistant Attorney General

John Gore, with input from Commerce.[3]  JA 2877-78; *see also infra* Sec. D, Newly

Discovered Evidence.

The district court further found that the Census Bureau was kept in the dark

about Commerce's plan until after Commerce maneuvered DOJ into officially

requesting the addition of the citizenship question.  *See* JA 2860.  Only after

receiving the DOJ Letter did the Census Bureau begin to evaluate the impact of a

citizenship question on the accuracy and cost of the 2020 Census.  *Id.*  The Census

Bureau "repeatedly, consistently, and unanimously recommended against adding a

citizenship question to the 2020 Census," and provided Commerce with

alternatives that would be more accurate, more efficient, and less costly.  JA 2860-

65.  The Census Bureau also unequivocally warned the Secretary and Commerce

that the addition of the citizenship question would harm Latinos and noncitizens.

JA 2886-88; *see also* JA 2889-90.

The Secretary ignored the Census Bureau's unanimous and consistent

warning that the addition of the citizenship question would lower response rates

and data quality, and he dismissed their insistence that there was a less costly,

more accurate method to collect citizenship data.  JA 2860-65.  DOJ was as

---

[3] Arthur Gary is the signatory of the letter, and is the same person who one year
earlier notified Commerce that DOJ had no need to amend the content of the
American Community Survey ("ACS"), which collects citizenship data used in
VRA enforcement actions, except to consider adding a new LGBT-related
question.  JA 2858.

uninterested in that solution as was the Secretary.  JA 2878-79.  Ten days after

formally receiving the DOJ Letter, Acting Census Bureau Director Ron Jarmin, per

standard practice, invited DOJ to discuss the Census Bureau's recommendation

that a linked file of administrative and survey data already in the possession of the

Census Bureau would more accurately and more cost effectively provide the data

DOJ requested.  JA 19, 2878-79.  The meeting between Census Bureau and DOJ

experts was cancelled at the direction of Sessions, who instructed his staff not to

attend—a move that was "very problematic" for DOJ, and one that Chief Scientist

for the Census Bureau, Dr. John Abowd, believed constituted problematic

"political influence[.]"  JA 2878-79.

The district court's findings confirm that despite the Census Bureau's

warnings, the Secretary and his staff nonetheless persisted.  JA 2865.  Kobach also

persisted, and sent yet another communication to the Secretary in February 2018,

repeating "his interest in including the question for 'election-related reasons'" and

"implying that undocumented immigrants are not 'residents' for purposes of

apportionment."  JA 2865-66.  The Census Bureau continued to caution against

adding the question, even if done in combination with the use of administrative

records, because this would be less accurate and more burdensome.  JA 2866.

On March 20, 2018, six days before the issuance of the Ross Memo, the

Secretary deliberately misled Congress about the true origin of and rationale for

the question.  *See* JA 2874-75, 2952 n.27; *see also* JA 5222 (video of testimony).

Although he acknowledged that he was aware of a Trump campaign email

advocating for the addition of a citizenship question,[4] the Secretary nonetheless

insisted that the Census Bureau's research into the topic was "solely" in response

to the DOJ Letter, and not at the direction of anyone at the White House.  *See id*.

Two days later, on March 22, 2018, the Secretary continued the ruse by testifying

again before Congress that DOJ "initiated" the process to add the citizenship

question.  JA 2875; JA 5273 (transcript of testimony).

Even after the lawsuits challenging the addition of the citizenship question

were filed in New York, California, and Maryland, as recently as April 2018, DOJ

and Commerce took pains to hide the fact that it was the Secretary who demanded

that DOJ make the request for the question, not the other way around.  A series of

talking points used by Sessions to prepare for *his* congressional testimony on the

topic of the Census begins with the following reminder: "**NOT PUBLIC**: In 2017,

[the Secretary] requested that [DOJ] send a letter requesting the addition of a

citizenship question on the 2020 Census."  JA 2879.  Sessions literally prepared

himself to conceal from Congress the steps the Secretary took to manufacture an

after-the-fact motive for adding the question.

---

[4] The district court found that before the Secretary issued the Ross Memo, the
Trump/Pence election campaign indirectly communicated that President Trump
wanted the citizenship question added to the Census.  JA 2874.

The district court further found that the Ross Memo itself misrepresents the origin of and rationale for the request to add a citizenship question because it attributes the initiation of the request and all that followed to the DOJ Letter.[5]  *See* JA2853-60 (section titled "Manufacturing DOJ's VRA Rationale").  The Ross Memo also incorrectly claims that the Census Bureau could not "document that the response rate would in fact decline materially," and that there will be no additional burden on respondents.  JA 2865-67, 2942-47.  The Ross Memo also directly contradicts evidence regarding the negative effect of the citizenship question on the Census Bureau's ability to match responses with administrative records, JA 2869-70, 2944-46, and falsely represents that the citizenship question was "well tested," *see* JA 2870.

Significantly, the district court found that this history "undermines the assertion that the requested data were of great importance to DOJ."  JA 2870.  The district court concluded that the "VRA rationale was a pretext, and the statements in the Ross Memo contradict the unanimous opinion of the Census Bureau that

---

[5] The Ross Memo further sets forth additional misrepresentations about the addition of the citizenship question and deviation from the normal, well-established process by including references to statements from a Nielsen executive that adding sensitive questions to short survey forms could be done "without any appreciable decrease in response rates." JA 2872.  Rather, the district court found evidence in the Administrative Record that Nielsen executives believe that "the reinstatement of a citizenship question could lead to a lower response rate [,]" and that they "*noted the importance of testing questions*." *Id.* at 30 (emphasis added).

DOJ's stated goal could be achieved through a superior alternative," and disregards the Bureau's warning that adding the question would "harm[] the overall quality of Census data and increas[e] costs and respondent burden."  JA 2851; *see also* JA 2951-54.

