No. 19-1425

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

LA UNION DEL PUEBLO ENTERO, *et al.*,

Plaintiffs-Appellants,

v.

WILBUR L. ROSS, *et al.*,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Maryland

---

## BRIEF FOR DEFENDANTS-APPELLEES

---

*Of Counsel:*

PETER B. DAVIDSON
*General Counsel*

DAVID DEWHIRST
*Deputy General Counsel*

*Department of Commerce*

JOSEPH H. HUNT
   *Assistant Attorney General*

HASHIM M. MOOPPAN
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
GERARD SINZDAK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7242*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-0718*

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUE ..........................................................................1

PERTINENT STATUTES AND REGULATIONS ...........................................1

STATEMENT OF THE CASE ...........................................................................1

    A.   Background .............................................................................................1

    B.   Reinstatement Of A Citizenship Question ............................................5

    C.   Procedural Background..........................................................................9

SUMMARY OF ARGUMENT ......................................................................... 13

STANDARD OF REVIEW ............................................................................... 18

ARGUMENT ..................................................................................................... 19

    THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS'
    EQUAL PROTECTION CLAIM ................................................................ 19

    A.   The Secretary's Decision Was Rational And Based On
         Legitimate Policy Considerations .................................................21

    B.   An Analysis Of The *Arlington Heights* Factors Does Not Support
         A Finding That The Secretary Acted With A Discriminatory
         Motive ...........................................................................................23

         1.   Any disparate impact the citizenship question will have on
             Hispanic and noncitizen participation in the census is not
             probative of discriminatory motive ...................................24

         2.   The historical background of the citizenship question
             weighs heavily against a finding of discriminatory motive ...........27

3.   The process through which the Secretary arrived at his
     decision does not support a finding of discriminatory intent ........3

4.   There are no relevant contemporaneous comments that
     would support a finding that the Secretary was motivated
     by discriminatory animus ...................................................................39

5.   The Secretary's stated reason for reinstating a citizenship
     question was not a pretext for discrimination ................................43

6.   Plaintiffs' "newly discovered" evidence has no bearing on
     this appeal and is in any event frivolous ...........................................48

CONCLUSION ......................................................................................................... 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                      <u>**Page(s)**</u>

*Alexander v. Modrak,*
  2 F. App'x 298 (4th Cir. 2001) .........................................................................49

*Batalla Vidal v. Nielsen,*
  291 F. Supp. 3d 260 (E.D.N.Y. 2018) ............................................................43

*California v. Ross,*
  358 F. Supp. 3d 965 (N.D. Cal. 2019) ......................................................10, 11

*Camp v. Pitts,*
  411 U.S. 138 (1973) ........................................................................................19

*CASA de Maryland, Inc. v. Trump,*
  355 F. Supp. 3d 307 (D. Md. 2018) ................................................................43

*In re Department of Commerce,*
  139 S. Ct. 16 (2018) ................................................................16, 35, 37, 46

*Evenwel v. Abbott,*
  136 S. Ct. 1120 (2016) ....................................................................................45

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ........................................................................................18

*Harkness v. Secretary of Navy,*
  858 F.3d 437 (6th Cir. 2017) ..........................................................................18

*Jagers v. Federal Crop Ins. Corp.,*
  758 F.3d 1179 (10th Cir. 2014) ......................................................................47

*La Union del Pueblo Entero v. Ross,*
  353 F. Supp. 3d 381 (D. Md. 2018) ................................................................43

*Lee v. Virginia State Bd. of Elections,*
  843 F.3d 592 (4th Cir. 2016) ....................................................................18, 28

iii

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ................................................................20

*Montalvo v. Radcliffe*,
  167 F.3d 873 (4th Cir. 1999) .................................................49

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) ...............................................25

*New York v. U.S. Dep't of Commerce*:
  315 F. Supp. 3d 766 (S.D.N.Y. 2018)................................. 2, 43
  351 F. Supp. 3d 502 (S.D.N.Y. 2019)...............10, 12, 13, 21, 36, 39, 40, 41, 42, 44

*North Carolina State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) .........................................28, 29, 30

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S 256 (1979) ..........................................................20, 26

*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................ 42, 43

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ...........................................................29

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ...............................................31

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ...........................................................44

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011) ...........................................................41

*Sylvia Dev. Corp. v. Calvert County*,
  48 F.3d 810 (4th Cir. 1995) ................................ 20, 24, 27, 30, 33, 39

*United States v. Armstrong*,
  517 U.S. 456 (1996) ...........................................................35

iv

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................14, 16, 19, 20, 24

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..............................................................................................23

*Washington v. Davis*,
   426 U.S. 229 (1976) ..............................................................................................23

*Wisconsin v. City of New York*,
   517 U.S. 1 (1996) ...................................................................................................33

**U.S. Constitution:**

Art. I, § 2, cl. 3 .........................................................................................................2

**Statutes:**

Administrative Procedure Act:
   5 U.S.C. § 702 ...........................................................................................................1
   5 U.S.C. § 706(2)(B) ..............................................................................................18

13 U.S.C. § 9(a) ..........................................................................................................2

13 U.S.C. § 141 .......................................................................................................41

13 U.S.C. § 141(a) ....................................................................................................2

13 U.S.C. § 221 .........................................................................................................2

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 .......................................................................................................1

28 U.S.C. § 1343 .......................................................................................................1

42 U.S.C. § 1985 .......................................................................................................1

**Other Authorities:**

83 Fed. Reg. 26,643 (June 8, 2018) ............................................................4

Final Census Residence Criteria and Residence Situations,
  83 Fed. Reg. 5525 (Feb. 8, 2018) .....................................................32

U.S. Census 2000 Form D-2,
  https://www.census.gov/history/pdf/2000_long_form.pdf ...................... 38

2018 WLNR 8815056 (Mar. 21, 2018) ............................................... 36

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343, raising claims under the Constitution, the Administrative Procedure Act (APA), 5 U.S.C. § 702, and 42 U.S.C. § 1985. JA 223. On April 5, 2019, after a trial, the district court entered a final judgment: it granted a permanent injunction in plaintiffs' favor on plaintiffs' Enumeration Clause and APA claims, and it denied relief on plaintiffs' equal protection and § 1985 claims. JA 2963-64. On April 8, 2019, the government filed a timely notice of appeal. JA 2965. On April 16, 2019, plaintiffs filed a cross-appeal. JA 2966. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court committed reversible error in making a factual finding that plaintiffs failed to establish by a preponderance of the evidence that Commerce Secretary Wilbur Ross's decision to reinstate a citizenship question on the 2020 Census was based on discriminatory animus towards Hispanics or noncitizens.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Background

**1.** The Constitution requires that an "actual Enumeration" of the population be conducted every ten years in order to allocate representatives in Congress among the States, and vests Congress with the authority to conduct that census "in such

Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3. The Census Act

delegates to the Secretary of Commerce the responsibility to conduct the census "in

such form and content as he may determine," and "authorize[s] [him] to obtain such

other census information as necessary." 13 U.S.C. § 141(a). Individuals who receive

the census questionnaire are required by law to answer fully and truthfully all of the

questions, and the government must keep individual answers confidential. *Id.* §§ 9(a),

221.

    **2.** The federal government has always used the census to collect demographic

and other information about the populace. JA 356. The very first census, for

example, sought information about the "sexes and colours of free persons" and

respondents' ages. *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 776

(S.D.N.Y. 2018). All subsequent censuses have likewise included a number of

demographic questions. *Id.* at 776-79. Beginning with the 1960 census, the Bureau

began asking a full suite of demographic questions of only a sample of the population,

while continuing to ask a more limited set of questions of the remainder. *Id.* at 777-

78. Between 1970 and 2000, the Census Bureau distributed a detailed "long form"

questionnaire to approximately one in six households. *Id.* at 778. The remaining

households received a "short-form" with fewer questions. *Id.* The 2000 short-form

census, for example, included eight questions, while the long form included more than

fifty. JA 3521. Beginning in 2005, the Bureau began collecting the more extensive

long-form data through the American Community Survey (ACS), which is sent yearly

to about 3.5 million households.  JA 357.  Replacing the long-form questionnaire with the yearly ACS enabled the 2010 census to be a "short-form-only" census.  JA 357.  The 2020 Census will also be a "short-form-only" census.  As in past years, the 2020 Census questionnaire will pose a number of questions beyond the total number of individuals residing at a location, including questions regarding sex, race, and relationship status.  JA 3329-40.

With the exception of 1840, the decennial censuses from 1820 to 1880 asked for citizenship or birthplace in some form, and the censuses from 1890 through 1950 specifically requested citizenship information of all respondents.  JA 356.  Citizenship-related questions continued to be asked of a substantial portion of the population after the 1950 Census.  JA 357.  In 1960, the Census Bureau asked 25% of the population where they and their parents were born.  From 1970 to 2000, the long-form questionnaire included questions about the respondent's citizenship or birthplace.  *Id.*  The annually distributed ACS includes a citizenship question, as it always has.  *Id.*

Because the ACS collects information from only a sample of the population, it produces data only for "census tracts" and "census block groups."  JA 3483.  The census attempts a full count of the population and produces population counts as well as counts of other information (such as race) down to the smallest level, known as the "census block."  JA 3483.