### B. Anti-Immigrant Statements By Officials

President Trump's campaign claimed that he "officially mandated" that the citizenship question be added.  JA 2884.  Regardless of whether the campaign statement is truthful or reflects a campaign simply trying to give the President a "win," the anti-immigrant political climate fueled by President Trump's statements was thriving during the relevant period.  The district court found that the "[t]rial Record [] includes several statements by candidate, President-elect, and President Trump demonstrating his animus toward immigrants," including "statements in tweets and other mediums that show President Trump is concerned by the political power that undocumented immigrants may wield."  JA 2884.  On May 21, 2018, the White House published an article on its website that used the term "animals" no less than ten times to describe individuals attempting to enter the country.  JA 6930.  Also, on May 25, 2016, President Trump tweeted, "The protestors in New Mexico were thugs who were flying the Mexican flag.  The rally inside was big and beautiful, but outside, criminals!"  JA 4669.  The trial record additionally confirms that on October 9, 2017, as discussions about the citizenship question

10

between Commerce and DOJ were ongoing, the Secretary issued a press release applauding Trump Administration priorities to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse and chain immigration." JA 6758. On November 27, 2016, President Trump tweeted, "[i]n addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally." JA 4671.

### C. The Secretary Was Not the Sole Decision-maker

The district court found that Plaintiffs "presented evidence that the President and Kobach harbored discriminatory animus towards non-citizens and evidence that the Secretary considered the impact of counting illegal immigrants in the Census, among other undisclosed issues." JA 2885. Based on evidence in the Administrative Record, the district court found that the Secretary consulted with and was influenced by others that sought to depress response rates among Latinos, immigrants of color, and those that live in households with or in close proximity to them. *See* JA 2865-74. Those who collaborated with him and others in the Commerce Department include Kobach, Trump transition team members, White House officials, Neuman, and Sessions, all of whom worked together to accomplish the goal of adding the question and misrepresenting the motivation. *Id.*; *see also* JA 2877.

11

### D. Newly Discovered Evidence

Currently pending before the district court in the *State of New York v. U.S. Dep't of Commerce (New York),* No. 18-CV-2921 (S.D.N.Y.), case and the district court in this case are motions based on the discovery of new evidence.[6]  This evidence confirms that a Republican strategist, Thomas Hofeller, urged the Trump transition team to add a citizenship question to the 2020 Census, based on his 2015 study concluding that adding the citizenship question would advantage Republican and non-Hispanic white voters.  JA 3066.  In his study, Hofeller detailed how adding a citizenship question to the 2020 Census would be necessary in order to switch from using total population to citizen voting age population ("CVAP") for redistricting.  Hofeller used Texas as a case study, and showed that the use of CVAP would in turn reduce the number of districts in South Texas, El Paso, and the Rio Grande Valley, and would eliminate five of the current thirty-five Latino majority House districts.  JA 3063-64.  Hofeller concluded that using CVAP would "be advantageous to Republicans and [n]on-Hispanic [w]hites," and that any such proposal would "provoke a high degree of resistance from Democrats and the major minority groups in the nation."  JA 3066.  The new evidence also shows that

---

[6] Plaintiffs in the *New York* case filed a motion for an order to show cause whether sanctions or other appropriate relief are warranted in light of new evidence that contradicts the sworn testimony of Neuman, advisor to Secretary Ross, and Gore, of the DOJ.  JA 3000-29.

Hofeller penned the paragraph of the draft letter that Neuman provided to Gore that asserted the pretextual VRA enforcement rationale.  JA 2991, 3125-26.

Neuman served as the point person for all issues related to the Census during the Presidential transition from 2016 to 2017, and went on to serve as a "trusted advisor" to Secretary Ross on Census issues. JA 2852, 2857.  This evidence is consistent with a March 29, 2019 interview given by Gore to the Congressional Committee on Oversight and Reform, where he first testified that Davidson referred him to Neuman, who provided to Gore, by hand-delivery, "a draft letter that would request reinstatement of the citizenship question on the census questionnaire."  JA 3115, 3118.

The newly revealed documents demonstrate that the addition of the question was in fact motivated by an explicit, racially discriminatory scheme to dilute the representation of Latinos and increase the over-representation of whites.  These documents dispel any "mystery" behind the Secretary's real purpose in orchestrating the VRA rationale, eliminate any doubt about the discriminatory purpose in adding the citizenship question, and directly connect that discriminatory purpose to the Secretary and Commerce, DOJ, Administration and transition team officials who conspired with Kobach to add the citizenship question to the 2020 Census.

13

## SUMMARY OF ARGUMENT

The district court erroneously denied Plaintiffs' equal protection claim because the court failed to engage in the totality of the circumstances analysis required by *Village of Arlington Heights v. Metropolitan Housing Development Corporation (Arlington Heights)*, 429 U.S. 252, 264-68 (1977). Instead, the district court summarily denied the claim for lack of direct evidence that the Secretary harbors discriminatory animus toward non-citizens and Hispanics. The district court's findings of fact wholly support a finding of intentional discrimination, but the district court failed to examine those findings within the *Arlington Heights* framework. Regardless of the Supreme Court's decision regarding the APA and the Enumeration Clause claims in the *New York* case, the summary treatment the district court accorded Plaintiffs' equal protection claim is reversible error.

That the district court erroneously required direct evidence of the Secretary's state of mind with regard to his racial animus is clear from the following findings of fact:

> At best, the Secretary ignored clear evidence that the citizenship question would harm the distributive accuracy of the Census *for some mysterious reason known only to him*. At worst, *the Secretary intended to negatively affect* the distributive accuracy of the Census by reducing immigrant response rates to the Census.
>     . . . .
>     . . . Outside of demonstrating that a citizenship question will disparately impact Hispanics, Plaintiffs have offered little, if any

14

evidence, *showing Secretary Ross harbors animus* towards Hispanics or that such animus impacted his decision.