**3.** The Census Bureau has numerous procedures in place to ensure that the information collected through the census is as complete as possible. In 2020, each household will receive up to six mailings, instructing them to respond to the census online, by telephone, or by paper questionnaire. 83 Fed. Reg. 26,643, 26,645-46 (June 8, 2018). The Census Bureau anticipates that the majority of households will self-respond through one of these methods. *Id.*

In those cases where the Census Bureau does not receive a response, the Bureau will initiate its multi-step "Non Response Follow Up" (NRFU) procedures. JA 2849. First, a census enumerator will personally visit the nonresponding household and, if possible, conduct the census survey face-to-face. *Id.* If the enumerator is unsuccessful, the Census Bureau will (for the first time in 2020) consult administrative records—*i.e.*, data from other federal agencies—to assess whether the housing unit is occupied and to assign response data for occupied households for which high-quality records are available. *Id.* If the household cannot be enumerated through administrative records, an enumerator will return to the household at least twice more. *Id.* After three unsuccessful attempts to contact a household in person, the enumerator will attempt to gather information about the household through a proxy, such as a neighbor. *Id.* If the above steps have not resulted in a successful enumeration, the Census Bureau will "impute" information about the household from data collected on other area households. *Id.*

The Census Bureau will also conduct extensive outreach efforts, including public advertising campaigns in foreign languages that are designed to reach hard-to-count populations and that stress the confidentiality of responses and the statutory prohibition against sharing those responses with any agency.  JA 1469-70.  Those efforts will also include partnerships with community organizations and state and local governments, deployment of field staff with foreign language skills, and the printing of census forms in numerous languages.  JA 1470.

### B.    Reinstatement Of A Citizenship Question

On March 26, 2018, the Secretary of Commerce issued a memorandum announcing the reinstatement of a citizenship question on the 2020 Census.  JA 3519-26.  The Secretary's reasoning is set out in that memorandum and in a supplemental memorandum issued on June 21, 2018.  JA 3527.  The Secretary explained that, "[s]oon after [his] appointment," he "began considering various fundamental issues" regarding the 2020 Census, including whether to reinstate a citizenship question.  *Id.*  As part of the Secretary's deliberative process, he and his staff "consulted with Federal governmental components and inquired whether the Department of Justice would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act."  *Id.*

In a December 12, 2017 letter (the Gary Letter), the Justice Department responded that more granular, block-level citizenship data "would greatly assist" the Department's enforcement of the Voting Rights Act (VRA) and that "the decennial

census questionnaire is the most appropriate vehicle for collecting that data" for at

least four reasons. JA 3419-21. First, the Department "already use[s] the total

population data from the census" in redistricting efforts, so using estimated

citizenship data from the ACS surveys "means relying on two different data sets, the

scope and level of detail of which vary quite significantly." JA 3420. Second, ACS

estimates "do not align in time with the decennial census data." JA 3421. Third, the

margin of error for ACS "increases as the sample size—and, thus, the geographic

area—decreases." *Id.* Fourth, the decennial census questionnaire would provide

more granular citizenship voting age population (CVAP) data than the ACS surveys—

down to the smallest "census block" level. *Id.* For these reasons, the Department

"formally request[ed] that the Census Bureau reinstate into the 2020 Census a

question regarding citizenship." *Id.*

      After receiving the Department of Justice's formal request, the Secretary asked

the Census Bureau to evaluate the best means of providing the data identified in the

letter. JA 3519. The Bureau initially presented three alternatives: do nothing; reinstate

a citizenship question on the census; and rely on federal administrative records to

estimate citizenship data in lieu of reinstating a citizenship question. JA 3520-22. The

Bureau recommended the third option. JA 3483.

      After reviewing the Bureau's analysis and discussing it with the Bureau and

others, the Secretary asked the Bureau to consider a fourth option: using both a

citizenship question and federal administrative records. JA 3522. Again, the Bureau

recommended relying solely on administrative records. JA 3518. The Secretary ultimately disagreed with that recommendation. JA 3523. The Secretary recognized the potential value of using administrative records, but noted that the Census Bureau's use of such records was "still evolving," and the Bureau did "not yet have a complete administrative records data set for the entire population." JA 3522. In that regard, the Secretary noted that available administrative records lacked citizenship information for more than ten percent of the population. *Id.*

The Secretary then determined that asking a citizenship question and supplementing that information with administrative records would provide more complete and accurate citizenship information than would using administrative records alone, as it would enable the Bureau to collect citizenship information directly from many individuals for whom administrative records data are unavailable. JA 3521. Asking a question would also, the Secretary noted, allow the Census Bureau to evaluate the accuracy of administrative records and self-responses by comparing the two. JA 3523. Therefore, the Secretary concluded that his proposed fourth option was the best alternative for providing the Justice Department with the information it requested. *Id.*

The Secretary also observed that collection of citizenship data in the decennial census has a long history and the ACS has included a citizenship question since 2005. JA 3520. And because the question appearing on the 2020 Census will be identical to the question appearing on the ACS, the Secretary found, and the Census Bureau

confirmed, that "the citizenship question has been well tested." *Id.* He further confirmed with the Census Bureau that census-block-level citizenship data are not available from the ACS. *Id.*

The Secretary also considered concerns that reinstating a citizenship question would reduce the response rate of noncitizens. JA 3521-24. While the Secretary agreed that a "significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up operations," and acknowledged that the Census Bureau estimated that response rates would decline for certain populations, he concluded that the available evidence, including the Bureau's analysis, did not provide "definitive, empirical support" with respect to the magnitude of any potential reduction. JA 3521-22. He noted, for instance, that, although the Bureau based its conclusion that response rates would decline in part on a comparison of response rates for the 2000 long-form census (which included a citizenship question) and the 2000 short-form census (which did not), the Bureau could not determine what percentage of the decline in response rates for the long-form was due to the inclusion of a citizenship question as opposed to other factors, such as the long form's much greater length. JA 3522. The Bureau's comparison of response rates between the short-form census and the much longer and less well-publicized ACS was similarly problematic. JA 3521. The Secretary further emphasized that, because "[c]ompleting and returning decennial census questionnaires is required by Federal law," concerns about lower response rates were

premised on speculation that some will "violat[e] their legal duty to respond." JA 3525.

In any event, the Secretary ultimately made the judgment as a matter of policy that, "even if there is some impact on responses, the value of more complete and accurate [citizenship] data derived from surveying the entire population outweighs such concerns." JA 3525; *see id.* (the benefits derived from asking a question were "of greater importance than any adverse effect that may result from people violating their legal duty to respond").

## C.    Procedural Background

**1.** Plaintiffs are nonprofit organizations and individuals. They allege that the Secretary's decision violated the Enumeration Clause and the Census Act, is arbitrary and capricious under the Administrative Procedure Act, and denies equal protection by discriminating against noncitizens and racial minorities. Their claims rest on the premise that adding a citizenship question will reduce the self-response rate to the census among households containing noncitizens and/or Hispanics because, notwithstanding the legal duty to answer the census, some members of these households may be deterred from doing so. Plaintiffs allege that this anticipated decline in response rates will result in an undercount of noncitizens and Hispanics, which will, in turn, reduce plaintiffs' political representation, cause them to lose federal funding, deprive them of accurate census data, and require them to expend resources.

Other plaintiffs filed challenges to the Secretary's decision in the Southern District of New York and the Northern District of California, collectively raising claims identical to those plaintiffs raise here. *See New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (S.D.N.Y); *New York Immigration Coal. v. U.S. Department of Commerce*, No. 18-cv-5025 (S.D.N.Y.); *California v. Ross*, No. 18-cv-1865 (N.D. Cal.); *City of San Jose v. Ross*, No. 18-cv-2279 (N.D. Cal.).

On January 15, 2019, the district court in the New York cases entered a permanent injunction barring the Secretary from including a citizenship question on the 2020 Census. The court concluded that the Secretary's decision violated the Census Act and the Administrative Procedure Act, but rejected plaintiffs' claims that the decision violated the Enumeration Clause or equal protection. *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 529, 635-71 (S.D.N.Y. 2019).

In light of the June 2019 deadline for the finalizing the census questionnaire, the government petitioned for certiorari before judgment from the district court's decision shortly after it was issued and also moved the Supreme Court to expedite briefing and oral argument. *See* Motion to Expedite, *Department of Commerce v. State of New York*, No. 18-966 (U.S. Jan. 25, 2019). The Supreme Court granted both requests. *See* Order, *Department of Commerce v. State of New York*, No. 18-966 (U.S. Feb. 15, 2019).

Meanwhile, on March 6, 2019, the district court in the California cases issued a decision likewise enjoining the Secretary's decision. *California v. Ross*, 358 F. Supp. 3d

965 (N.D. Cal. 2019).  Like the court in *New York*, the district court found that the

decision violated the APA and the Census Act.  *See California*, 358 F. Supp. 3d at 1037-

46.  But, unlike the court in *New York*, the court also found that the decision violated

the Enumeration Clause (the plaintiffs in the California cases did not assert an equal

protection claim).  *See California*, 358 F. Supp. 3d at 1048-49.

Because the *New York* district court had rejected the plaintiffs' Enumeration

Clause claim, the government immediately filed a letter with the Supreme Court

urging it to address the Enumeration Clause, which remained an alternative ground

for affirmance, in its disposition of that case.  *See* Letter, *Department of Commerce v. New

York*, No. 18-966 (U.S. Mar. 11, 2019).  The Supreme Court subsequently ordered the

parties to brief and argue the Enumeration Clause question.  *See* Order, *Department of

Commerce v. New York*, No. 18-966 (U.S. Mar. 15, 2019).