. . . .

. . . Without more evidence demonstrating the Secretary was *actually persuaded* to make his decision *based on discriminatory animus*, a finding that, more likely than not, *the Secretary's real motivation* was to depress immigrant response rates cannot be made. *Ultimately, Secretary Ross's original rationale remains, to some extent, a mystery*.

JA 2955-56, 2959, 2885 (emphasis added).

It is not surprising that Plaintiffs were not able to provide direct evidence of whatever animus the Secretary harbored, or whether he shared the racial animus displayed by Trump and by others in his administration who prevailed upon him to add the question, given that Plaintiffs were barred from deposing the Secretary, Bannon, and Kobach. *LUPE v. Ross*, No. 18-CV-1570, Order, ECF 81 (Nov. 9, 2018); Order, ECF 97 (Dec. 28, 2018); *In re Dep't of Commerce,* 139 S. Ct. 16, 16-17 (2018).[7] However, this is precisely why *Arlington Heights* counsels for an intense examination of the procedural and substantive history of this issue: the

---

[7] In addition to the instant consolidated cases, the *New York* case consolidated the following cases for the purposes of discovery: *New York v. United States Department of Commerce*, 1:18-cv-02921-JMF (S.D.N.Y.); *New York Immigrant Coalition v. United States Department of Commerce*, No. 1:18-cv-05025-JMF (S.D.N.Y.); *California v. Ross*, No. 3:18-cv-01865-RS (N.D. Cal.); *City of San Jose v. Ross*, No. 5:18-cv-02279-RS (N.D. Cal.). *See New York v. United States Dep't of Commerce*, 1:18-cv-02921-JMF, Transcript of July 3, 2018 oral argument at 94 (S.D.N.Y. Jul. 20, 2018) (ECF No. 207, order consolidating discovery). The Supreme Court ultimately stayed the *New York* court's order allowing the Secretary's deposition. *In re Dep't of Commerce*, 139 S. Ct. 16, 16-17 (2018).

15

time frame, the persons involved and their relationship to the Secretary, and his

efforts to conceal the steps he took to fabricate a non-discriminatory motive for the

addition of the question.

In fact, direct evidence of racial animus held by governmental decision-

makers is *not* required to support a conclusion that the action taken nonetheless

violates equal protection constitutional guarantees.  This Court previously wrote:

> Our conclusion does not mean, and we do not suggest, that any
> member of the General Assembly *harbored racial hatred or animosity*
> toward any minority group.  But the totality of the circumstances—
> North Carolina's history of voting discrimination; the surge in African
> American voting; the legislature's knowledge that African Americans
> voting translated into support for one party; and the swift elimination
> of the tools African Americans had used to vote and imposition of a
> new barrier at the first opportunity to do so—*cumulatively and
> unmistakably reveal* that the General Assembly used SL 2013–381 to
> entrench itself.  It did so by targeting voters who, based on race, were
> unlikely to vote for the majority party.  Even if done for partisan ends,
> that constituted racial discrimination.

*North Carolina State Conference of NAACP v. McCrory* (*NAACP*), 831 F.3d 204,

233 (4th Cir. 2016) (emphasis added).  Here, like the North Carolina legislature

which acted knowing the impact their decision would have on African Americans,

Secretary Ross had before him the unequivocal findings of the Census Bureau that

the addition of the citizenship question would harm Latinos and noncitizens, and

nevertheless ordered the addition of the citizenship question.

The Supreme Court recognizes that when a court properly considers the

broader context surrounding a decision, here the addition of a citizenship question

16

to the 2020 Census, it does so in recognition that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also NAACP*, 831 F.3d at 221. Where the improper motive itself is the basis for the claim of intentional discrimination, this Court ascertains the "true motive" through an extensive analysis of pretext to determine whether a discriminatory motive was a factor in the action. *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 597-98 (4th Cir. 2017) (noting that actions arising under the Equal Protection Clause require a "more searching scrutiny" of intent to "avoid the 'circumventi[on] [of] a federally protected right.'"). Determining governmental motivation requires careful consideration in order to ensure that "a bare [] desire to harm a politically unpopular group" is not the basis for the decision." *U.S. v. Windsor*, 570 U.S. 744, 770 (2013).

The application of a totality of the circumstances analysis to the district court's factual findings leads inexorably to the conclusion that the addition of the citizenship question was executed for the purpose of depriving non-citizens and Latinos of political representation, and that the government has offered no alternative legitimate rationale. Consistent with *Arlington Heights* and *NAACP*, this Court must analyze, factor by factor, the abundant evidence in the record as reflected in the district court's findings of fact. That evidence demonstrates: 1)

17

that the addition of the citizenship question "bears more heavily" on non-citizens and Latinos; 2) that the historical background of the decision is rife with prevarication, manipulation, and suspect motives; 3) that there were significant departures from the "normal procedural sequence" that usually dictates when a new question may be added, including the refusal of the Secretary to take into account the unanimous recommendations of Census Bureau scientists, recommendations that are "usually considered important[;]" and, 4) that the "contemporary statements" by the Secretary and by other governmental actors who pressed Ross to move forward reflect discriminatory animus. *See Arlington Heights,* 429 U.S. at 266-68; *NAACP*, 831 F.3d at 220-21.  The district court's findings contain more than enough evidence of a discriminatory motive to shift the burden to the government to provide a non-discriminatory rationale for the citizenship question, *NAACP*, 831 F.3d at 221, a rationale that the district court already found does not exist anywhere in the record.

Upon a finding of a violation of the Equal Protection Clause of the Fifth Amendment to the Constitution, this Court should reverse the judgment of the district court, JA 2844, and enter an order enjoining the addition of the citizenship question to the 2020 Census.