**2.**  On April 5, 2019, after conducting a nearly two-week trial, the district court

in this case entered judgment in plaintiffs' favor, and enjoined the Secretary from

including a citizenship question on the 2020 Census.  JA 2844-2962.  The court

concluded that the Secretary's decision violated the Enumeration Clause, the Census

Act, and the Administrative Procedure Act, for the same reasons given by the other

district courts.  JA 2939-56.  The government appealed, JA 2965, and this Court,

recognizing that the Supreme Court's decision in *Department of Commerce v. New York*

will almost certainly be dispositive as to those claims, placed the government's appeal

11

on those claims in abeyance until after the Supreme Court rules. *See* Order, *La Union del Pueblo Entero v. Ross*, No. 19-1425 (May 29, 2019).

As relevant here, the district court rejected plaintiffs' claim that the Secretary's decision also violated the equal protection component of the Fifth Amendment's Due Process Clause. JA 2956-60. After "consider[ing] the background of the decision, the process that led to it and relevant contemporary statements," the court concluded that plaintiffs had failed to demonstrate that the Secretary "acted with racially-motivated discriminatory intent." JA 2959. Although plaintiffs had demonstrated that adding a citizenship question will disparately impact Hispanics, they had "offered little, if any evidence," the court emphasized, "showing that Secretary Ross harbors animus towards Hispanics or that such animus impacted his decision." *Id.* All the plaintiffs established, the court stressed, was that the Secretary "had a strong interest in the citizenship question, and his discussions on the issue included information regarding the impact of counting undocumented immigrants on the Census, as well as other discussions that have not been explored on the record." *Id.* Such evidence was "not sufficient for the Court to find by a preponderance of the evidence that the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus." *Id.*

In rejecting plaintiffs' equal protection claim, the court joined the only other court to address that claim. *See New York*, 351 F. Supp. 3d at 669-70. Like the district court here, the court in *New York* emphasized that plaintiffs' evidence,

including both evidence in the administrative record and evidence produced during
extra-record discovery, did not "reveal discriminatory animus on the part of Secretary
Ross himself." *Id.* at 670.

Plaintiffs filed a cross appeal, challenging the district court's conclusion that
they had failed to establish their equal protection claim. This Court subsequently
ordered expedited briefing limited to that claim.

## SUMMARY OF ARGUMENT

The district court did not clearly err when it found, like the only other court to
consider the issue, that plaintiffs have failed to establish that Secretary Ross's decision
to reinstate a citizenship question on the 2020 Census was motivated by
discriminatory intent. As plaintiffs themselves concede, despite an expansive record
and extraordinary extra-record discovery, they have not unearthed any direct evidence
indicating that Secretary Ross (or any other Commerce or Justice Department official)
harbored discriminatory animus against Hispanics or noncitizens. That is
unsurprising, because, as the government has explained in its Supreme Court briefs
defending the Secretary's decision against challenge under the APA and the
Enumeration Clause, the Secretary's decision was an entirely reasonable policy
decision not based on race or ethnicity. Having failed to produce any direct evidence
of discriminatory intent, plaintiffs instead attempt to prove Secretary Ross's purported
animus through a smattering of circumstantial evidence. The district court correctly
concluded that plaintiffs' evidence falls well short of establishing that the Secretary's

13

decision was motivated by a discriminatory purpose, and at a minimum the court did not clearly err in making that factual finding.

The district court did not, as plaintiffs contend, fail to evaluate the totality of circumstances surrounding the Secretary's decision when it evaluated plaintiffs' discrimination claim.  Nor did the district court reject that claim simply because plaintiffs had failed to produce direct evidence of animus on the Secretary's part.  The court of course found it significant that plaintiffs had failed to produce any such direct evidence of discriminatory animus.  But it rejected plaintiffs' equal protection claim only after additionally "consider[ing] the background of the [Secretary's] decision, the process that led to it and relevant contemporary statements," JA 2959, all of which the court had previously set forth and analyzed in great detail,  JA 2849-84, 2939-55.  The district court's legal analysis of plaintiffs' equal-protection claim was correct, and its factual finding was accurate and cannot be second-guessed on this record regardless.

The Supreme Court has identified a number of factors for courts to consider when evaluating whether circumstantial evidence indicates that a government decisionmaker was motivated by discriminatory intent.  *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977) (*Arlington Heights*).  None of those factors weighs in favor of a finding that the Secretary's decision was motivated by discriminatory animus, let alone clearly compelled the district court to make such a finding.

14

The first factor—whether the action will have a disparate impact on a particular group—is of minimal probative value here.  Although the Census Bureau suggested to the Secretary that the reinstatement of a citizenship question would reduce self-response rates for noncitizens and Hispanics, the evidence of a disparate impact was far from conclusive.  The Census Bureau's analysis failed to account for confounding factors that might explain all or a significant part of the lower response rates that the Bureau predicted, and the Bureau also failed to account for the extensive follow-up operations that its staff conduct when they do not receive a response to the census questionnaire and which are likely to significantly correct any decline in initial response rates.  The Secretary also made clear that, to the extent there might be an undercount, he had made the policy judgment that the value of more accurate citizenship information outweighed any adverse impact that might result from individuals violating their legal duty to respond.  In other words, he chose to reinstate a citizenship question in spite of, not because of, a possible undercount, as any such undercount would be due to the illegal action of third parties based on unfounded and speculative fears that the government would misuse their responses.

The second factor—the "historical background of the decision"—weighs strongly against a finding of discriminatory intent.  Questions about citizenship have appeared on the census throughout the Nation's history and continue to be asked of millions of households each year on the ACS.  Indeed, 2010 was the first time in 170 years that a question about citizenship or birthplace did *not* appear on any decennial

census form.  The United Nations recommends that its member countries include a

citizenship inquiry on their censuses and a number of western democracies (including

Canada, Mexico, and the United Kingdom) include such a question on their surveys.

Against that longstanding and well-accepted practice, the Secretary's decision to

reinstate such a question, after a one-census hiatus, can hardly be viewed as improper.

The third factor—"the specific sequence of events leading up to the challenged

decision"—likewise fails to support a finding of discriminatory intent.  Plaintiffs seek

to find a discriminatory motive in the fact that Secretary Ross was inclined to reinstate

a citizenship question from the outset of his decisionmaking process, consulted a

number of stakeholders inside and outside the government, and ultimately overruled

Census Bureau staff, who recommended against the reinstatement of a citizenship

question.  But "there's nothing unusual about a new cabinet secretary coming to

office inclined to favor a different policy direction, soliciting support from other

agencies to bolster his views, [and] disagreeing with staff."  *In re Department of*

*Commerce*, 139 S. Ct. 16, 17 (2018) (opinion of Gorsuch, J.).  The Secretary also had

good reason to disagree with the Census Bureau's recommendation, which contained

a substantial flaw that the Secretary identified.

Plaintiffs likewise fail to identify any relevant "contemporary statements"—the

fourth and final *Arlington Heights* factor—that would indicate that Secretary Ross acted

with the purpose of discriminating against Hispanics or noncitizens.  Again, plaintiffs

concede that they cannot identify any statement by Secretary Ross or any relevant

16

Commerce or Justice Department official that would indicate that the Secretary was motivated by animus. Plaintiffs instead point to allegedly discriminatory statements made by Kris Kobach and the President. The district court properly refused to attribute any alleged animus in those statements to the Secretary. Senior Commerce officials rejected Kobach's rationale, and the Secretary declined to adopt the question that Kobach proposed, which focused on immigration status, and that Kobach believed was essential to furthering his goal. The President's remarks similarly have no bearing on plaintiffs' equal protection claim. The statements have nothing to do with the census generally or the citizenship question in particular. Indeed, despite the voluminous record in this case, there is no evidence that the President directly communicated with Secretary Ross about the census or that he was otherwise personally involved in the decision.

Plaintiffs also make much of the district court's finding that Secretary Ross's stated rationale for his decision—*i.e.*, that reinstatement of a citizenship question would aid the Department of Justice's enforcement of the VRA—was pretextual. As a threshold matter, that finding was improper and incorrect. The Secretary's explanation for his decision was rational and fully supported by the record, and nothing in the Secretary's memoranda (or any other document) suggests that he would have asserted the VRA-enforcement rationale had the Justice Department disagreed or that the Secretary would have asked the citizenship question if the Justice Department had not requested it. But in any event, as the district court correctly

observed, providing a pretextual reason for a decision does not itself establish that the actual reason is discriminatory. Indeed, plaintiffs themselves emphasize the purported existence of a secret alternative rationale—enabling States to engage in redistricting using citizenship data—that is not racially discriminatory. And in all events, plaintiffs' purported new evidence (which is not part of the record on appeal) in support of that secret rationale in no way supports the conclusion that Secretary Ross in fact harbored such a motive. The documents plaintiffs have dredged up do not demonstrate discriminatory animus on their face, and there is no evidence that the documents made their way to Secretary Ross or played any role in his decision.

## STANDARD OF REVIEW

This Court reviews a district court's decision that an actor was not motivated by discriminatory intent for clear error. *Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016).

This Court's review of plaintiffs' equal protection claim should be limited to the administrative record. Constitutional challenges to agency action, like other challenges to agency action, are governed by the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(B) (providing cause of action to "set aside agency action" "contrary to constitutional right"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *Harkness v. Secretary of Navy*, 858 F.3d 437, 451 & n.9 (6th Cir. 2017). And it is black-letter law that, in evaluating a challenge to agency action under the APA, judicial review is limited to the "administrative record already in existence, not some new

record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  In any event, as explained more fully below, plaintiffs' equal protection claim fails even with the benefit of the extra-record evidence they obtained through discovery.  *See also* JA 2959.