18

# ARGUMENT

## I.    Standard of Review

Findings of fact "must not be set aside unless clearly erroneous."  Fed. R.

Civ. P. 52(a)(6); *NAACP*, 831 F.3d 204, 219-20.  "A finding is 'clearly erroneous'

when although there is evidence to support it, the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been

committed."  *U.S. v. Gypsum Co.*, 333 U.S. 364, 395 (1948).

A finding of whether or not an action was motivated by intentional

discrimination is a finding of fact.  *Cromartie*, 526 U.S. at 549.  An appellate court

may reverse a district court's ultimate finding regarding discriminatory motive if it

is clearly erroneous.  *See NAACP*, 831 F.3d at 223-27 (reversing district court's

failure to find discriminatory intent motivated state legislature's passage of

restrictive voting laws); *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 534, 537-

40 (1979) (affirming court of appeals' conclusion that district court's failure to find

the intentional operation of a dual school system was clearly erroneous).  A finding

on the question of intentional discrimination is clearly erroneous when, as here, the

district court reaches its finding by misapplying the applicable law or standard.

*Hunter v. Underwood*, 471 U.S. 222, 228-30 (1985) (affirming appellate court's

reversal of lower court's finding that state constitutional provision was not enacted

on basis of racial animus after district court failed to apply *Arlington Heights*).  In

such an instance, the district court's conclusion—as it is here—is not based on a choice between two permissible views of the weight of the evidence. *See United States v. Yellow Cab Co.,* 338 U.S. 338, 342 (1949). Rather, the district court made all the predicate findings to support the conclusion that Defendants were motivated by discriminatory intent, but failed to apply those findings to the applicable law as required by *Arlington Heights*. 429 U.S. at 266-68. This Court need not "duplicate the role of the lower court," *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573 (1985), to find that, based on the wealth of factual findings, there was no other conclusion to be drawn but that Defendants added the citizenship question for a racially discriminatory purpose. S*ee NAACP*, 831 F.3d at 238.

## II.    The District Court Failed to Undertake the Sensitive Inquiry into the Totality of the Circumstances, as Required Under Arlington Heights.

The Supreme Court in *Arlington Heights* provided a framework for examining the totality of the circumstances surrounding a governmental decision in order to determine whether racial discrimination motivated the action. 429 U.S. at 264-68. The Supreme Court has recognized that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Cromartie*, 526 U.S. at 553; *NAACP*, 831 F.3d at 221. Governmental actions that are not racially discriminatory on their face can nonetheless violate constitutionally guaranteed protections. *NAACP*, 831 F.3d at

220.

*Arlington Heights* identified a non-exhaustive list of factors that may constitute part of the mosaic of evidence that can give rise to an inference of discrimination: (1) disparate impact, *i.e.*, whether the action "bears more heavily on one race than another[;]" (2) the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes[;]" (3) "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures[,]" "particularly if the factors usually considered important . . . favor a decision contrary to the one reached[;]" and (4) "contemporary statements" by those deciding the issue. *Arlington Heights*, 429 U.S. at 266-68 (internal quotations and citations omitted).

In its reversal of the lower court in *NAACP*, the Fourth Circuit applied the *Arlington Heights* factors to enjoin provisions of a North Carolina election law after concluding that the district court erred when it failed to find the provisions racially discriminatory. *NAACP*, 831 F.3d at 223-38. The Fourth Circuit examined North Carolina's history of racial discrimination in voting, the specific sequence of events leading up to the passage of the law, the legislative history of the law, and the disproportionate impact of the law on African-American voters, finding that all of those factors weighed in favor of finding that the law was motivated by discriminatory intent. *Id*. A comparable *Arlington Heights* totality

21

of the circumstances analysis of the district court's factual findings similarly leads

to the conclusion that Defendants were motived to add the citizenship question by

their racially discriminatory desire to reduce Latino and non-U.S. citizen political

representation.

### A. *Arlington Heights* Factor 1: The District Court Findings Demonstrate That Plaintiffs Will Be Disparately Impacted by the Addition of a Citizenship Question to the 2020 Census.

The district court's extensive findings confirm that the "clear pattern" of

disparity that emerges from the impact of the citizenship question is of the kind

described in *Arlington Heights*, 429 U.S. at 266, and is sufficient to establish one

of the circumstances supporting a finding of discriminatory intent, *NAACP*, 831

F.3d at 231. Indeed, the district court acknowledged that Plaintiffs demonstrated

the impact necessary to support a finding of discriminatory intent. JA 2885 n.11,

2959.

Specifically, the district court's opinion finds "[o]verwhelming evidence. . .

that a citizenship question will cause a differential decline in Census participation

among noncitizen and Hispanic households." JA 2886. One basis for this finding

is the Census Bureau's own conservative estimate of a 5.8% differential decline in

self-response for non-citizen households. JA 2889-90. Additionally, based on

22

Plaintiffs' expert testimony,[8] the district court found that Hispanic self-response will decrease by 8.7%.  JA 2890-92.  The court further found that those non-response rates will lead to an undercount of non-citizens and Latinos of "at the very least" two percentage points.  JA 2892-903.  Importantly, the court found that the Census Bureau repeatedly advised the Secretary of the likelihood of disparate impact, advice which the Secretary deliberately ignored.  See JA 2860-74; 2955-56.

Finally, the court found that the effect of a differential undercount will injure Plaintiffs by causing "vote dilution due to intrastate congressional and state legislative redistricting," "malapportionment of congressional districts," and "will cause Plaintiffs' communities to lose out on federal funding."  JA 2904; *see also* JA 2904-21, 2928-34.