## ARGUMENT

## THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' EQUAL PROTECTION CLAIM

The district court did not clearly err in concluding that plaintiffs failed to establish that Secretary Ross's decision to reinstate a citizenship question on the 2020 Census was motivated by invidious discrimination.  After considering "the background of the decision, the process that led to it and relevant contemporary statements," JA 2959, all of which the district court had previously analyzed in great detail, *see* JA 2849-84, 2939-55, the court determined that plaintiffs had failed to show that the Secretary's decision was the product of discriminatory intent.  That decision was correct and far from clearly erroneous.

To establish a violation of the equal protection component of the Due Process Clause, plaintiffs bear the burden of demonstrating that an "invidious discriminatory purpose was a motivating factor" behind the Secretary's decision.  *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  Proof that a facially neutral policy will have a disproportionate impact on a protected class and that the decisionmaker was aware of that impact is not sufficient to make such a showing.  *Id.*

19

at 265; *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S 256, 279 (1979)

("'Discriminatory purpose,' however, implies more than intent as volition or intent as

awareness of consequences."). Rather, plaintiffs must establish that "the

decisionmaker . . . selected or reaffirmed a particular course of action at least in part

'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Feeney*, 442 U.S. at 279.

This Court has identified several, nonexclusive factors "as probative of whether

a decisionmaking body was motivated by a discriminatory intent," including:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking
> body disparately impacting members of a particular class of persons; (2)
> historical background of the decision, which may take into account any
> history of discrimination by the decisionmaking body or the jurisdiction
> it represents; (3) the specific sequence of events leading up to the
> particular decision being challenged, including any significant departures
> from normal procedures; and (4) contemporary statements by
> decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 819 (4th Cir. 1995) (quoting *Arlington*

*Heights*, 429 U.S. at 266-68). Here, analysis of these and other relevant factors

precludes a finding that the Secretary's decision was motivated by impermissible

discrimination.[1]

---

[1] To the extent that plaintiffs' equal protection claim is based on alleged
discrimination against noncitizens, that claim fails for the additional reason that
noncitizens are not a suspect class under the Due Process Clause. Indeed, the federal
government routinely differentiates between citizens and noncitizens in immigration
and other areas, and such differentiation does not violate equal protection. *See, e.g.,*
*Mathews v. Diaz*, 426 U.S. 67 (1976) (holding that limitation on eligibility for a federal

### A.     The Secretary's Decision Was Rational And Based On Legitimate Policy Considerations

The district court found, and plaintiffs now concede (Br. 15), that,

notwithstanding the extensive and extraordinary extra-record discovery that plaintiffs

undertook in this case, they failed to unearth any direct evidence showing that

Secretary Ross (or, for that matter, any other Commerce or Justice official involved in

the Secretary's decision) "harbors animus towards Hispanics or that such animus

impacted his decision." JA 2959; *see also New York v. U.S. Dep't of Commerce*, 351 F.

Supp. 3d 502, 669-70 (S.D.N.Y. 2019) (emphasizing that "[t]he extra-record discovery

does not, as Plaintiffs all but admit, reveal discriminatory animus on the part of

Secretary Ross himself"). Plaintiffs instead rely entirely on circumstantial evidence to

prove their claim that Secretary Ross reinstated a citizenship question for

discriminatory reasons. Contrary to plaintiffs' assertion (Br. 17), that evidence falls far

short of establishing "that the addition of the citizenship question was executed for

the purpose of depriving non-citizens and Latinos of political representation."

For the reasons explained at length in the government's briefing in *Department of

Commerce v. New York*, No. 18-966 (U.S.), the Secretary's decision was rational, fully

supported by the administrative record, based on legitimate policy considerations, and

---

medical insurance program was limited to citizens and long-term permanent residents
did not violate Equal Protection Clause). In any event, as explained below and
correctly found by the district court, plaintiffs cannot establish that the Secretary's
decision was motivated by discrimination against noncitizens. *See* JA 2959.

arrived at in a procedurally proper manner. *See* Gov't Opening Br. 28-45, 53-54;

Gov't Reply Br. 10-21, 24-27. If the Supreme Court agrees and concludes that the

Secretary's decision comported with the APA, the Census Act, and the Enumeration

Clause, its decision will effectively foreclose plaintiffs' equal protection claim.

Plaintiffs' circumstantial evidence of the Secretary's purported discriminatory

motivation consists primarily of evidence allegedly showing that the Secretary's

rationale for reinstating a citizenship question was "manufacture[d]" and "pretextual"

(Br. 25-26); that the Secretary departed from the Census Bureau's normal process for

adding or changing the content on the census (Br. 27-30); that he received input from

allegedly biased stakeholders (Br. 31-35); and that he failed to provide a nonpretextual

rationale for the decision (Br. 35-36). If the Supreme Court concludes that the

Secretary's decision complied with the APA, the Census Act, and the Enumeration

Clause, it will likely reject the materiality of each, if not all, of these allegations, dealing

a fatal blow to plaintiffs' claim that the Secretary's decision violated equal protection.[2]

---

[2] The Supreme Court is also considering whether the similarly situated plaintiffs in *Department of Commerce v. New York*, No. 18-966 (U.S.), have standing to pursue their APA, Census Act, and Enumeration Clause claims. *See* Gov't Opening Br. 17-21 (arguing that plaintiffs lack standing because the harm plaintiffs allege results "from unlawful third-party conduct, itself driven by speculative fears that the government will act unlawfully, is [not] fairly attributable to the government's otherwise lawful actions"). If the Supreme Court concludes that the plaintiffs in *Department of Commerce* lack Article III standing because the harms they allege are not fairly traceable to the Secretary's decision, plaintiffs here likely would lack standing on that ground as well. Moreover, plaintiffs also lack third-party standing because their *own* equal protection rights are not violated even assuming *other* Hispanics refuse to answer the citizenship

Even apart from the Supreme Court proceedings, however, plaintiffs' evidence falls short of establishing a discriminatory motive on the Secretary's part, and the district court at a minimum did not clearly err in so finding.

## B.     An Analysis Of The *Arlington Heights* Factors Does Not Support A Finding That The Secretary Acted With A Discriminatory Motive

Contrary to plaintiffs' contention (Br. 20-22), the district court did not fail to "examin[e] the totality of the circumstances surrounding" the Secretary's decision in evaluating whether racial discrimination motivated that decision. Br. 20. Nor did the court rest its conclusion that plaintiffs had failed to prove such discriminatory motivation on plaintiffs' failure to produce direct evidence that the Secretary harbors discriminatory animus towards noncitizens and Hispanics, Br. 14. The court of course found it significant that, notwithstanding the extensive record, plaintiffs had not identified any direct evidence that the Secretary harbored animus against Hispanics or noncitizens. JA 2959. But the court did not end its analysis there. The court recognized that "[r]acially discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact" that the effect of the addition of the citizenship question 'bears more heavily on one race than another.'" JA 2957 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). It then identified the four

---

question and that refusal has *an incidental effect* on plaintiffs. *See Warth v. Seldin*, 422 U.S. 490, 509 (1975) (litigants are ordinarily barred "from asserting the rights or legal interests of others in order to obtain relief from injury to themselves").

*Arlington Heights* factors this Court set forth in *Sylvia Development Corp.*, 48 F.3d at 819,

as the framework for evaluating whether the totality of the "evidence demonstrat[es] a

defendant's racially discriminatory purpose." JA 2957. After identifying those factors,

the court then considered "the background of the decision, the process that led to it

and relevant contemporary statements" by the Secretary and others (all of which the

court set forth and analyzed in painstaking detail in its lengthy opinion, JA 2849-84,

2939-55), before concluding that the plaintiffs had failed to establish their equal

protection claim, JA 2959. All plaintiffs' evidence established, the court found, was

that Secretary Ross had a strong interest in reinstating the citizenship question and

was told that reinstating the question could have an adverse impact on census

response rates for Hispanics and noncitizens. *Id.* The court correctly determined that

such a showing was insufficient under *Arlington Heights* to prove discriminatory intent.

An independent analysis of the *Arlington Heights* factors confirms that determination.

> **1.    Any disparate impact the citizenship question will have on Hispanic and noncitizen participation in the census is not probative of discriminatory motive**

The first *Arlington Heights* factor—whether the challenged government action

will have a disparate impact on a class of individuals, *Sylvia Dev. Corp.*, 48 F.3d at

819—provides little, if any, support for a finding of discriminatory motive here. The

Supreme Court itself emphasized that evidence of a disproportionate impact will

often be of "limited probative value," and, for that reason, "impact alone is not

determinative." *Arlington Heights*, 429 U.S. at 266 & n.15; *see also Sylvia Dev. Corp.*, 48

24

F.3d at 825 ("[A] showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim.").