---

[8] The district court found that Plaintiffs met their burden to show that scope of its review should be based on the full trial record, which includes evidence outside of the Administrative Record, because the district court made a preliminary finding of bad faith.  JA 2941, 2958-59.  "It would be nearly impossible to smoke out discriminatory purpose if litigants and courts evaluating whether government actors have engaged in invidious discrimination cannot look beyond the record that those very decisionmakers may have carefully curated to exclude evidence of their true intent and purpose."  JA 2958 (citing *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 668 (S.D.N.Y. 2019)).

**B.** ***Arlington Heights*** **Factor 2: The District Court Findings Confirm that the Historical Background Leading to the Addition of the Citizenship Question Is Replete with Ulterior Motives, Connivance, Falsehood, and Secrecy.**

The "historical background" factor in the *Arlington Heights* inquiry "may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents." *Sylvia Dev. v. Calvert Cnty.,* 48 F.3d 810, 819 (4th Cir. 1995). In *NAACP* this Court reversed a district court finding that expressly recognized the long history of discrimination in North Carolina, but nonetheless ignored or minimized its relevance, and critically "failed to recognize [the] linkage" between race and party that translates "politics as usual into race-based discrimination." 831 F.3d at 223-25. The Court criticized the lower court's failure to contextualize the "powerful undercurrent influencing North Carolina politics," because those currents and their historical background are necessary considerations to properly understand the law's purpose. *Id.* at 226-27. *NAACP* establishes that *Arlington Heights* requires not just an intense examination of the history of the citizenship question and the anti-immigrant environment from which it emerged, but an understanding that such evidence is relevant to determining the motivation for the decision. The district court did not discuss this *Arlington Heights* factor in its cursory discussion of Plaintiffs' equal protection claim. *See* JA 2956-60. The district court's detailed findings glaringly illuminate the historical background and

24

political undercurrents—the district court's failure to apply its own findings to a totality of the circumstances analysis constitutes clear error.

First, the district court made extensive findings as to the actual genesis of the decision to add the citizenship question and the fact that it surfaced early in 2017 amidst emails concerning the inclusion of immigrants in the congressional apportionment base. *See supra* Sec. A.

Second, the findings show that the Secretary did not act alone. He was contacted multiple times by White House officials, a member of the Trump transition team, and Kobach, among others, about adding the question for congressional apportionment purposes, and the Secretary worked with these individuals to research the issue and to manufacture the pretextual VRA rationale for adding the citizenship question.[9]

Third, the district court's findings show that the Census Bureau conducted extensive analysis following receipt of the DOJ Letter, and "repeatedly, consistently, and unanimously recommended against adding a citizenship question to the 2020 Census," JA 2861, and warned Ross that the question would cause a disproportionate non-response rate among Latinos and non-citizens, JA 2864. The Census Bureau provided Commerce with less expensive and more accurate

---

[9] Newly discovered evidence recently filed in the Maryland and New York cases confirm both the orchestration of the plan to add the question and the discriminatory motive behind it. *See supra* Sec. D, Newly Discovered Evidence.

25

alternatives for collecting citizenship data.  JA 2863.  DOJ refused to meet with the
Census Bureau about the superior alternatives and Commerce proceeded with its
plan to add the question despite the alarms raised by the scientists at the Census
Bureau. *See infra* Sec. II.C.

Fourth, the district court found that the Secretary misled Congress about the
genesis of the question and the VRA rationale both during live testimony and in
the Ross Memo.  The Ross Memo falsely relied on the pretextual VRA rationale;
downplayed the departures from usual Census Bureau procedures, including
testing of new questions; misrepresented the Secretary's dealings with
stakeholders; and contradicted the Census Bureau's warnings about disparities in
response rates and more accurate and less expensive alternatives.  *See* JA 2851-85;
*see also* JA 3519-27.  This history, according to the district court, "undermines the
assertion that the requested data were of great importance to DOJ."  JA 2871.

All of the district court findings regarding the history of the citizenship
question decision are based on the Administrative Record alone.[10]  "Indeed, this

_____

[10] As a result of the district court's determination that Plaintiffs were entitled to
extra-record discovery, extra-record findings contain additional facts
"supplementing Administrative Record evidence that the Department of
Commerce manufactured the VRA rationale," supports the finding that "DOJ did
not need the data it requested," confirms that Sessions "personally decided" that
the DOJ would not meet with Census to pursue alternatives, gives context to the
Secretary's efforts to keep the Census Bureau in the dark about his plans, details
why non-compliance with pre-testing procedures was critical, and confirms that the

case presents the unusual instance in which the Administrative Record alone

provides more than sufficient evidence to demonstrate not only the invalidity of the

Secretary's announced decision on the conventional grounds set forth in APA §

706(2) but also the pretextual nature of the Secretary's stated reasons in his March

26 Memorandum announcing the decision." JA 2941. The district court's failure

to consider the historical context of the decision in an *Arlington Heights* analysis

was clear error.

### C. *Arlington Heights* Factor 3: The District Court Found that Defendants Departed, Procedurally and Substantively, From Past Practice.

*Arlington Heights* requires an examination of the "specific sequence of

events leading up to the challenged decision," with a critical eye toward

"[d]epartures from the normal procedural sequence," which may demonstrate "that

improper purposes are playing a role." 429 U.S. at 267.

In its examination of the route taken by legislators to pass election laws in

North Carolina, for example, this Court adopted district court findings that the bill

was rushed through the process to avoid in-depth scrutiny, that it was afforded far

less debate than was normally offered, and that it targeted African American

voters. *NAACP*, 831 F.3d at 227-29. Finding error in the district court's

---

Secretary looked at the issues of whether undocumented immigrants are counted in
the Census for apportionment purposes. JA 2874-85.

"accepting the State's efforts to cast this suspicious narrative in an innocuous light," the Court held that such departures, even as other procedural rules were adhered to, provided "another compelling piece of the [motivation] puzzle." *Id*. at 228-29.