Evidence that the reinstatement of a citizenship question will have a disparate impact on noncitizens and Hispanics is of particularly little probative value in this case. While it is true, as Secretary Ross acknowledged in his decision memorandum, JA 3521-22, that the Census Bureau provided him with information suggesting that the reinstatement of a citizenship question would reduce self-response rates among Hispanics and noncitizens, he also observed that "limited empirical evidence exists" about the magnitude of such a reduction, especially after correcting for "those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement" and thus would not have responded to the census anyway, *see* JA 3523; *see also In re Navy Chaplaincy*, 738 F.3d 425, 428–30 (D.C. Cir. 2013) (finding little probative value in evidence of a ten percentage point disparity in promotion rates between relevant groups where that evidence failed "to control for potential confounding factors").

Moreover, the Secretary also observed that a decline in self-response rates among noncitizens and Hispanics would not necessarily result in an undercount at the end of the census because that decline largely could be addressed by extensive nonresponse follow-up procedures. *See* JA 3524. Indeed, the district court determined that the Commerce Department's follow-up procedures would correct

most of the decline in initial response rates that plaintiffs' experts estimated. *See* JA 2890-92, 2902-03. At trial, the Census Bureau's chief scientist also emphasized that there was no evidence that an undercount would occur as a result of the citizenship question:

> [N]either the Census Bureau nor any external expert has produced credible quantitative evidence that the addition of a citizenship question to the 2020 Census will increase the net undercount or increase differential net undercounts for identifiable sub-populations. *Therefore, there is no credible quantitative evidence that the addition of a citizenship question will affect the accuracy of the count.*

JA 2308 (emphasis added).

The Secretary also emphasized in his decision memorandum that he had made a policy judgment that the value of more accurate citizenship data outweighed the possibility of a decline in response rates, given that response rates would decline only if individuals violated their legal duty to respond to the census, based on a speculative and unjustified fear that the government would misuse their responses. *See* JA 3525 (explaining that the benefits derived from asking a question were "of greater importance than any adverse effect that may result from people violating their legal duty to respond"). That policy explanation provides a particularly compelling reason to think that the Secretary's decision was made, at most, "in spite of," not "because of," any potential undercount. *See Feeney*, 442 U.S. at 279.

>     2.    **The historical background of the citizenship question
>           weighs heavily against a finding of discriminatory
>           motive**

The second *Arlington Heights* factor—the historical background of the decision,

*Sylvia Dev. Corp.*, 48 F.3d at 819—not only fails to support a finding of discriminatory

motive, but strongly counters any such inference.  Questions about birthplace and

citizenship have been asked on the census for most of the country's 200-year history.

Indeed, 2010 was the first time in 170 years that a question about citizenship or

birthplace did *not* appear on any decennial census form.  As the Secretary observed,

"other major democracies inquire about citizenship on their census, including

Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the

United Kingdom, to name a few."  JA 3525.  The United Nations also recommends

asking about citizenship on a census.  *Id.*  And the United States itself continues to ask

millions of households each year a question about citizenship on the ACS, as it has

since that survey's inception.  In short, the practice of asking citizenship questions of

the populace is longstanding, uniform, and widely accepted, and has never been

thought to be improper.  That backdrop strongly suggests that the Secretary's decision

to reinstate a citizenship question on the decennial census, not just the limited ACS

survey, was reasonable.  At the very least, it undermines plaintiffs' claim that the

Secretary's decision was motivated by discriminatory intent.

The Commerce Department has also historically welcomed the full

participation of any and all classes of individuals residing in the United States, and has

gone to significant lengths to encourage such participation, and will do so again in

2020.  Among other things, the census forms are printed in a variety of languages; the

Commerce Department hires enumerators with similar language and cultural

backgrounds as the persons they will be enumerating; the Department uses paid

media to conduct public advertising campaigns aimed at hard-to-reach populations;

and the Department works extensively with local businesses, faith-based groups,

elected officials, and community organizations to reach persons from all racial,

national, and citizenship backgrounds.  *See supra* pp. 4-5.  The Commerce Department

will also run marketing campaigns that emphasize the importance of responding to

the census and that federal law requires the Department to maintain the

confidentiality of individual responses.  The Department will therefore go to

substantial lengths to ensure that any impact on self-response rates of including the

citizenship question is as small as possible, negating any inference that the decision to

include the question was motivated by an intent to exclude certain groups from the

census count.  *See Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016)

(affirming the district court's conclusion that the Virginia legislature's enactment of a

voter identification law was not motivated by discriminatory animus where, among

other things, the "legislature went out of its way to make [the law's] impact as burden-

free as possible").

The circumstances surrounding the Secretary's decision to reinstate a

citizenship question thus bear no resemblance to the circumstances present in *North*

*Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), the case

on which plaintiffs principally rely. *See* Br. 21-22, 24-25, 27-28. In *NAACP*, this

Court concluded that the facts surrounding the North Carolina legislature's enactment

of an omnibus election law indicated that the law was enacted with discriminatory

intent. 831 F.3d at 215. Those facts included North Carolina's "long history of race

discrimination"; other recent instances of "official discrimination" by North Carolina

lawmakers; the legislature's enactment of five different measures that restricted voting

and registration, and targeted African American voters "with almost surgical

precision"; and the announcement of the measures only one day after the Supreme

Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), relieved the State of its

preclearance obligations under § 5 of the Voting Rights Act. *NAACP*, 831 F.3d at

214, 216, 223-24.

     Nothing like those circumstances exists here. There has been no long history

of discrimination in the conduct of the census. To the contrary, the Commerce

Department has gone to great lengths to gather information as inclusively and

completely as possible, and it will once again do so. Nor does the citizenship question

target Hispanics or noncitizens through any differential burdens, let alone with

"surgical precision." *See supra* pp. 25-27. And the longstanding and widespread use of

citizenship-related questions on censuses by the United States and other democracies

demonstrates that neither the timing nor the substance of the Secretary's decision was

unusual or suggestive of discriminatory motive.

Plaintiffs ignore entirely the Census Bureau's long history of asking citizenship questions of the populace on the census and other surveys. Instead, they attempt (Br. 25-26) to disguise the total absence of evidence in their favor on this factor by instead discussing the events leading up to the Secretary's specific decision and describing those events as the decision's "historical background." *Id.* But "the specific sequence of events leading up to the particular decision being challenged," *Sylvia Dev. Corp.*, 48 F.3d at 819, are covered by the third *Arlington Heights* factor, and the government will address plaintiffs' arguments about the specific sequence of events there. Suffice it to say that plaintiffs' complete failure to acknowledge the actual historical background against which the Secretary made his decision, let alone identify any evidence of historical discrimination in the government's inclusion of citizenship-related questions on the census and other national surveys, is a tacit acknowledgement that this factor weighs heavily against a finding of discrimination.

3. **The process through which the Secretary arrived at his decision does not support a finding of discriminatory intent**

Plaintiffs likewise err in asserting (Br. 27-31) that the third *Arlington Heights* factor—"the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures," *Sylvia Dev. Corp.*, 48 F.3d at 819—supports their equal protection claim.

**a.** As noted above, plaintiffs wrongly address the specific sequence of events leading up to the Secretary's decision under the second *Arlington Heights* factor. But

30

regardless where plaintiffs attempt to cram their arguments regarding the Secretary's decisionmaking process, those arguments are without merit. Plaintiffs first note (Br. 2-4, 25) that, in arriving at his decision, the Secretary communicated with his staff, other senior government officials (including a White House official), and outside stakeholders, including Kris Kobach, and that Kobach suggested to the Secretary that adding a citizenship question to the census would help address what he characterized as a "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes," Br. 4 (quoting JA 2855-56). But there is nothing unusual or untoward about a Cabinet Secretary communicating with other government officials and outside stakeholders during his consideration of an important policy matter. *See, e.g.*, *Sierra Club v. Costle*, 657 F.2d 298, 406-10 (D.C. Cir. 1981). Indeed, "[o]ur form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive." *Id.* at 406.

And the district court correctly found that none of the communications between the Secretary and others (with the possible exception of the email from Kobach to the Secretary) suggests that the Secretary's decision "was made for the purpose of depressing immigrant response and motivated by discriminatory animus." JA 2959. To the contrary, the record demonstrates that the Secretary's senior staff understood that the inclusion of noncitizens in the census count and subsequent apportionment had "a solid and fairly long legal history"; that "there is no question

31

the Census should count all persons in the United States regardless of citizenship," JA

3986; and that the Census Bureau in fact counted "all people (citizens and

noncitizens) . . . in the census and thus in the apportionment counts," JA 3574. The

Census Bureau has, moreover, promulgated a formal rule indicating that it will count

all foreign citizens considered to be "living" in the United States at the time of the

census in the census population counts. *See* Final Census Residence Criteria and

Residence Situations, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018).

As for Kobach's email to the Secretary suggesting that adding a citizenship

question would help address the supposed "problem" of including unlawful

immigrants in the census and apportionment counts, the district court correctly

recognized that this statement on Kobach's part could not fairly be the basis for

attributing discriminatory animus to the Secretary. JA 2959. To begin, a belief that

unlawful immigrants should not be counted in the census is not even evidence of

discriminatory animus against Hispanics or any other protected group. More

importantly, as just noted, Commerce staff and the Secretary *rejected* Kobach's view

that including noncitizens in the census count was a "problem." Indeed, the Secretary

*refused* to adopt the citizenship question Kobach proposed, which would have asked

individuals about their immigration status (*i.e.*, whether they were lawful or unlawful

immigrants) and which Kobach viewed as "important" to furthering his rationale for

reinstating a citizenship question, JA 3458. Even Kobach appeared to acknowledge

that *lawful* immigrants must be included within the apportionment, *see id.*, and thus the

32

citizenship question that the Secretary authorized would not provide the information needed to exclude *unlawful* immigrants from the apportionment.