The district court here found that the Census Bureau has a "well established" process for adding or changing the content on the Census. *See* JA 2871.[11] Had the procedure for adding a question to the decennial Census proceeded normally: first, there would have been a request by an agency for data; second, the Census Bureau would have considered the request and determined how to provide the most accurate data at the lowest cost that best fit the needs of the requesting agency; third, the question would have undergone extensive testing, and the Census Bureau would have made a recommendation to the Secretary of Commerce; and fourth, by March 28, 2017, the question would have then been included in the report, as mandated by the Census Act, to Congress on the subjects to be covered. In order to follow the "well-established" process, these steps would have been initiated early to mid-decade. Instead, as discussed below, none of these normal procedures

---

[11] The district court lays out the "well-established process" for adding content to the census to ensure compliance with legal and regulatory requirements established by Congress. JA 2871. The process involves, *inter alia*, extensive testing, review, and evaluation upon a federal agency identifying data needs requiring additions or changes to the current questions; these changes must demonstrate a clear statutory or regulatory need for data, and must go through extensive cognitive and field testing. *See* JA 2871-72.

were followed and what ensued was secrecy or prevarication by Commerce, DOJ, and Trump Administration officials and others.

First, under normal circumstances an agency would have requested necessary data collection from the Census Bureau, but, as the district court found, the "request" came not from an agency needing data, rather it came from events orchestrated by Commerce staff and coordination amongst Trump administration officials and advisors, including Bannon, Neuman, Kobach, Sessions, and the Secretary himself. *See* JA 2853-60 (section titled "Manufacturing DOJ's VRA Rationale").

Second, once notified, the Census Bureau followed proper procedure and considered the "request" to determine how best to meet it, including attempting to discuss the proposed solution with the requesting agency. But the Secretary ignored the Census Bureau's unanimous recommendation that the addition of the citizenship question would lower response rates and data quality, and that there was a less costly and more accurate method to collect citizenship data through administrative records. JA 2861-63. Moreover, ten days after formally receiving the DOJ request, Jarmin, per standard practice, invited DOJ to discuss the Census Bureau's recommendation that a linked file of administrative and survey data already in the possession of the Census Bureau would provide the data DOJ requested. *See* JA 2862, 2871. DOJ, at the direction of Sessions, cancelled this

29

meeting. *Id.* Sessions' refusal to meet with the Census Bureau was a move that was "very problematic" for DOJ, and one that Dr. Abowd believed constituted problematic "political influence." *See* JA 2878-79.

Third, as the district court found based on the Administrative Record alone, the citizenship question was not properly tested as required by the "well-established process," and the Ross Memo misrepresented that the question was well-tested. *See* JA 2870 (finding that "[b]y labeling the citizenship question 'well tested' while failing to acknowledge the evidence that the question does not perform adequately on the ACS and ignoring the differences between the ACS and the Census questionnaire, the Ross Memo downplayed deviations from Census Bureau procedure."); *see also* JA 2869-72.[12]

Fourth, instead of following the proper process to timely and truthfully report to Congress the plans to add a citizenship question, the Secretary first

_____

[12] Extra-record evidence not only corroborates that the "well established" process was not followed, but that Commerce officials attempted to alter the Administrative Record from including the "well established" process. *See* JA 2880. And extra-record evidence also shows that testing requirements from the "well established" process used for changes made or contemplated in the past were not followed either. *See* JA 2880.

missed the deadline, and then when he did finally report, misled Congress as to the genesis of the question.  *See* JA 2874.[13]

The departures from normal procedures, the rush to cut corners as demonstrated by the sequence of events leading up to the addition of the citizenship question, and the suspicious withholding of information regarding Defendants' initial motivation driving the addition of the citizenship question "provide[] another compelling piece of the puzzle" of Defendants' discriminatory motivation.  *NAACP,* 831 F.3d at 229.

### D. *Arlington Heights* Factor 4: The Record Contains Contemporary Statements by Those Involved in Ensuring that the Secretary Carried out the Administration's Intent to Discriminate Against Immigrants and Communities of Color.

*Arlington Heights* factor four considers evidence of "contemporary statements" by those deciding the issue.  429 U.S. at 268.  This Court recognizes that officials acting in their official capacities "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority" and that "it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this." *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982).  This Court

---

[13] Sessions prepared himself for his congressional testimony with an internal memo reminding him to conceal from Congress the steps the Secretary took to manufacture an after-the-fact motive for adding the question. *See* JA 2879.

also considers statements from other party leaders—not just those that officially ordered the challenged actions—as "evidence of the racial and partisan political environment" in which the challenged action was taken. *NAACP*, 831 F.3d 204, 229 n.7 (4th Cir. 2016) (considering "the sheer outrageousness" of public statements made by other party leaders).

The district court findings here confirm that there were multiple officials in contact with Commerce who made statements indicating they were interested in adding the citizenship question to the Census as a vehicle for affecting congressional reapportionment. *See* JA 2851-85. When multiple officials influence a final decision, the relevant inquiry is whether the decision was "tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997), *superseded on other grounds by rule as stated in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).[14]

---

[14] *See also Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (holding that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018) (granting plaintiff's motion for a preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decision making process.") (citation and internal quotation marks omitted); *see also Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 393, 415 n.3 (D. Mass. 2018) (explaining that

32

In addition, the district court found that the trial record contains several vituperative statements by President Trump demonstrating his racial animus toward Latinos, and that he is particularly concerned with the political power of undocumented immigrants and obsessed with purported noncitizen voting.  Indeed, the district court found evidence that both the President and Kobach harbored discriminatory animus towards non-citizens, and evidence that the Secretary considered the impact of counting illegal immigrants in the Census.  JA 2885.