As this Court has explained, while it is "a difficult task in any case to convince this [C]ourt to project the feelings of a single audience member onto the members of a decisionmaking body," it is "nearly impossible" to do so where, as here, the decisionmaking body dismisses those views. *Sylvia Dev. Corp.*, 48 F.3d at 822-23. That is all the more true in this case, where the Secretary received input from a number of outside stakeholders, including several besides Kobach who supported the reinstatement of a citizenship question. *See* JA 3422-80. Among those supporting the addition of a question were several States, who confirmed that citizenship data from the census would be useful for their own VRA and redistricting efforts. *See, e.g.,* JA 3449-50 (Louisiana); JA 3462-64 (Texas); JA 3465-66 (Alabama); JA 3477-79 (Oklahoma, Kansas, Michigan, Indiana, Nebraska, South Carolina, Arkansas, Georgia, Kentucky, Tennessee, Mississippi, Florida, and West Virginia).

Plaintiffs next wrongly assert (Br. 25, 29) that evidence that the Secretary disagreed with his subordinates supports a finding that the Secretary acted with discriminatory intent. As the Supreme Court has emphasized—in the context of the census no less—"that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision." *Wisconsin v. City of New York*, 517 U.S. 1, 23 (1996). Moreover, the Secretary had good reason to disagree with personnel from the Census Bureau about the best course of

action.  Census Bureau personnel preferred collecting granular citizenship information for the Department of Justice through the use of administrative records alone, rather than through the combined use of administrative records and a census question.  *See supra* pp. 6-7.  But the Bureau acknowledged that administrative records with citizenship information were unavailable for 35 million people and that the citizenship information for those individuals would have to be estimated through statistical modelling.  JA 3512.  By combining administrative records with a citizenship question, on the other hand, the Bureau estimated that it would have to model the citizenship status of only 13.8 million individuals, because it would obtain responses to the citizenship question from 22 million people for whom administrative records data is otherwise unavailable.  JA 3513.  Adding the citizenship question would thus increase the number of individuals for whom the government has *actual* (not modeled) citizenship information—a clear advantage over the Census Bureau's preferred option.

In addition, the Census Bureau acknowledged that it had not yet developed and tested the model it would use to estimate citizenship status from administrative records alone and would "never possess a fully adequate truth deck to benchmark" the model's accuracy.  JA 3510.  For that reason, the Bureau concluded that it "cannot quantify the relative magnitude of the errors across the alternatives [(*i.e.*, using administrative records alone versus using administrative records and a citizenship question)] at this time."  JA 3511.

34

In the face of the Bureau's uncertainty over the relative advantages of its preferred approach and the obvious benefit of the combined approach, it was reasonable for the Secretary to opt for the combined approach over the use of administrative records alone. At a minimum, the Secretary's disagreement with the Bureau's recommendation does not in any way suggest that he adopted the combined approach for discriminatory reasons.

Plaintiffs fare no better when they assert (Br. 26) that Secretary Ross misled Congress and others about the genesis of the citizenship question and the VRA rationale, an assertion with which the district court agreed, JA 2874-75. The "extraordinary" accusation that a Cabinet Secretary intentionally misled Congress, the judiciary, and the public about his decisionmaking process is unfounded. *In re Department of Commerce*, 139 S. Ct. 16, 17 (2018) (opinion of Gorsuch, J.). To conclude that the Secretary's explanation of his decisionmaking process was misleading requires a court to construe the Secretary's remarks and actions in the most uncharitable manner possible, in defiance of the presumption of regularity that courts must apply to Executive Branch action. *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

For example, as evidence that the Secretary purportedly concealed that he had asked the Department of Justice if it would request that a citizenship question be reinstated, plaintiffs and the district court cited the Secretary's March 20, 2018 statement to Congress that the Commerce Department was responding "solely . . . to the Department of Justice's request." JA 2874-75. But that statement was in

response to questions asking whether the Commerce Department acted in response to requests from political campaigns or parties. *See* 2018 WLNR 8815056 (March 21, 2018). Secretary Ross's disavowal cannot reasonably be interpreted as additionally claiming that Secretary Ross had not previously considered the issue or spoken to others within the Administration about it. Plaintiffs' and the court's other examples are of a piece; viewed in context, none is misleading. *See also* Gov't Br. at 25-37, *Department of Commerce v. SDNY*, No. 18-557 (U.S. Dec. 17, 2018) (explaining in depth why the actions of the Secretary and his staff were not false or misleading). Put simply, neither the Secretary nor his staff attempted to mislead or conceal the basis for the Secretary's decision, which is set out in the Secretary's decisional memoranda.

**b.** Plaintiffs also contend (Br. 27-31) that, in deciding to reinstate a citizenship question, the Secretary allegedly departed from past Census Bureau practices in four ways. None of plaintiffs' contentions has merit, much less establishes discriminatory intent. *See New York*, 351 F. Supp. 3d at 669-70 (evaluating the same alleged "procedural irregularities and substantive departures" from past practice that plaintiffs assert here and concluding that the evidence of such purported irregularities and departures, "taken together," did not establish that the Secretary was motivated by discriminatory animus).

As an initial matter, plaintiffs' contention that the Secretary's decision broke from past Census Bureau practice is wrong on its face: as already discussed, questions about citizenship or place of birth (or both) have a long pedigree on the decennial

census dating back to 1820 and have been part of the ACS every year since its inception in 2005, so reinstating a citizenship question to the 2020 decennial census does not represent a departure from census practice at all. If anything, it represents a return to the traditional practice.

In any event, the specific ways plaintiffs claim Secretary Ross departed from past Commerce Department practice do not withstand scrutiny. Plaintiffs first assert (Br. 29) that "under normal circumstances an agency would have requested necessary data collection from the Census Bureau," but, in this case, the Department of Justice requested the citizenship data only after the Department of Commerce contacted the Department. But "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, [and] soliciting support from other agencies to bolster his views." *In re Department of Commerce*, 139 S. Ct. at 17 (opinion of Gorsuch, J.). That the Department of Commerce thought the Department of Justice might benefit from a citizenship question and the information it would provide and reached out to the Justice Department to see if that hypothesis was true is thus hardly evidence of a discriminatory motive.

Next, plaintiffs attempt to find significance in the fact that Secretary Ross did not follow the Census Bureau's recommendation to use administrative records alone, and the Department of Justice declined to meet with the Bureau to discuss the use of administrative records as an alternative means of collecting more granular citizenship data. Br. 29. As discussed above, *see supra* pp. 34-35, the Census Bureau's preferred

option—using administrative records alone—had a significant flaw that the Secretary reasonably believed could be improved upon through the combined use of administrative records and a citizenship question. That the *Department of Justice* declined to meet with the Census Bureau following the Gary Letter is hardly evidence of the *Secretary's* intent, and in any event merely reflects the Justice Department's view that it was up to the Secretary and the Commerce Department to determine how best to meet the Justice Department's data needs.

Plaintiffs similarly miss the mark in asserting (Br. 30) that the Secretary failed to properly test the citizenship question. The particular citizenship question the Secretary chose is identical to the citizenship question that has appeared on the ACS since its inception in 2005. It is also materially identical to the question that appeared on (and was tested for) the long form in 2000. Compare JA 5216 with U.S. Census 2000 Form D-2 at 4.[3] For that reason, the Bureau informed the Secretary that no further testing of the question was necessary because it would "accept the cognitive research and questionnaire testing from the ACS." JA 3485. At trial, the Bureau's chief scientist confirmed that the Secretary's chosen question "was thoroughly tested for the [ACS]," that the "question ha[d] performed adequately" on the ACS, and that, in the Census Bureau's expert view, no "further testing" of the question was

---

[3] https://www.census.gov/history/pdf/2000_long_form.pdf (also available at PX-1, at 5).

"required." JA 2297-98. It is therefore unsurprising that the Secretary did not believe it was necessary to test the question further.

Finally, plaintiffs reiterate (Br. 31) their flawed assertion that the Secretary "misled Congress as to the genesis of the question." For the reasons explained above, *see supra* pp. 35-36, that assertion is wrong, and provides no support for plaintiffs' equal protection claim.

### 4. There are no relevant contemporaneous comments that would support a finding that the Secretary was motivated by discriminatory animus

The fourth *Arlington Heights* factor—"contemporary statements by decisionmakers on the record," *Sylvia Dev. Corp.*, 48 F.3d at 819—also weighs against a finding of discriminatory intent. As plaintiffs effectively concede, despite extensive discovery and a massive record, they cannot identify any contemporaneous statements by Secretary Ross, officials at the Department of Commerce, or personnel at Department of Justice indicating that they harbored animus towards Hispanics or noncitizens or that any such animus played a role in the Secretary's decision to reinstate a citizenship question. *See* JA 2959; *see also New York*, 351 F. Supp. 3d at 670 n.82 (noting that the only contemporaneous statement from Secretary Ross that plaintiffs identified—relating to comments the Secretary made about the President's immigration policies (*see* Br. 11)—did "not come close to establishing a constitutionally prohibited discriminatory purpose" and did not "have anything to do with the census or the challenged decision").