The President's statements properly contribute to the *Arlington Heights* inquiry and raise an inference of discriminatory motive for related actions by the head of Commerce.  *New York v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 810 (S.D.N.Y. 2018) (finding that President Trump's discriminatory statements "help to nudge [plaintiffs'] claim of intentional discrimination across the line from conceivable to plausible") (citing *Batalla Vidal*, 291 F. Supp. 3d at 279).  The President's statements are particularly relevant because he chooses, directs, and demands loyalty from his Cabinet, and if taken at his word, he "mandated" the addition of the citizenship question.  JA 4400, 4403-04.

In *CASA de Maryland, Inc. v. Trump*, Defendants "contend[ed] that the Secretary was the decision-maker, not the President, and that the Secretary's

---

although the cat's paw principle originates in the employment discrimination context, "nothing in the reasoning of those opinions makes them inapplicable in a constitutional context").

33

decision did not involve classification of a group . . . on the basis of their individual characteristics."  355 F. Supp. 3d 307, 326 (D. Md. 2018).  The district court rejected this argument, noting that "[a]n action is not cured of discriminatory taint because it is taken by an unprejudiced decision-maker who is manipulated or controlled by another who is motivated by discriminatory intent" and "there can be no doubt that if, as alleged, the President influenced the [Secretary's] decision . . . the discriminatory motivation cannot be laundered through the Secretary."  *Id*. at 325-26.

Moreover, several courts have recently recognized that "there is evidence that President Trump harbors an animus against nonwhite, non-European aliens which influenced" his decision to revoke protected status from individuals from Haiti, Sudan, El Salvador, and Nicaragua.  *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1100 (N.D. Cal. 2018); *see also CASA de Maryland, Inc.*, 355 F. Supp. 3d at 325 (finding that "[o]ne could hardly find more direct evidence of discriminatory intent towards Latino immigrants.").[15]

---

[15] Several courts have recently applied these principles to situations in which President Trump or his advisors influenced other government officials in making decisions, such as revoking protections from Deferred Action for Childhood Arrivals ("DACA") recipients and temporary protected status from residents of certain Central American, Caribbean, and African nations.  *See Batalla Vidal*, 291 F. Supp. 3d at 279 (holding in DACA-rescission case that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos*, 336 F. Supp. 3d at

The district court's findings include statements of government officials advocating for the addition of the citizenship question in order to affect congressional reapportionment and redistricting, and alarm that "undocumented immigrants" were included in the Census, as well as findings that President Trump and others made statements indicating they harbor racial animus. Those findings are evidence raising an inference of discriminatory motive under *Arlington Heights'* fourth factor.

**III.  The District Court Failed to Properly Take Into Account the Complete Absence of a Non-Discriminatory Rationale for the Addition of the Citizenship Question under *Arlington Heights*.**

Because the district court failed to engage in a totality of the circumstances analysis under *Arlington Heights,* the court did not reach the next stage of the equal protection analysis. Once the totality of the circumstances analysis establishes that race was at least one of the motivating factors behind a governmental act, the burden shifts to Defendants to "demonstrate that the law would have been enacted without this factor." *NAACP*, 831 F.3d at 233 (citing *Hunter,* 471 U.S. at 228 and *Arlington Heights*, 429 U.S. at 265-66). Crucial to this step of the analysis is the Supreme Court's admonition that "judicial deference" to the government's stated

---

1098 (granting plaintiffs' motion for a preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not 'personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process.'") (citation omitted).

justifications "is no longer justified." *Id*. at 221.

However, in this case there can be no scrutiny of the "actual non-racial motivations" because the "only reason provided" was pretextual, and manufactured "to rationalize a decision that that already been made for other reasons." JA 2954-55. The district court found that "because the VRA enforcement rationale did not actually motivate the Secretary's decision, the Secretary has failed to 'disclose the basis of' his decision." *Id.* at 108.

The district court's findings regarding the government's failure to provide an actual non-pretextual reason for its actions contributed to the court's conclusions that the government violated the APA and the Enumeration Clause. *Id*. at 108, 111-12. In contrast, with regard to Plaintiffs' intentional discrimination claim, the absence of any non-pretextual rationale only led the court to muse that "discriminatory animus may well be the most likely explanation[.]" *Id.* at 116.

Based on the entirety of the record, there is no other rationale for the Court to scrutinize that is actual or truthful, let alone a rationale that is non-discriminatory. What remains is the conclusion that the totality of circumstances—supported by evidence under each of the *Arlington Heights* factors—cumulatively reveal that the motivation for the addition of the citizenship question was racial discrimination. *See NAACP*, 831 F.3d at 233.

36

**IV. Invalidation Without Remand to the District Court is the Proper Remedy; This Court May Enjoin the Addition of a Citizenship Question to the 2020 Decennial Census.**

"[I]f 'the record permits only one resolution of the factual issue' of discriminatory purpose, then an appellate court need not remand the case to the district court." *Id.* at 219-20 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)); *see Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (reversing, without remanding, three-judge court's factual finding that racial considerations predominated in the drawing of the challenged redistricting plan); *Hunter*, 471 U.S. at 229-30, 233 (affirming appellate court reversal without remand where district court's finding of no discriminatory purpose was clearly erroneous); *Brinkman v. Gillian*, 583 F.2d 243, 258 (6th Cir. 1978) (reversing district court's finding of no intentional discrimination with remand only to enter remedy order), *affirmed by Dayton Bd. of Educ.*, 443 U.S. at 534, 542. If, as the evidence shows, the genesis of the citizenship question was discriminatory, then the question has no legitimacy under the Constitution and this Court should invalidate the question and enjoin Defendants from adding the question to the census. *NAACP*, 831 F.3d at 239, 241 (citing *City of Richmond v. United States,* 422 U.S. 358, 378-79 (1975)).