39

Instead, plaintiffs vainly attempt (Br. 31-35) to find evidence of the Secretary's discriminatory animus in contemporaneous statements made by individuals further afield.  The district court did not clearly err in rejecting that attempt.  *See* JA 2959 (concluding that plaintiffs had failed to tie the alleged discriminatory animus expressed by others to the Secretary and his decision); *New York*, 351 F. Supp. 3d at 670 (reaching the same conclusion).  Plaintiffs first assert (Br. 32) that the district court found "that there were multiple officials in contact with Commerce who made statements indicating they were interested in adding the citizenship question to the Census as a vehicle for affecting congressional reapportionment."  That is wrong.  The *only* individual the district court found to have expressed a view that a citizenship question should be reinstated for congressional reapportionment purposes was Kris Kobach.  *See* JA 2855.  For the reasons explained *supra* pp. 32-34, the district court correctly rejected plaintiffs attempt to attribute Kobach's motivations to the Secretary notwithstanding that the Secretary and other Commerce officials disagreed with Kobach's views, *see* JA 2959; *accord New York*, 351 F. Supp. 3d at 670, and Kobach's desire to use the results of a citizenship question to exclude *unlawful immigrants* from the apportionment is not in any event evidence of *discrimination* against Hispanics or any other protected group.

Plaintiffs also err in asserting (Br. 32-35) that purportedly discriminatory statements made by the President provide evidence of discriminatory motivation on the Secretary's part.  Both the district court here and in *New York* correctly rejected

that erroneous theory. JA 2959; *New York*, 351 F. Supp. 3d at 670. Even setting aside that the cited statements do not actually reflect discriminatory animus by the President, plaintiffs are quite wrong to the extent they suggest that a "cat's paw" theory of imputed animus can be applied here. The doctrine does not extend to an exercise of statutory authority by a Cabinet Secretary acting under an oath to uphold the Constitution. *See* 13 U.S.C. § 141 (entrusting the Secretary with the authority to determine the form and content of the census). As the Supreme Court explained in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), "general principles of . . . agency law" "suggest[] that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both." *Id.* at 418. Although the Court was nevertheless willing to hold an employer liable by deeming a biased supervisor responsible for the adverse action of an unbiased supervisor if the former's own discriminatory acts were the intended and proximate cause of the latter's adverse action, *id.* at 418-20, extending that sort of imputation to the government regulatory context would severely undermine the ability of government officials to make decisions exclusively within their purview.

Any such imputation is particularly inappropriate in this case, where there is no evidence remotely connecting the President's remarks to the Secretary's decision. None of the President's public statements that plaintiffs cite concern the census generally, or the possibility of including a citizenship question on the 2020 Census specifically. Nor does the extensive record indicate that the President was personally

41

involved in the Secretary's decision or communicated directly with the Secretary about the census or the citizenship question. The only evidence plaintiffs offer to tie the President's remarks to the Secretary's decision is an email from the President's re-election campaign that stated that "President Trump has officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens." JA 4400. The email is inadmissible hearsay that the government objected to, Dkt. No. 90-1, at 5-6, and that the district court should have excluded, *see New York*, 351 F. Supp. 3d at 670, but failed to do so, *see* Dkt. No. 120, at 57: 16-24. But, in any event, the email is far from proof that the President played a role in the Secretary's decision. The email does not purport to be from the President, but rather from his re-election campaign. More importantly, the email was sent on March 28, two days *after* the Secretary announced his decision, *see* JA 3519. At most, then, it simply reports on the Secretary's decision to reinstate a citizenship question. In short, plaintiffs have offered no proof to tie the President's remarks to the Secretary's decision, and the remarks are thus in no way probative of a discriminatory motive on the part of the Secretary.

The district court cases that plaintiffs cite in arguing that the President's statements are relevant here are readily distinguishable. *See* Br. 33-34. In addition to involving different agency actions, each of the cases were decided at the motion-to-dismiss or preliminary-injunction stage, not, as here and in *New York*, after the rigors of a trial. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108-09 (N.D. Cal. 2018)

(granting preliminary injunction); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d

307, 325 (D. Md. 2018) (denying motion to dismiss); *Batalla Vidal v. Nielsen*, 291 F.

Supp. 3d 260, 279 (E.D.N.Y. 2018) (denying motion to dismiss). Here and in *New

York*, the district courts likewise *initially* concluded that plaintiffs' allegations regarding

the President's statements were sufficient "to nudge [plaintiffs'] claim of intentional

discrimination across the line from conceivable to plausible," and thus to survive a

motion to dismiss. *New York*, 315 F. Supp. 3d at 810; *La Union del Pueblo Entero v.

Ross*, 353 F. Supp. 3d 381, 394-95 (D. Md. 2018). But plaintiffs here and in *New York*

subsequently failed to prove at trial that the President's statements supported a

finding of intentional discrimination on the Secretary's part, an outcome that may and

should occur in the other cases as well.[4]

### 5. The Secretary's stated reason for reinstating a citizenship question was not a pretext for discrimination

Plaintiffs' equal protection argument is built in significant part on a

fundamentally flawed premise. Sprinkled throughout their discussion of the *Arlington

Heights* factors (Br. 25-27), and emphasized in their discussion of the proper analysis if

---

[4] Indeed, in granting a preliminary injunction in *Ramos*, the district court found only that the plaintiffs' allegations raised "serious questions going to the merits" of their equal protection claim, *not* that they were likely to prevail on the merits of that claim. *See Ramos*, 336 F. Supp. 3d at 1098. That finding is particularly notable because the court in *Ramos* concluded that the plaintiffs *were* likely to prevail on the merits of their other claim. *See id.* at 1097 (concluding that "not only have Plaintiffs have shown serious questions going to the merits, they have demonstrated a likelihood of success on the merits for their APA claim").

they met the *Arlington Heights* standard (Br. 35-36), is the apparent view that it is

sufficient to prove their case for plaintiffs to show that the Secretary's stated rationale

was false.  That is legally erroneous.  The district court correctly held that, even if the

Secretary's motive were unclear, plaintiffs failed to establish that the Secretary was

motivated by discriminatory intent.  JA 2959 (emphasizing that "[a]ll that is clearly

proven regarding Secretary Ross is that, seemingly from the beginning of his tenure,

he had a strong interest in the citizenship question"); *New York*, 351 F. Supp. 3d at

670 (concluding that, even if plaintiffs' evidence supported a finding that the

Secretary's rationale was pretextual, they failed to show that the rationale "was a

pretext *for discrimination* prohibited by the Due Process Clause").

As the Supreme Court has emphasized, "a reason cannot be proved to be 'a

pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that

discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-

16 (1993); *see also id.* at 519 ("[I]t is not enough . . . to *dis*believe the employer; the

factfinder must *believe* the plaintiff's explanation of intentional discrimination.").  For

the reasons explained above, plaintiffs' evidence falls far short of establishing that

Secretary Ross was motivated by discriminatory animus, and the validity of his stated

rationale is thus beside the point.  Moreover, the record itself indicates that there are

any number of nondiscriminatory reasons why the Secretary may have intuited that

reinstating a citizenship would benefit the government.  Having more granular

citizenship data will likely prove useful to federal, state, and local legislators,

policymakers, and social science researchers for myriad policy decisions. *See, e.g.*, JA 3449 (indicating that the collection of citizenship data on the census would aid many "functions of State government"); *see also* Br. of *Amici Curiae* Judicial Watch, Inc. and Allied Educational Foundation, at 15-18, *U.S. Dep't of Commerce v. New York*, No. 18-966 (U.S. Mar. 6, 2019) (arguing that "[e]nlarging the available citizenship data" will be "to the great benefit of everyone—researchers, policy makers, courts, and litigants—who can use that information"). It is presumably because of the many benefits associated with collecting such information that, as the Secretary himself observed, most Western democracies ask a citizenship question on their censuses and the United Nations so recommends. JA 3525.

Indeed, even the reason for reinstating a citizenship question that plaintiffs now seek to ascribe to Secretary Ross—that he included the question in order to gather citizenship information for redistricting purposes, *see* Br. 12—is not discriminatory. *See, e.g.*, *Evenwel v. Abbott,* 136 S. Ct. 1120, 1133-42 (2016) (Thomas, J., concurring) (concluding that the Constitution grants States the right to decide the population base on which it makes redistricting decisions); *id.* at 1142-49 (Alito, J., concurring) (suggesting, though not ultimately deciding, that the Constitution may permit States to use eligible voters as the population base for redistricting). Accordingly, even if the Secretary's stated rationale was pretextual, that does not remotely establish that the Secretary acted for *discriminatory* reasons. The district court

was plainly correct in so finding, and at the very least it did not clearly err in this regard.

Because plaintiffs failed to establish that Secretary Ross's decision to reinstate a citizenship question was motivated by discriminatory animus, the district court's finding that the Secretary's stated rationale was pretextual is, as that court itself correctly recognized, immaterial to the proper resolution of plaintiffs' equal protection claim. That said, the finding was erroneous, and the legitimacy of the Secretary's stated rationale only underscores the correctness of the district court's determination that plaintiffs have not proved their equal protection claim.