The district court has already enjoined the government from adding the citizenship question based on violations of the APA and the Enumeration Clause. JA 2960-61. The *New York* court also enjoined the addition of the citizenship

37

question based on a violation of the APA, *New York* , 351 F. Supp. 3d at 675-78,

and that order is now pending before the Supreme Court, where the Supreme Court

heard argument on the APA and the Enumeration Clause claims.[16]  Grant of Cert.,

*Dep't of Commerce v. New York*, No. 18-966 (U.S. Feb. 15, 2019); Order, *Dep't of*

*Commerce v. New York*, No. 18-966 (U.S. Mar. 15, 2019) (order directing parties

to brief Enumeration Clause issue).  If the Supreme Court vacates the injunction

entered in the *New York* case, Defendants will no doubt petition this Court to do

the same with regard to the district court's injunction.

Defendants argue that the Supreme Court's decision will likely be

dispositive of this appeal.  Defs.' Resp. in Opp'n to Pls.' Mot. to Expedite, ECF 21

at 7.  However, even if the Supreme Court rules that the addition of the citizenship

question violated neither the APA nor the Enumeration Clause, and even if its

holding precludes any other outcome for those claims in this case, such a holding

would not automatically dictate the outcome of Plaintiffs' Fifth Amendment claim.

For example, should the Supreme Court rule for Defendants on the "deferential"

---

[16] The California court enjoined the addition of the citizenship question on the basis of the Enumeration Clause claim, explaining that Defendants are "enjoined from including the citizenship question on the 2020 Census, regardless of any technical compliance with the APA."  *California v. Ross,* 358 F. Supp. 3d 965, 1050-51 (N.D. Cal. 2019).  In light of this finding, the petitioners in the New York case asked the Supreme Court to address the Enumeration Clause claim. Letter of Pet'rs' Updating Court on Related Case Filed, *Dep't of Commerce v. New York*, No. 18-966 (U.S. Mar. 11, 2019). The Supreme Court ordered briefing on this claim on March 15, 2019.

standard of review under the APA, *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007), it need not reach the level of scrutiny required here.  Because "racial discrimination is not just another competing consideration," a court must do much more than review the proffered rationale for "arbitrariness or irrationality."  *Arlington Heights*, 429 U.S. at 265-66.  Deference of the kind afforded under the APA is unwarranted because a finding that Defendants' justifications are rational "is a far cry from a finding that a particular law would have been enacted without considerations of race."  *NAACP* 831 F.3d at 234.

For the same reasons, a Supreme Court ruling that there was no violation of the Enumeration Clause will not preclude review of Plaintiffs' Fifth Amendment claim.  Compliance with the Enumeration Clause requires that the Secretary's execution of the 2020 decennial Census "need bear only a reasonable relationship to the accomplishment of an actual enumeration[.]"  *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996).  Such a finding would not preclude a conclusion based on the *Arlington Heights* factors, most of which are not relevant to an Enumeration Clause inquiry, that the decision to include a citizenship question on the decennial Census was born out of improper discriminatory motives.  Indeed, discrimination need not be the sole or even the primary motive for the addition of the question in order to find for Plaintiffs.  *NAACP*, 831 F.3d at 220 (citing *Arlington Heights*, 429 U.S. at 265-66).

This Court has the equitable power to enter an order invalidating the addition of the citizenship question without remand to the district court, and the Court need only remand for entry of an order enjoining the addition of the citizenship question to the decennial census. *NAACP*, 831 F.3d at 239.

## CONCLUSION

For the reasons set forth above, Plaintiffs request that this Court reverse the judgment of the district court with respect to Plaintiffs' claim under the Due Process Clause, invalidate the addition of the citizenship question, and enjoin its inclusion in the 2020 Census.

## REQUEST FOR ORAL ARGUMENT

*LUPE* Plaintiffs respectfully request that this Court hear oral argument in this case. Given the complexity and record-intensive nature of this appeal, and the importance of the issue to be decided, oral argument would assist the Court's consideration of the appeal.

Dated: June 5, 2019                    By /s/ Andrea Senteno

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430 )
Denise Hulett* (CA Bar No. 121553)
Andrea Senteno* (NY Bar No. 5285341)
Burth G. Lopez* (MD Bar No. 20461)
Tanya Pellegrini (CA Bar No. 285169)
Julia A. Gomez (CA Bar No. 316270)
1016 16th Street NW, Suite 100
Washington, DC 20036

Phone: (202) 293-2828
Facsimile: (202) 293-2849

ASIAN AMERICANS ADVANCING
JUSTICE | AAJC
John C. Yang* (IL Bar No. 6210478)
Niyati Shah*° (NJ Bar No. 026622005)
Terry Ao Minnis (MD Bar No. 0212170024)
Eri Andriola (NY Bar No. 5510805)
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318

*° Admitted in New Jersey and New York
only.  DC practice limited to federal courts.*

*Admitted to the Fourth Circuit Court of
Appeals*

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Rules 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned counsel for appellees certifies that the accompanying brief is printed in 14-point Times New Roman typeface, with serifs, and, including footnotes, contains no more than 13,000 words. According to the word-processing system used to prepare the brief, Microsoft Word, it contains 9,419 words.

Date: June 5, 2019                          /s/ Andrea Senteno

                                            Andrea Senteno
                                            **MEXICAN AMERICAN LEGAL
                                            DEFENSE AND EDUCATIONAL FUND**
                                            1016 16th Street NW, Suite 100
                                            Washington, DC 20036
                                            Phone: (202) 293-2828
                                            asenteno@maldef.org

                                            *Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2019, the foregoing Plaintiffs-Appellees'

Opening Brief was served on all parties or their counsel of record through the

CM/ECF system if they are registered users.

Date:  June 5, 2019                    /s/ Andrea Senteno

Andrea Senteno
**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
asenteno@maldef.org

*Counsel for Plaintiffs-Appellees*