As the government has explained at length in its briefing in *Department of Commerce v. New York*, No. 18-966 (U.S.), the Secretary's stated reason for reinstituting a citizenship question on the census—*i.e.*, that reinstatement of a citizenship question would aid the Department of Justice's enforcement of the VRA and was the best way to provide the Justice Department with the most complete and accurate citizenship data at the level of granularity it desired—was rational and fully supported by the administrative record. Gov't Opening Br. 28-40; Reply Br. 10-19. Although the district court was concerned that the Secretary "pursu[ed] a citizenship question with urgency long before he had any awareness of the purported VRA-rationale," JA 2952, as already noted, "[t]here's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, [and] soliciting support from other agencies to bolster his views." *In re Department of Commerce*, 139 S. Ct. at 17 (opinion of

46

Gorsuch, J.).  Nothing in the Secretary's memoranda (or any other document) suggests that he would have asserted the VRA-enforcement rationale had the Department of Justice disagreed or that he would have asked the citizenship question if the Justice Department had not requested it.  And there is no evidence in the record indicating that the Secretary disbelieved the Department of Justice's letter, and, instead, secretly thought that reinstating a citizenship question would *not* be useful for VRA enforcement.

Nor did the Secretary's reason for reinstating a citizenship question "fl[y] in the face of the agency's 'scientific evidence," JA 2952 (quoting *Jagers v. Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185 (10th Cir. 2014)), such that the Secretary could not plausibly have believed it.  As explained *supra* pp. 34-35, the Secretary's conclusion that the combined use of administrative records and a citizenship question was superior to the Census Bureau's preferred option (use of administrative records alone) is eminently reasonable, especially as the Bureau itself acknowledged that it could not determine which of the alternatives would produce fewer errors.

Under these circumstances, plaintiffs' assertion (with which the district court agreed) that the Secretary failed to identify a legitimate, nonpretextual justification for his decision is not tenable, even if it were material to this Court's resolution of plaintiffs' equal protection claim—which, more fundamentally, it is not, given plaintiffs' failure to provide sufficient evidence that the decision instead was based on a *discriminatory* motive.

47

* * *

In sum, by their own admission, plaintiffs have not produced any direct evidence that Secretary Ross or any other Commerce official harbored discriminatory animus against Hispanics or noncitizens. Plaintiffs instead rely on a scattershot of circumstantial evidence that they claim establishes a discriminatory motive. The district court did not err, much less clearly so, in concluding that plaintiffs' evidence falls well short of proving that the Secretary acted for a discriminatory reason.

### 6.     Plaintiffs' "newly discovered" evidence has no bearing on this appeal and is in any event frivolous

Finally, plaintiffs assert (Br. 12-13) that they have recently discovered "new evidence" which purportedly "demonstrate[s] that the addition of the [citizenship] question was in fact motivated by an explicit, racially discriminatory scheme to dilute the representation of Latinos and increase the over-representation of whites." Plaintiffs' belated attempt to inject these allegations into this appeal is procedurally and substantively improper.

Plaintiffs' purported new evidence is not properly before this Court and likely never will be. The district court of course did not consider the matter when it entered judgment on plaintiffs' equal protection claim (following a bench trial), and it is therefore not part of the record on appeal. And, despite plaintiffs' improper inclusion of the documents at issue in the joint appendix and their description of the documents in their opening brief, they have not moved to expand the record on

48

appeal, which would be inappropriate in any event. These allegations thus are not

properly presented in this Court's consideration of plaintiffs' equal protection claim.

*See Montalvo v. Radcliffe*, 167 F.3d 873, 878 (4th Cir. 1999) (This Court "will not

consider factual evidence that was not presented at trial."); *Alexander v. Modrak*, 2 F.

App'x 298 (4th Cir. 2001) (per curiam) ("Although Modrak did submit this [new]

evidence in a Fed. R. Civ. P. 60(b) motion for reconsideration, that motion was filed

after his appeal was noted in this case and, thus, is not properly considered on

appeal.").

    This Court's consideration of plaintiffs' purported "new" "evidence" is also

inappropriate because it is neither new nor evidence. As the government explained in

its opposition to plaintiffs' Rule 60(b)(2) motion asking the district court to consider

the documents and issue an indicative ruling, plaintiffs could have discovered the

"new"' material prior to trial with due diligence, but failed to do so. *See* Dkt No. 166,

at 18-21. In addition, the "evidence" is inadmissible hearsay that plaintiffs have made

little effort to authenticate. *See id.* at 22-25. Thus, the district court itself should

decline to consider the matter at this late date, and may do so.[5]

---

[5] In connection with the Rule 60(b) proceedings, the government today notified
the district court of a recent filing in *Common Cause v. Lewis*, No. 18-cv-14001 (N.C.
Super. Ct.), the North Carolina redistricting case through which plaintiffs obtained the
allegedly newly discovered materials. *See* Dkt. No. 172. The filing raises serious
questions about whether the disclosure of the materials was lawful, whether the
materials were privileged or proprietary, and whether the lawyers who solicited the
materials violated their ethical obligations. While the government takes no position

In any event, even if the documents were admissible and properly before this Court, they do not advance plaintiffs' equal protection claim. The primary document that plaintiffs belatedly seek to introduce is an unpublished 2015 study by a redistricting specialist named Dr. Thomas Hofeller in which Hofeller allegedly observed that "[a] switch to the use of citizen voting age population [(CVAP)] as the [ ] population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," and "a disadvantage for the Democrats." JA 3064-66. Again, at the outset, Hofeller's observation is not evidence of discriminatory animus, but rather an empirical observation on the impact of a switch to the use of CVAP for redistricting. Equally important, plaintiffs provide absolutely no evidence that the unpublished 2015 study (which Hofeller purportedly produced for a private company) was ever provided to Secretary Ross or anyone else in the government, or that Hofeller ever shared the information in the study with any government official, let alone with Secretary Ross or other Commerce officials involved in the Secretary's decision. *See* Dkt. No. 166, at 7-16 (explaining in detail why the Hofeller study is completely irrelevant to plaintiffs' equal protection claim and bears no connection to the Secretary's decision).

Plaintiffs' other belatedly raised document is similarly unavailing. Plaintiffs allege that they found, in a file on a hard drive the now-deceased Hofeller left among

---

on the assertions in the filing, the allegations underscore the impropriety of plaintiffs' attempt to insert the materials into this case at this late date.

his personal effects, a paragraph that appears in a letter that Mark Neuman (who consulted with Commerce on the citizenship question) gave to John Gore, the Department of Justice official who drafted the Gary Letter. *See* JA 3126. This paragraph was separate from and wholly unrelated to the 2015 study, and appears to have been created in 2017. Plaintiffs have long known about Neuman, his connection to Hofeller, the letter Neuman provided to Gore, and the fact that Neuman provided the letter to Gore. *See* Dkt. No. 166, at 19. That Hofeller may have contributed to Neuman's letter (which plaintiffs have not, in fact, established) should thus hardly have come as a surprise to plaintiffs. More importantly, the paragraph (which, again, plaintiffs had in their possession before trial) is entirely innocuous, and certainly not evidence of discriminatory animus on anyone's part. *See* JA 3126. And even if it somehow reflected discriminatory animus on either Hofeller's or Neuman's part (which it does not), the draft paragraph was not part of, and clearly did not form the basis of, the multi-page Gary Letter that Mr. Gore drafted and that provided the rationale for the Secretary's decision. *Compare* JA 3419-21 (Gary Letter) *with* JA 3126 (draft paragraph). Accordingly, the paragraph, like the Hofeller study, bears no connection to the Secretary's decision to reinstate the citizenship question. Tellingly, although plaintiffs obtained a copy of the paragraph months before trial, neither they nor the plaintiffs in related census litigation have ever previously suggested that it played any role in the drafting of the Gary Letter or in the Secretary's decision more generally.

In sum, plaintiffs' "new" "evidence" is a desperate, eleventh-hour attempt to overcome their failure to produce any evidence that Secretary Ross added a citizenship question to the census for discriminatory reasons. They produced no such evidence because none exists. Secretary Ross's decision was unbiased and lawful.

## CONCLUSION

For the foregoing reasons, the district court's dismissal of plaintiffs' equal protection claim should be affirmed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

*Of Counsel:*

PETER B. DAVIDSON
*General Counsel*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

DAVID DEWHIRST
*Deputy General Counsel*

MARK R. FREEMAN
MARK B. STERN

*Department of Commerce*

 *s/ Gerard Sinzdak*

GERARD SINZDAK
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*
*gerard.j.sinzdak@usdoj.gov*

June 2019

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,994 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Gerard Sinzdak*
Gerard Sinzdak

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2019, I electronically filed the foregoing brief

with the Clerk of the Court for the United States Court of Appeals for the Fourth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Gerard Sinzdak*
Gerard Sinzdak

**ADDENDUM**

## TABLE OF CONTENTS

U.S. Const. art. I, § 2.................................................................................A1

13 U.S.C. § 221............................................................................................A2

## U.S. Constitution Article I, § 2

Section 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

**13 U.S.C. § 221**

§ 221.  Refusal or neglect to answer questions; false answers

**(a)** Whoever, being over eighteen years of age, refuses or willfully neglects, when requested by the Secretary, or by any other authorized officer or employee of the Department of Commerce or bureau or agency thereof acting under the instructions of the Secretary or authorized officer, to answer, to the best of his knowledge, any of the questions on any schedule submitted to him in connection with any census or survey provided for by subchapters I, II, IV, and V of chapter 5 of this title, applying to himself or to the family to which he belongs or is related, or to the farm or farms of which he or his family is the occupant, shall be fined not more than $100.

**(b)** Whoever, when answering questions described in subsection (a) of this section, and under the conditions or circumstances described in such subsection, willfully gives any answer that is false, shall be fined not more than $500.

**(c)** Notwithstanding any other provision of this title, no person shall be compelled to disclose information relative to his religious beliefs or to membership in a religious body.