## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LA UNION DEL PUEBLO ENTERO, *et al.*,

    Plaintiffs-Appellees-Cross-Appellants,

             v.

WILBUR L. ROSS, *et al.*,

    Defendants-Appellants-Cross-Appellees.

Nos. 19-1382, 19-1387, 19-1425 (Cross-Appeal)

## RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

The government respectfully opposes plaintiffs' request to remand these appeals in light of the district court's June 19, 2019, indicative ruling as to plaintiffs' request for relief under Rule 60(b)(2). The Supreme Court's forthcoming decision in *Department of Commerce v. New York*, No. 18-966, is likely to conclusively resolve these appeals in their entirety, eliminating the need for further proceedings in the district court. In addition, a remand at this late date is unwarranted in light of the Census Bureau's imminent need to finalize the census questionnaire. The prejudice to the Bureau from any delay resulting from a remand both independently militates against a remand and would foreclose relief under Rule 60(b)(2) in any event. Plaintiffs' request for Rule 60(b)(2) relief also fails for several other reasons—indeed, the district

court concluded *not* that the request was meritorious, but merely (and erroneously) that it raised a "substantial issue" that would cause the court to "reopen discovery for no more than 45 days" and then "order an expedited evidentiary hearing." Attachment A, Mem. Op. (D. Ct. Doc. 175), at 13. A remand thus would be imprudent in these circumstances, especially given the timing involved. Accordingly, plaintiffs' motion to remand should be denied.[1]

## BACKGROUND

The district court enjoined Commerce Secretary Wilbur Ross's decision to reinstate a question regarding citizenship on the decennial census. The court held that inclusion of the question violated the Administrative Procedure Act (APA), the Census Act, and the Enumeration Clause. *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 742-51 (D. Md. 2019). In *Department of Commerce v. New York*, No. 18-966, the Supreme Court is reviewing the validity of a parallel order enjoining inclusion of the citizenship question and is considering each of the grounds relied on by the district court here. The Supreme Court's holding, which is expected by the end of

---

[1] Plaintiffs have asked this Court to remand these appeals in their entirety, not just plaintiffs' cross-appeal. *See* Corr. Mot. to Remand at 1 & n.1. Plaintiffs' request should be denied in its entirety for the reasons discussed in text, and at least should be denied for the government's appeals (which do not implicate the issue common to plaintiffs' cross-appeal and Rule 60(b)(2) motion). More importantly, though, the government agrees with plaintiffs that, even if this Court does remand the appeal(s) for the limited purposes of allowing the district court to consider plaintiffs' Rule 60(b)(2) motion, it should retain jurisdiction over the case. *See id.*; Fed. R. App. P. 12.1(b).

this week, will thus almost certainly be dispositive of the government's appeal from the district court's injunction.

Plaintiffs here also sought to enjoin the Secretary's decision on the ground that it violated the equal protection component of the Fifth Amendment's Due Process Clause. The district court rejected that argument. *Kravitz*, 366 F. Supp. 3d at 752-54. After "consider[ing] the background of the decision, the process that led to it and relevant contemporary statements," the court concluded that plaintiffs had failed to establish that the Secretary was motivated by discriminatory intent. *See id.* at 754; *see also id.* (emphasizing that "[p]laintiffs have offered little, if any[,] evidence[] showing Secretary Ross harbors animus towards Hispanics or that such animus impacted his decision"). In reaching that conclusion, the district court joined a district court in New York (the only other court to consider the issue), which likewise concluded that similarly situated plaintiffs had failed to show that the Secretary's decision was motivated by discriminatory intent. *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 669-71 (S.D.N.Y. 2019). In its opening brief in *Department of Commerce v. New York*, No. 18-966 (U.S.), the government asked the Supreme Court to affirm the *New York* court's rejection of plaintiff's equal protection claim. *See* Gov't Br. 53-54. The government reiterated that request in its recent opposition to a motion, filed by some of the plaintiffs in *Department of Commerce v. New York*, asking the Supreme Court to remand the case to the *New York* district court for it to consider the same purportedly new evidence plaintiffs are relying on here. *See* Attachment B, Opp. to

Respondents' Mot. For Limited Remand, *Department of Commerce v. New York*, No. 18-966, at 16-17 (U.S. June 20, 2019).

After the government filed its notice of appeal in this case, plaintiffs filed a cross-appeal with respect to their equal protection claim. Recognizing that the Supreme Court's decision in *New York* would likely control the government's appeal, this Court placed that appeal in abeyance. At plaintiffs' request, this Court simultaneously ordered expedited briefing on plaintiffs' equal protection claim: plaintiffs filed their opening brief on June 5, 2019; the government filed its response brief on June 19, 2019; and plaintiffs' reply brief is due by June 26, 2019.

Meanwhile, based on their discovery of alleged new evidence that purportedly supports their equal protection claim (as well as a conspiracy claim under 42 U.S.C. § 1985 that plaintiffs pressed in the district court but did not pursue on appeal), plaintiffs filed a motion in the district court for an indicative ruling on whether the court would grant a Rule 60(b)(2) motion for relief. *See* Corr. Mot. to Remand Ex. B. On June 19, 2019, the district court issued an order stating that plaintiffs' Rule 60(b)(2) motion "raises a substantial issue." *See* Corr. Mot. to Remand Ex. A. On June 20, plaintiffs filed a motion, which they amended later that day, asking this Court to remand the case in light of the district court's indicative ruling. *See* Corr. Mot. to Remand. This morning, the district court issued an opinion explaining its conclusion that plaintiffs' Rule 60(b)(2) motion raises a substantial issue. *See* Attachment A. Notably, the court made clear that the alleged new evidence alone was *not* sufficient to

grant Rule 60(b)(2) relief.  Instead, the court explained that, "[i]f the case is remanded, [it] will reopen discovery for no more than 45 days, order an expedited evidentiary hearing, and provide a speedy ruling."  *Id.* at 13.

## ARGUMENT

Plaintiffs' motion for a remand in light of the district court's indicative ruling should be denied.  Plaintiffs seek a remand so that the district court may consider whether to grant plaintiffs Rule 60(b)(2) relief on their equal protection claim (and related Section 1985 claim) in light of purported new evidence.  The Supreme Court's impending decision in *Department of Commerce v. New York*, No. 18-966 (U.S.), is likely either to render plaintiffs' motion for Rule 60(b)(2) relief moot (if the Supreme Court agrees that the Secretary's decision was improper) or to fatally undermine plaintiffs' equal protection claim regardless of plaintiffs' alleged new evidence (if the Court upholds the decision against the various challenges raised and denies the *New York* plaintiffs' motion to remand).  Following the Supreme Court's ruling, this Court will then be able to dispose of plaintiffs' equal protection claim directly, without any need for further proceedings in the district court.

Moreover, even absent a controlling decision from the Supreme Court, remand would be inappropriate.  As the district court in *New York* found, "time is of the essence because the Census Bureau needs to finalize the 2020 questionnaire by June of this year."  351 F. Supp. 3d at 517.  The prejudice to the Bureau from any delay resulting from a remand both independently militates against a remand and, in any

event, would foreclose relief under Rule 60(b)(2)—which also fails on the merits for several other reasons.

1.  A remand for the district court to consider plaintiffs' Rule 60(b)(2) motion is unnecessary in light of the Supreme Court's forthcoming decision in *New York*.  As the government explained in its response brief to the plaintiffs' cross-appeal in this case, *see* Defendants-Appellees Resp. Br. at 21-23, if the Supreme Court in *New York* upholds the Secretary's reinstatement of a citizenship question, the Court's decision is likely to fatally undermine plaintiffs' equal protection claim.  Indeed, the Supreme Court may directly address whether the Secretary's decision violated equal protection, especially in light of the motion to remand that some of the *New York* plaintiffs filed in that Court.  And even if the Supreme Court does not directly address the equal protection claim, a decision in the government's favor on the APA claim, which alleged (among other things) that the Secretary's decision was pretextual, will likely reject as immaterial the circumstantial evidence that forms the core of plaintiffs' equal protection claim here.  *See id.* at 22.  Thus, once the Supreme Court issues its decision, this Court should be able to dispose of plaintiffs' equal protection claim expeditiously and without further proceedings in the district court.

The Supreme Court also will soon weigh in on the significance of the new evidence on which plaintiffs' Rule 60(b)(2) motion is based.  Some of the plaintiffs in *New York* have asked the Supreme Court to remand their case to the New York district court, so that it may consider the same materials plaintiffs rely on here,

6

including because those materials supposedly "suggest[] an unconstitutional, racially discriminatory motive" for the Secretary's decision.  NYIC Resps.' Mot. for Limited Remand at 2, *Department of Commerce v. New York*, No. 18-966 (U.S. June 12, 2019).  If the Supreme Court denies that motion, while upholding the Secretary's decision to include the citizenship question, the Supreme Court will at least implicitly confirm the insignificance of those materials, including for the equal protection claim.  Thus, if the Supreme Court refuses to remand the case in light of plaintiffs' new materials, there would be no basis for this Court to take a different approach.

2.  A remand is also inappropriate here given the prejudicial timing of the request.  Again, as the district court in *New York* found, "time is of the essence because the Census Bureau needs to finalize the 2020 questionnaire by June of this year."  351 F. Supp. 3d at 517.  A remand at this late date would needlessly prolong the resolution of this litigation and severely prejudice the Census Bureau, potentially jeopardizing its ability to distribute the 2020 Census on the statutorily-mandated April 1, 2020 deadline, *see* 13 U.S.C. § 141(a).  Indeed, although the parties extensively briefed the question whether relief under Rule 60(b)(2) was warranted, *see* Corr. Mot. to Remand, Exs. B, C, and D; Attachment C, Defs.' Surreply to Pls.' Rule 60(b)(2) Mot., the district court pointedly did *not* indicate that it would grant such relief if the case were remanded.  *See* Attachment A at 13.  The court merely concluded that plaintiffs' Rule 60(b)(2) motion raised a "substantial issue."  *Id.*; *see also* Fed. R. Civ. P. 62.1(a)(3).  The court expressly advised that, "[i]f the case is remanded, [it] will reopen

7

discovery for no more than 45 days, order an expedited evidentiary hearing, and provide a speedy ruling." Attachment A at 13. Whether the district court then granted or denied the motion, the losing party would likely appeal to this Court and the Supreme Court.

The Census Bureau cannot wait the weeks or months that it would take for this process to play out. It requires an imminent final decision on the lawfulness of the citizenship question. Because of the prejudice to the Census Bureau from any delay resulting from a remand, this Court should deny the remand and dispose of plaintiffs' equal protection claim on the existing trial record following the Supreme Court's decision. Moreover, the prejudice to the Census Bureau would itself warrant denying Rule 60(b)(2) relief and thus would render a remand futile. *See Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (Rule 60(b) movant must establish "a lack of unfair prejudice to the opposing party").

The district court's response to the prejudice that the government will suffer is a series of non sequiturs. *First*, the district court observed that the need to finalize the census questionnaire "affect[s] Plaintiffs' ability to obtain relief and appellate review just as much as [it] impact[s] Defendants'." Attachment A at 10. But all parties conducted the trial and appellate proceedings with full awareness of the need to finalize the census questionnaire by June 30, and it is only plaintiffs, not defendants, who belatedly seek to disturb the schedule and reopen the trial record. *Second*, the district court contended that this "appeal is currently pending before the Fourth

Circuit and is not yet ripe, meaning whether Defendants were waiting for a ruling by this Court or by the Fourth Circuit, their deadlines could come and go under either circumstance." *Id.* To the contrary, the government expeditiously sought a Supreme Court ruling by the end of this week, and a favorable decision there will compel vacatur of the injunction entered by the district court here and thus enable the government to finalize the census questionnaire before June 30. *Third*, the district court asserted that "any prejudice that Defendants now face is partially of their own making," relying on its prior conclusion that "Secretary Ross bulldozed over the Census Bureau's standards and procedures for adding questions." *Id.* at 11. But that is completely backwards, because that alleged fault *expedited* the process rather than *delayed* it; and besides, if the Supreme Court rules in favor of the government, it will have rejected the premise that Secretary Ross's decisionmaking was procedurally improper.

In sum, the district court failed to justify the serious prejudice a remand would impose on the government's timely conduct of the census. That alone is reason not to remand.

3. In all events, a remand also would serve no purpose because plaintiffs' Rule 60(b)(2) motion is substantively and procedurally meritless for several additional reasons. *See Horowitz v. Federal Ins. Co.*, 733 F. App'x 105, 106 (4th Cir. 2018) ("A party seeking relief under Rule 60(b)(2) must, among other things, demonstrate that his claim is meritorious." (citing *Heyman v. M.L. Mktg. Co.*, 116 F.3d 91, 94 n.3 (4th

9

Cir. 1997))).  Indeed, despite extensive briefing from the parties on plaintiffs' Rule 60(b)(2) motion in connection with plaintiffs' request for an indicative ruling, *see* Corr. Mot. to Remand, Ex. B-D; Attachment C, the district court did not indicate that it would grant the motion, but only that the motion raised a "substantial issue" that would warrant "reopen[ing] discovery."  Attachment A at 13.  Moreover, no such issue exists.

To begin, the district court's need for further discovery belies any notion that plaintiffs can satisfy the requisite showing for Rule 60(b)(2) that their "newly discovered evidence" was "of such a material and controlling nature as [would] probably [have] change[d] the outcome."  *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994); *Luna v. Bell*, 887 F.3d 290, 294 (4th Cir. 2018) (holding that a movant seeking relief under Rule 60(b)(2) must show "that the evidence is material, *i.e.*, would have *clearly resulted in a different outcome*") (emphasis added).  In fact, this Court has held that it is error to permit a Rule 60(b)(2) motion merely because the alleged newly discovered evidence "would have affected depositions" and "would most likely have led the parties to other material evidence."  *Luna*, 887 F.3d at 296.  In failing to conclude that plaintiffs' alleged newly discovered evidence would have changed the outcome, and nevertheless inviting a remand for 45 days of discovery that has no discernable limitation, the district court's order conflicts with this Court's precedents regarding Rule 60(b)(2) relief.

Even apart from that threshold flaw, plaintiffs' request for Rule 60(b)(2) relief is predicated on their discovery of purported "new evidence" that they allege establishes that the Secretary's decision "was motivated by a discriminatory purpose." *See* Corr. Mot. to Remand, Ex. B at 10.  But contrary to plaintiffs' assertion, the new material in no way establishes that the Secretary's decision was motivated by discriminatory intent, just as the voluminous evidence in the existing record fails to do (as the court itself correctly found after a trial).  The primary document that plaintiffs belatedly seek to introduce is an unpublished 2015 study by a redistricting specialist named Dr. Thomas Hofeller in which Hofeller allegedly observed that "[a] switch to the use of citizen voting age population [(CVAP)] as the . . . population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites." Corr. Mot. to Remand, Ex. B at 4-6.

Plaintiffs fundamentally err in attributing a discriminatory motivation to Hofeller's 2015 study.  Nowhere in that study did Hofeller suggest that he intended harm to any racial minority.  Instead, the study was his attempt to predict, as an objective matter, the consequences of a potential ruling in favor of the appellants urging CVAP-based redistricting in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), which the Supreme Court had not yet decided.  The statement on which plaintiffs rely was thus no more than Hofeller's empirical prediction of the impact of a switch to the use of CVAP data for redistricting.

Indeed, even the district court itself at most concluded that "[t]he evidence suggests that Dr. Hofeller was motivated to recommend the addition of a citizenship question to the 2020 Census to advantage Republicans." *See* Attachment A at 8. But redistricting for *partisan* reasons is fundamentally different from redistricting for *racially discriminatory* reasons, *see, e.g.*, *Easley v. Cromartie*, 532 U.S. 234, 241-43 (2001); Defendants-Appellees Resp. Br. at 28-29 (distinguishing *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)), and that is true *a fortiori* for a decision merely to ask a citizenship question on the census and thereby enable States to choose independently whether to use CVAP data for redistricting. *See* Corr. Mot. to Remand, Ex. C (explaining in detail why the Hofeller study is completely irrelevant to plaintiffs' equal protection claim and bears no connection to the Secretary's decision); *see also* Attachment B at 7-9 (explaining why the Hofeller study does not support a finding of discriminatory intent). Although the district court further suggested that a Republican advantage from CVAP redistricting would occur "by diminishing Hispanics' political power," *see* Attachment A at 8, CVAP redistricting applies to all persons without regard to their race, and the court identified no evidence whatsoever that Hofeller's alleged preference for that *racially neutral* practice with a favorable partisan effect was "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [racial] group," *see Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Equally important, plaintiffs provide absolutely no evidence that the unpublished 2015 study (which Hofeller purportedly produced for a private company) was ever provided to Secretary Ross or anyone else in the government, or that Hofeller ever shared the information in the study with any governmental official, let alone with Secretary Ross. In lieu of evidence, plaintiffs and the district court speculate that Hofeller's private motives (supposedly reflected in his years-old unpublished study) surely must have made their way to the Secretary through Mark Neuman, one of the Secretary's advisors on the presidential transition team: "Hofeller and Neuman were 'good friends' for decades"; "Hofeller was 'the first person that said something' to Mark Neuman about adding a citizenship question"; and "Neuman played an outsized role in advising Secretary Ross and his staff on census-related decisions." *See* Attachment A at 6-7. Even if all that is true, it says nothing about whether Hofeller shared his 2015 study, or even his alleged partisan motive, with Neuman or the Secretary or anyone else in the Department of Commerce. That alone breaks any connection between the unpublished 2015 study and the Secretary's 2018 decision.

Moreover, plaintiffs were aware of all that information *months* before trial; if Neuman's role really was "outsized," and if Hofeller's having been "the first person" to speak to Neuman really was that significant, it was incumbent upon plaintiffs to conduct a further investigation at that time. *See* Fed. R. Civ. P. 60(b)(2) (relief available only if, among other things, plaintiffs present "newly discovered evidence

13

that, *with reasonable diligence*, could not have been discovered in time to move for a new trial" (emphasis added)).  And it would not have required much diligence on plaintiffs' part; Neuman *told* plaintiffs that Hofeller was "pretty important," "was known in the redistricting community," and was "a point person for redistricting" in Republican circles.  *See* Corr. Mot. to Remand, Ex. B, Ex. 2 at 6-8.  Yet plaintiffs never investigated further; indeed, they apparently found Neuman and Hofeller so tangential to their case that they did not designate or admit into evidence even a single line of Neuman's testimony—a strategic litigation choice that they should be held to now.

Plaintiffs' second belatedly raised document is similarly unavailing.  Plaintiffs allege that they found, in a file on a portable hard drive the now-deceased Hofeller left among his personal effects, a paragraph that appears in a letter (the Neuman Letter) that Neuman gave to John Gore, the Department of Justice official who drafted the letter that the Department sent to the Census Bureau requesting that the Bureau reinstate a citizenship question (the Gary Letter).  *See* Corr. Mot. to Remand, Ex. B at 6-7; *see also id.* at Ex. 1, Ex. H (copy of paragraph); *id.* at Ex. 1, Ex. G (copy of Neuman Letter); *id.* at Ex. 9 (copy of Gary Letter).  The paragraph has no relation to the 2015 study (other than its alleged author).  The two documents were apparently written years apart and deal with different issues:  one is about the population base for redistricting, the other is about block-level data for VRA compliance.  The documents are thus unrelated in time and scope, and no reasonable reader could conclude that the latter was written in stealth service of the former.  That breaks the chain between

14

any purported improper motive expressed in the 2015 study and the paragraph that appears in the letter Neuman gave Gore.

More importantly, the above-cited Neuman Letter (which the government produced to plaintiffs during discovery), including the paragraph found in Hofeller's files, is entirely innocuous, and certainly not evidence of discriminatory animus on anyone's part. And even if the paragraph somehow reflected discriminatory animus on either Hofeller's or Neuman's part (which it does not), the paragraph was not part of, and clearly did not form the basis of, the multi-page Gary Letter that Mr. Gore drafted and that provided the rationale for the Secretary's decision. Even a cursory comparison reveals that the Gary Letter bears no resemblance to any part of the Neuman Letter, including the paragraph found in the Hofeller files. *Compare id.* at Ex. 1, Ex. G (copy of Neuman Letter), *with id.* at Ex. 9 (copy of Gary Letter). The only thing the two documents have in common is that both purport to be letters addressed from the Justice Department to the Census Bureau—and even on that triviality, the Neuman Letter is addressed to a different person and contains no signature. Tellingly, despite having had the Neuman Letter for months—and questioning Neuman about it in his deposition—plaintiffs have until now never suggested that it bore any resemblance to the Gary Letter. In short, plaintiffs' claim that the paragraph "provides a direct line from Dr. Hofeller's 2015 study . . . to the [Gary] Letter," Corr. Mot. to Remand, Ex. B at 7-8, is meritless on its face. The paragraph, like the

Hofeller study, bears no connection to the Secretary's decision to reinstate a citizenship question.

Rather than address these obvious dissimilarities between the Neuman Letter and the Gary Letter, the district court instead found significant the fact that "Secretary Ross was aware of Neuman's role as a go-between and specifically of the meeting at which Neuman handed Gore the [Neuman Letter]." *See* Attachment A at 8. That is a non sequitur. For one thing, Neuman's meeting with Gore was hardly a secret; both of them freely testified that they had met. *See* D. Ct. Doc. 166, Ex. C at 38-39; *id.* Ex. D at 33-38. More important, the Secretary's mere awareness of Neuman's role and his meeting with Gore does not even arguably show that he was stealthily acting to further the secret goals of Hofeller, a private citizen.

At all events, if the Secretary had really intended to reinstate the citizenship question so that maybe, at some point in the future, a State might choose to use the resulting data to redistrict based on CVAP instead of total population, he did not need to rely on Hofeller's secret unpublished study to support that rationale. He could have cited *the administrative record.* The Attorney General of Louisiana expressly requested a citizenship question because, in his view, drawing districts without considering CVAP "dilutes the votes of all legally-eligible voters by improperly counting those ineligible to vote when determining the population for representative districts." A.R. (D. Ct. Doc. 25) 1079; *see id.* at 1203. Texas advanced a similar argument in *Evenwel.* 136 S. Ct. at 1126. It is implausible that the Secretary would

16

choose not to adopt reasons openly provided by these State officials in the

administrative record and public filings—yet secretly adopt essentially the same

reasons expressed in a years-old unpublished document that not even plaintiffs claim

he ever saw or knew about.

Plaintiffs' third and final set of new documents are particularly far afield, and

only underscore the lack of merit in their Rule 60(b) motion.  In their reply brief

below, plaintiffs alleged that they recently discovered documents indicating that

Hofeller communicated with a career Census Bureau official in 2015.  *See* Corr. Mot.

to Remand, Ex. D at 2-3.  Plaintiffs claim that these documents "refute[] [the

government's] contention that no link between Hofeller and the Secretary can be

shown."  *Id.* at 3.  That bizarre claim fails.  *First*, the fact that a career Census Bureau

employee communicated with Hofeller during the Obama Administration about

topics unrelated to his secret 2015 study is probative of nothing, much less any

connection between Hofeller's allegedly discriminatory motives and the Secretary's

final decision.  *Second*, plaintiffs previously argued, and the district court found, that

the Census Bureau—where the career employee works for the Deputy Director—

"*repeatedly, consistently, and unanimously recommended against adding a citizenship question* to the

2020 Decennial Census."  *Kravitz*, 366 F. Supp. 3d at 699 (emphasis added).  It makes

no sense to transfer Hofeller's allegedly discriminatory intent to the Secretary through

the Census Bureau's recommendation *against* including the citizenship question.  *See*

Attachment C at 3-11 (explaining the many reasons why).  Plaintiffs' nonsensical

attempt to link Hofeller to Secretary Ross through the Census Bureau—which, notably, the district court did *not* rely on—underscores the baselessness of their Rule 60(b) motion.

In addition to its substantive deficiencies, plaintiffs' Rule 60(b)(2) motion is procedurally defective because plaintiffs' materials are neither "new[]" nor "evidence." *See* Fed. R. Civ. P. 60(b)(2). Plaintiffs had every opportunity to learn all of the information they now claim is "new," yet failed to do so. The government produced the Neuman Letter to plaintiffs long before trial, and plaintiffs had ample opportunity to learn, if they did not already believe, that Neuman provided the letter to Gore. *See* Attachment B at 12-13. Plaintiffs also deposed both Neuman and Gore after receiving the Neuman Letter. If plaintiffs thought the Neuman Letter played an important role in the Gary Letter that Gore drafted, they could have pursued the connection at Neuman's and Gore's depositions or through subsequent investigation. They did not. *See id.* (describing the simple questions that plaintiffs could have asked but failed to ask).

Plaintiffs also well knew of Hofeller's connection to Neuman. During his deposition, Neuman testified at length about Hofeller and their several discussions about the citizenship question. *See* Corr. Mot. to Remand, Ex. C at 19; Attachment B at 6, 13-14. That Hofeller may have contributed to Neuman's letter should thus hardly have come as a surprise to plaintiffs. And again, if plaintiffs wanted to know

more about Neuman and Hofeller's interactions, they could have asked Neuman

further questions.  They did not.  *See* Attachment B at 12-14.

The district court excused this blatant failure only by crediting plaintiffs'

dubious "new evidence" over 14 hours of sworn testimony from Neuman and Gore.

*See* Attachment A at 11 (speculating that Neuman "may have misled Plaintiffs about

the nature of Hofeller's role"); *id.* (criticizing the "credibility" of Neuman's testimony

that he "wasn't part of the drafting process of the DOJ Letter").  But the only

competent evidence in the record is fully consistent and demonstrates the unexciting

truth:  Hofeller played no role in the Secretary's decisionmaking process, and DOJ's

Gary Letter was not based on the Neuman Letter.  *See* Attachment B at 18-22.

Neither plaintiffs nor the district court identify a single question that was misleadingly

answered in light of the "new" documents themselves—as opposed to erroneous

inferences from those documents—only further highlighting that any problem lies in

plaintiffs' questioning, not the deponents' answers.

Plaintiffs' documents are also not "evidence."  They are, instead, inadmissible

hearsay of uncertain provenance that plaintiffs have failed to authenticate.  *See* Corr.

Mot. to Remand, Ex. C at 22-25 (explaining in detail why plaintiffs' new materials are

inadmissible).  The district court, relying upon *Horne v. Owens-Corning-Fiberglas Corp.*, 4

F.3d 276 (4th Cir. 1993), concluded that the new documents could be authenticated

based upon the deposition of Hofeller's daughter taken in unrelated litigation in

North Carolina state court because "'privity is not the gravamen' of Rule 804(b)(1)."

19

Attachment A at 12-13.  But given the factual and legal differences between this case and the challenge to North Carolina's redistricting in state court, *Horne* completely undermines the conclusion that the deposition is admissible under Rule 804(b)(1) and may therefore be used to authenticate the alleged new evidence.  *See Horne*, 283 F.3d at 283 (holding that to be admissible under Rule 804(b)(1), the proceedings in the two cases must be legally and factually similar); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986) (holding that where previous case involved claim of hazardous effects of raw asbestos upon health of plant workers exposed in a manufacturing environment, deposition taken in that case could not be used in case brought by pipefitter who worked in proximity to asbestos after it had been processed, due to legal and factual differences in two cases).

In sum, plaintiffs' Rule 60(b)(2) motion lacks merit on several levels.  Their purported new evidence fails to advance their equal protection claim, and the materials are both inadmissible and do not present any relevant information that plaintiffs could not have discovered previously with due diligence.  A remand for the district court to consider plaintiffs' motion would thus be unwarranted—and all the more so given the Supreme Court's forthcoming decision and the prejudice to the Census Bureau from a remand.

## CONCLUSION

For the foregoing reasons, plaintiffs' request for remand should be denied.

20

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

s/Mark B. Stern
MARK B. STERN
GERARD SINZDAK
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice, Room 7242*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*
  *202-353-9018*

  *Counsel for the Government*

JUNE 2019

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify this motion complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), because it contains 5100 words, according to the count of Microsoft Word.

s/Mark B. Stern
MARK B. STERN

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2019, I electronically filed the foregoing with

the Clerk of the Court by using the appellate CM/ECF system.  Participants in the

case are registered CM/ECF users and service will be accomplished by the appellate

CM/ECF system.

s/Mark B. Stern
MARK B. STERN

**ATTACHMENT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

|  |  |  |
|---|---|---|
| **ROBYN KRAVITZ**, *et al.,* | * | |
| Plaintiffs, | * | **Case No.: GJH-18-1041** |
| | * | |
| v. | * | |
| **UNITED STATES DEPARTMENT OF COMMERCE**, *et al.,* | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

|  |  |  |
|---|---|---|
| | * | |
| **LA UNIÓN DEL PUEBLO ENTERO**, *et al.,* | | |
| Plaintiffs, | * | **Case No.: GJH-18-1570** |
| v. | * | |
| **WILBUR ROSS**, *et al.,* | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

In these related cases, Plaintiffs challenged Commerce Secretary Wilbur Ross's decision to include a citizenship question on the 2020 Census. Plaintiffs claimed the decision was arbitrary and capricious in violation of the Administrative Procedure Act (APA), unconstitutional in violation of the Constitution's Enumeration Clause and the equal protection guarantee of the Due Process Clause of the Fifth Amendment (Equal Protection claim), and made as part of a

1

conspiracy to violate their civil rights in violation of 42 U.S.C. § 1985.[1] After a six-day bench

trial, on April 5, 2019, this Court entered judgment in favor of the Plaintiffs on their claims

arising under the Administrative Procedure Act and the Enumeration Clause. ECF No. 155.[2] The

Court also permanently enjoined Defendants from including a citizenship question on the 2020

Census. *Id.* However, the Court entered judgment for Defendants on Plaintiffs' Equal Protection

claim and on the *LUPE* Plaintiffs' 42 U.S.C. § 1985(3) claim. *Id.*

On June 3, 2019, Plaintiffs filed a Rule 60(b)(2) Motion for Relief from Final Judgment,

alleging that newly-discovered evidence entitled them to judgment on their Equal Protection and

§ 1985 claims. ECF No. 162. Because an appeal is pending and this Court only retains limited

jurisdiction over a Rule 60(b) motion, Plaintiffs also requested that the Court "issue an indicative

ruling under Fed. R. Civ. P. 62.1 stating that a Rule 60(b) motion raises a substantial issue or

would be granted." *Id.* at 9 (quoting Fourth Circuit Appellate Procedure Guide (Dec. 2018) at

22–23).

After a hearing, ECF No. 169, the Court entered an Order on June 19, 2019, granting

Plaintiffs' Motion for an Indicative Ruling Under Rule 62.1(a) and concluding that Plaintiffs'

Rule 60(b)(2) Motion raises a substantial issue. ECF No. 174. This Memorandum Opinion

explains that Order.

## I.    STANDARD OF REVIEW

Plaintiffs ultimately seek relief from the Court's Final Judgment entered in favor of

Defendants on Plaintiffs' claims based on the equal protection guarantee of the Fifth Amendment

Due Process Clause and, for the LUPE Plaintiffs only, § 1985. To obtain relief under Rule 60(b),

a party must show that its motion is timely, that the motion raises a meritorious claim or defense,

---

[1] Only the *LUPE* Plaintiffs alleged the § 1985 claim.
[2] Unless otherwise noted, all citations to the docket are to the lead Case: No. 18-CV-1041.

and that the opposing party would not be unfairly prejudiced by having the judgment set aside. *See Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993) (quoting *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987)). When Rule 60(b)(2) is applicable, as here, a party must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2).

This Court retains limited jurisdiction to consider a motion for relief under Rule 60(b) even though an appeal is pending. *See Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 891 (4th Cir. 1999) ("[W]hen a Rule 60(b) motion is filed while a judgment is on appeal, the district court has jurisdiction to entertain the motion, and should do so promptly."). Specifically, pursuant to Rule 62.1, the Court may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue. Fed. R. Civ. P. 62.1; s*ee also* Fourth Circuit Appellate Procedure Guide (Dec. 2018) at 22–23.

## II.   DISCUSSION

This Court previously concluded that the Secretary's articulated reason for adding a citizenship question to the 2020 Census—to improve Voting Rights Act (VRA) enforcement—was a pretext. ECF No. 154 at 108. However, the Court held that based on the trial record, Secretary's Ross's actual rationale remained, to some extent, a mystery. *Id.* at 42, 112. Plaintiffs now claim that new evidence sheds additional light on Secretary Ross's real reasoning.

Specifically, new evidence shows that a longtime partisan redistricting strategist, Dr. Thomas Hofeller, played a potentially significant role in concocting the Defendants' pretextual rationale for adding the citizenship question, and that Dr. Hofeller had concluded in 2015 that adding a citizenship question would facilitate redistricting methods "advantageous to

Republicans and Non-Hispanic Whites." ECF No. 162-3 at 68, 125–126, 128. Before fully

exploring the meaning of this new evidence, it is useful, for context, to first review the evidence

established at trial.

### A. Trial Record

The Court previously found that evidence in the Trial Record demonstrated that persons

around Secretary Ross had an interest in whether undocumented immigrants are counted in the

Census for apportionment purposes, and that the Secretary did look at that issue. Secretary

Ross's activity in this regard included conversations with Chief White House Strategist Steve

Bannon who asked the Secretary to speak to Kansas Secretary of State Kris Kobach about adding

a citizenship question to the Census. PX-19 (AR 763); PX-58 (AR 2651). Thereafter, complying

with Bannon's request, Kobach and Secretary Ross discussed Kobach's ideas about adding a

citizenship question to the Census, and "the fact that the US census does not currently ask

respondents about their citizenship." PX-19 at 2 (AR 764). Secretary Ross and Kobach also

discussed the potential effect adding "one simple question" to the Census would have on

"congressional apportionment." *Id.* Kobach expressed concern that the lack of a citizenship

question "leads to the problem that aliens who do not actually 'reside' in the United States are

still counted for congressional apportionment purposes," but he did not mention the VRA

rationale. *Id.*

Additionally, Deputy Chief of Staff and Director of Policy Earl Comstock emailed the

Secretary an article entitled "The Pitfalls of Counting Illegal Immigrants" in response to the

Secretary's inquiry into whether undocumented people were counted for apportionment purposes

on March 10, 2017, shortly after the Secretary's confirmation. PX-55 (AR 2521); Comstock

Dep. at 62:13–64:4, 65:5-8. "Potentially" that same day, Secretary Ross made what he later

would term his "months old request" that a citizenship question be added to the 2020 Census. Comstock Dep. 146: 1-15; *see* also PX-88 (AR 3710).

The Trial Record also included emails from President Trump's re-election campaign crediting the President with mandating the addition of the citizenship question and various statements and tweets by candidate, President-elect and President Trump, demonstrating his animus towards immigrants and his concern about political power being wielded by undocumented immigrants. PX-64 (AR 2643–44); PX-3 (AR 3424–25); PX-1139; PX-1145; PX-1149; PX-1156; PX-1177.

Thus, at the close of trial, Plaintiffs had presented evidence that individuals in Secretary Ross's orbit, including the President and Mr. Kobach, did harbor discriminatory animus towards non-citizens.[3] They had also presented substantial evidence, which the Court adopted, that the VRA rationale was not Secretary Ross's original or actual motivation. Ultimately though, the Court could not, by a preponderance of the evidence, connect the dots between the President and Mr. Kobach's views, the Secretary's failure to disclose his real rationale, and the Secretary's final decision and entered judgment in favor of Defendants on the Equal Protection claim and the § 1985 Claim.

With this backdrop, the Court turns to the newly discovered evidence.

**B.  Newly Discovered Evidence**

Plaintiffs point primarily to two pieces of evidence in their Motion: an unpublished 2015 study by Dr. Thomas Hofeller discussing the use of citizen voting-age population (CVAP) data for redistricting purposes and a paragraph found in Dr. Hofeller's files that was identical to a

---

[3] Outside of showing that a citizenship question is likely to disparately impact Hispanics, the Court found that Plaintiffs, at that time, had not provided any evidence that Secretary Ross was motivated by animus towards Hispanics/Latinos.

5

paragraph in an early draft of a letter that would serve as the pretextual basis for the citizenship question. The Court will discuss each in turn.

In the newly-discovered unpublished 2015 study, Dr. Hofeller explained how a switch from the current norm of drawing legislative districts of equal total population pursuant to *Wesberry v. Sanders*, 376 U.S. 1 (1964) to using CVAP data for redistricting purposes could shift political power in favor of white voters and away from Hispanic voters. ECF No. 162-3 at 60–108. To generate the CVAP data necessary to make this switch—a change that would "be advantageous to Republicans and Non-Hispanic Whites"—Dr. Hofeller concluded that a citizenship question would need to be added to the 2020 Census. *Id.* at 68.

Dr. Hofeller acknowledged that a change from redistricting based on total population to CVAP would be a "radical departure" that might alienate Hispanic voters. *Id.* at 67. He noted that further research should address whether "the gain of GOP voting strength" from the use of CVAP data would be "worth the alienation of Latino voters who will perceive the switch" as an "attempt to diminish their voting strength." *Id.* at 63. Dr. Hofeller did not want the 2015 report to be attributed to him "either directly or indirectly" because of the role he played as an expert witness in redistricting cases. *Id.* at 56–57.

The significance of this study found in Dr. Hofeller's files is made manifest through evidence previously placed in the record. Existing evidence showed that Dr. Hofeller was "the first person that said something" to Mark Neuman about adding a citizenship question to the 2020 Census. ECF No. 162-4 at 51:7–16.[4] Hofeller and Neuman were "good friends" for decades, *id.* at 137:11–12, and they spoke several times about the citizenship question during the

---

[4] Pin cites to deposition transcripts refer to the page numbers generated by the transcripts rather than the page number generated by the ECF system.

Presidential transition when Neuman was serving as the point person for all issues related to the Census. *Id.* at 37:16–22; ECF No. 154 at 9; *id.* at 14 (quoting PX-614).

Neuman played an outsized role in advising Secretary Ross and his staff on census-related decisions. *See e.g.*, PX-87 (AR 3709); PX-614 (COM_DIS00019687) (AR); PX-38 (AR 2051_0001); PX-145 (AR 11329); PX-592 (COM_DIS00017396) (AR); PX-52 (AR 2482); PX-193. After serving as the point person for all issues related to the Census during the Presidential transition in 2016 and 2017, Neuman went on to serve as a "trusted advisor" to Secretary Ross on Census issues. ECF No. 154 at 9; *id.* at 14 (quoting PX-614).

When Secretary Ross complained in May 2017 that nothing had been done about his "months-old request to add a citizenship question," see ECF No. 154 at 10, his chief of staff asked whether she should try to set up another meeting with Neuman, and Ross responded that they should try to "stick Neuman in there to fact find." PX-83. On September 7, 2017, the Department of Commerce's general counsel, Peter Davidson, expressed "concern" about contacting Kansas Secretary of State Kris Kobach about Census matters, and instead recommended that the team "set up a meeting with" someone "trusted" like Neuman before doing "anything externally." PX-614 at 3 (COM_DIS00019687) (AR). Days later, on September 13, 2017, John Gore, the then-Acting Assistant Attorney General for Civil Rights, first connected with Department of Commerce staff about the citizenship question issue. PX-68 (AR 2659); PX-59 (AR 2628); PX-60 (AR 2634) Once Gore—the political appointee who would go on to ghostwrite DOJ's request—had been recruited to solicit the addition of a citizenship question, Neuman communicated with him about the pretextual rationale upon which DOJ could base its request. PX-52; ECF No. 103-10 at 437–38; *See also* ECF No. 103-8 at 155–56.

And that leads to the significance of the second key piece of newly discovered evidence. It now appears that Dr. Hofeller worked with Neuman to concoct the VRA pretext that Neuman then provided to Gore on the Secretary's behalf. ECF No. 162-3 at 2; ECF No. 162-4 at 112:5–11; PX-52 (AR 2482). At a meeting arranged by the Department of Commerce's in-house counsel, Neuman handed Gore a draft letter that could serve as a template to request inclusion of a citizenship question on the 2020 Census. ECF No. 162-3 at 118. The template included a paragraph setting forth the pretextual VRA enforcement rationale. *Id.* at 125. A copy of this same paragraph was found in Dr. Hofeller's files, indicating that he may have drafted the paragraph that was later incorporated into Neuman's template. *Id.* at 128.

Secretary Ross was aware of Neuman's role as a go-between and specifically of the meeting at which Neuman handed Gore the template DOJ letter apparently co-written with Dr. Hofeller. PX-52 (AR 2482). When the Secretary asked Davidson about the "Letter from DoJ" in an October 8, 2017 email, Davidson replied that he was "on the phone with Mark Neuman right now" getting a "readout of his meeting last week." *Id.* He offered to give the Secretary "an update via phone," *id.*, to which the Secretary responded, "please call me." *Id.*

Plaintiffs' new evidence potentially connects the dots between a discriminatory purpose—diluting Hispanics' political power—and Secretary Ross's decision. The evidence suggests that Dr. Hofeller was motivated to recommend the addition of a citizenship question to the 2020 Census to advantage Republicans by diminishing Hispanics' political power. ECF No. 162-3 at 68. Taken together with existing evidence, it appears that Dr. Hofeller was involved in the creation of the pretextual VRA rationale and worked with Neuman, Secretary Ross's "trusted advisor," PX-614, to drive the addition of a citizenship question. ECF No. 162-3 at 2–5; PX-52 (AR 2482). Dr. Hofeller's close relationship with Neuman, the fact that they had early

8

discussions about adding the citizenship question and his apparent work with Neuman in crafting the VRA pretext all point to a possible, if not likely, conclusion that the decisionmakers adopted Dr. Hofeller's discriminatory purpose for adding the citizenship question. In this way, a connection between Dr. Hofeller's motive and the decisionmakers' motivations may be less attenuated than any connection between evidence of Kris Kobach's motivations and the Secretary and his staff's intent.

The Court is unconvinced by Defendants' argument that Plaintiffs' Rule 60(b) Motion must fail because the newly-discovered evidence supports an entirely different theory than the one advanced at trial. First, the new evidence that decisionmakers may have been originally motivated to add a citizenship question to allow for the use of CVAP data for redistricting purposes because of that change's effect on Hispanic political power does not conflict with Plaintiffs' trial theory that Defendants were also motivated to add the question so that Hispanics and noncitizens would be undercounted. Instead, these methods of depriving Hispanics and/or non-citizens of equal representation are entirely complementary. Whether the ultimate goal was accomplished by causing an undercount of Hispanics and non-citizens or by creating and then using a data set (CVAP) that was less likely to include them, the discriminatory purpose was the same.

Further, accepting for the sake of argument that the newly-discovered evidence supports an entirely different theory about the decisionmakers' discriminatory purpose, it still provides additional force to Plaintiffs' original theory. At trial, evidence was provided that Kobach, motivated by discriminatory animus, spoke to Ross about adding a citizenship question; the Trump campaign, with the backdrop of many statements and tweets demonstrating discriminatory animus by the President, sought to take credit for the citizenship question; and

Secretary Ross was provided reading material regarding the pitfalls of counting illegal immigrants in the Census, a problem that would be mitigated by adding a citizenship question. Ultimately, the Court found that this evidence still fell just short of establishing discriminatory intent by a preponderance of the evidence. However, even if Dr. Hofeller's study evidences a different approach, the fact that yet another person was providing input into the decision-making process that was based in discriminatory purpose, with no counterbalancing reasoning other than one the Court found to be pretext, provides more weight to Plaintiffs' position that Defendants' ultimate motivation in adding the citizenship question was discriminatory. Additionally, there is a basis to conclude that Dr. Hofeller's views directly impacted the decision. Thus, at the very least, Plaintiffs have raised a substantial issue.

### C.  Additional Defense Arguments

In addition to challenging the import of the evidence, Defendants raise additional questions, to which the Court now turns.

### 1.  Does the Motion comply with Rule 60(b)?

In addition to raising a meritorious claim, to comply with Rule 60(b), the movant must demonstrate that the opposing party would not be unfairly prejudiced and that the motion is timely. *Nat'l Credit Union Admin Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993).

Regarding Defendants' claim that they will suffer unfair prejudice if the judgment is set aside, the Court is sensitive to Defendants' deadlines. However, Defendants' deadlines affect Plaintiffs' ability to obtain relief and appellate review just as much as they impact Defendants'. Further, an appeal is currently pending before the Fourth Circuit and is not yet ripe, meaning whether Defendants were waiting for a ruling by this Court or by the Fourth Circuit, their deadlines could come and go under either circumstance. Finally, because this Court previously

10

concluded that, on his path to adding a citizenship question, Secretary Ross bulldozed over the Census Bureau's standards and procedures for adding questions, at times entirely ignoring the Bureau's rules, ECF No. 154 at 100–108, any prejudice that Defendants now face is partially of their own making. Taken together, the Court cannot conclude that Defendants would be unfairly prejudiced by having the judgment set aside.

Additionally, Plaintiffs' Motion is timely. This Court entered judgment on April 5, 2019, and Plaintiffs could not reasonably have obtained this evidence prior to or within 28 days of that judgment, despite their diligent discovery efforts. Neuman mentioned at his deposition, which was taken on the last day of fact discovery, that Dr. Hofeller was the first person to raise the citizenship question issue with him, ECF No. 162-4 at 51:7–16, but he may have misled Plaintiffs about the nature of Hofeller's role, ECF No. 162-4 at 138:3–15; *id.* at 143:25–144:6; *id.* at 54:11-56:24. Neuman represented at his deposition that the "substance" of his conversations with Dr. Hofeller were limited to encouragement that "block level data" was necessary to "draw the most accurate districts" and requests that the administration not "skimp on the budget." ECF No. 162-4 at 138:3–15. Neuman also testified that he did not rely on Dr. Hofeller for "expertise on the Voting Rights Act." *Id.* at 143:25–144:6. The new evidence casts doubt on the plausibility of this testimony. Similarly, Neuman also suggested that Hofeller's interest in obtaining citizenship data from the Census was to create Latino-majority voting districts, ECF No. 162-4 at 54:11-56:24, which is unlikely in light of Hofeller's 2015 study. Neuman further testified that he "wasn't part of the drafting process of the [DOJ] letter." *Id.* at 114:15–21. The newly-discovered evidence indicating that Neuman and Hofeller collaborated to draft a template DOJ letter calls the credibility of this testimony into question. Thus, it is possible

that if Neuman had testified more accurately, Plaintiffs would have had the necessary motivation to pursue the material now at issue.

Defendants argue that Plaintiffs had access to the Hofeller documents on March 13, 2019. ECF No. 168-1 at 11. That is inaccurate. The large law firm representing the New York Plaintiffs had access to the documents because of their work on an unrelated case on March 13, 2019. ECF No. 162-3 at 2; *see also* ECF No. 167-1 ¶¶ 1–5. They had no reason to search the documents for terms relevant to this action. *Id.* When the documents were subsequently identified as relevant to the New York plaintiffs, those plaintiffs filed the New York Motion, publicly revealing the new evidence's existence for the first time. *Id.* at 2–5. Days later, the Plaintiffs here filed their motion. In sum, Plaintiffs have demonstrated that the newly-discovered evidence could not have been discovered with reasonable diligence in time to raise the evidence at trial or to move for a new trial under Rule 59(b). Fed. R. Civ. P. 60(b)(2).

   2.   Is the evidence admissible?

Defendants' argument that the newly-discovered evidence is clearly inadmissible also fails. To authenticate the documents found on Dr. Hofeller's computer, Plaintiffs have provided the deposition testimony of Dr. Hofeller's daughter taken in the unrelated North Carolina litigation. ECF No. 167-28. That testimony establishes how Ms. Hofeller came into possession of the documents. *Id.* at 20. Given her distant location, Ms. Hofeller is an unavailable declarant and her prior sworn testimony is likely admissible under Rule 804(b)(1) because the parties cross-examining her in the unrelated North Carolina action had a similar motive to question her on authentication issues as the Defendants here. Fed. R. Evid. 804(b)(1); *see also Horne v. Owens-Corning-Fiberglas Corp.*, 4 F.3d 276, 283 (4th Cir. 1993) (holding that district court's introduction of past deposition testimony was proper even though plaintiff was not a party to the

12

prior litigation and noting that "privity is not the gravamen" of Rule 804(b)(1)). It is irrelevant

that the North Carolina action is factually unrelated to this case because Ms. Hofeller's

deposition testimony served the same purpose in that case as it would here.

The newly-discovered documents are also not barred by the rule against hearsay.

Plaintiffs would not be admitting either of the key documents for their truth but rather to show

the motive or intent behind the citizenship question.

\* \* \*

The Court did not arrive at its previous findings—that Secretary Ross's articulated

reasoning was pretextual and that the overall decision to add a citizenship question was arbitrary

and capricious—lightly; instead, careful consideration of the evidence compelled those

conclusions. The question of whether the Secretary's true reasoning was driven by

discriminatory animus is similarly weighty. But, here as well, it is becoming difficult to avoid

seeing that which is increasingly clear. As more puzzle pieces are placed on the mat, a disturbing

picture of the decisionmakers' motives takes shape.

The Court recognizes that because of the unique procedural posture of this and related

cases, this Opinion and the Order it supports may well be moot by the time it is read by anyone

other than the Court's own staff. Nonetheless, pursuant to Rule 62.1, the Court finds a substantial

issue has been raised. If the case is remanded, the Court will reopen discovery for no more than

45 days, order an expedited evidentiary hearing, and provide a speedy ruling.

**III.    CONCLUSION**

For the foregoing reasons, on June 19, 2019, the Court granted Plaintiffs' Motion for an

Indicative Ruling Under Rule 62.1(a), finding Plaintiffs' Rule 60(b) Motion raises a substantial

issue.

Dated: <u>June 24, 2019</u>                                              /s/_____

GEORGE J. HAZEL
United States District Judge

**ATTACHMENT B**

**No. 18-966**

# In the Supreme Court of the United States

───────────

DEPARTMENT OF COMMERCE, ET AL., PETITIONERS

*v.*

STATE OF NEW YORK, ET AL.

───────────

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

───────────

**PETITIONERS' OPPOSITION TO**
**NYIC RESPONDENTS' MOTION FOR LIMITED REMAND**

───────────

NOEL J. FRANCISCO
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

Page

Statement ................................................................. 2
Argument................................................................. 7
Conclusion ............................................................. 20

## TABLE OF AUTHORITIES

Cases:

    *Burns* v. *Richardson*, 384 U.S. 73 (1966) ........................... 15
    *Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016) ................ 9, 12, 15

Statutes and rules:

    Census Act, 13 U.S.C. 1 *et seq.*:
        13 U.S.C. 141(a) .................................................... 2
    Voting Rights Act of 1965, 52 U.S.C. 10301 *et seq.*
      (Supp. V 2017):
        52 U.S.C. 10301 (§ 2) ........................................ 2
    Fed. R. Civ. P:
        Rule 60(b)(2) .................................................... 16
        Rule 62.1(a) ..................................................... 16
        Rule 62.1(a)(3).................................................. 16
    Fed. R. Evid.:
        Rule 802........................................................... 9
        Rule 901(a) ...................................................... 9

(I)

# In the Supreme Court of the United States

────────

No. 18-966

DEPARTMENT OF COMMERCE, ET AL., PETITIONERS

*v.*

STATE OF NEW YORK, ET AL.

────────

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

────────

**PETITIONERS' OPPOSITION TO**
**NYIC RESPONDENTS' MOTION FOR LIMITED REMAND**

────────

Trial is long since over; briefing in this Court has concluded; oral argument has been heard; and the Court is poised to issue its decision soon. Yet now at the eleventh hour, private respondents—but not New York or the other governmental respondents—seek to reopen discovery on the basis of "[n]ew evidence, discovered after oral argument." Mot. 1. The Court should deny that request.

According to private respondents, a years-old document allegedly discovered among the personal effects of a deceased private citizen, Dr. Thomas Hofeller, somehow proves that *he* was the true mastermind behind the Secretary of Commerce's decision to reinstate a citizenship question to the 2020 decennial census—and all because Hofeller allegedly wrote an unrelated and cryptic paragraph in a separate letter that someone else gave to the Department of Justice (DOJ) official who later

(1)

2

drafted the formal request to the Census Bureau requesting a citizenship question.

Private respondents' conspiracy theory is implausible on its face. Moreover, the allegedly "new evidence" is not even new; respondents either already knew or, with minimal diligence, easily could have discovered its substance months ago. And in any event it is irrelevant to respondents' claims here. If anything, private respondents' motion only underscores the district court's fundamental error in allowing respondents to stray beyond the administrative record in the first place. The motion should be denied.

**STATEMENT**

1. a. Exercising the authority delegated to him by the Census Act to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. 141(a), the Secretary of Commerce, Wilbur L. Ross, Jr., determined in a March 26, 2018 memorandum that the 2020 decennial census questionnaire should include a question requesting citizenship information. Pet. App. 548a-563a. The Secretary's memorandum responded to a December 12, 2017 letter (Gary Letter) from DOJ, which was drafted by then-Acting Assistant Attorney General John M. Gore. *Id.* at 564a-569a.

The Gary Letter stated that citizenship data is "critical" to DOJ's enforcement of Section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C. 10301 (Supp. V 2017), and that "the decennial census questionnaire is the most appropriate vehicle for collecting that data." Pet. App. 565a; see *id.* at 567a-568a. It further explained how citizenship data from the American Community Survey (ACS) suffered from at least four flaws that census citizenship data would avoid. See *id.* at 567a-568a. DOJ

3

thus "formally request[ed] that the Census Bureau re-instate into the 2020 Census a question regarding citizenship." *Id.* at 569a.

b. Respondents successfully sought extra-record discovery, including to compel Gore's deposition. Pet. App. 452-455a. In his October 26, 2018 deposition, Gore was asked whether, when he was drafting the Gary Letter, he had had "any communication with anybody who was not a federal employee at the time about having a citizenship question on the census." D. Ct. Doc. 601-7, at 37-38.[1] Gore answered that he had "had a conversation with a gentleman named Mark Neuman," who Gore understood had been "advising the Department of Commerce and the Census Bureau with respect to this issue." *Id.* at 38. When asked for "the substance of [his] conversation with Mr. Neuman," Gore declined to answer on the basis of deliberative-process privilege. *Ibid.* Respondents did not challenge the privilege assertion, either then or later in the district court. Nor was Gore asked any follow-up questions about his meeting with Neuman.

Neuman was deposed two days later. See D. Ct. Doc. 601-8. He, too, identified Gore as someone "with whom [he had] communicated about the possible addition of a citizenship or immigration question to the 2020 census." *Id.* at 33. When asked whether he had "provided some information to Mr. Gore for purposes of the letter that DOJ subsequently drafted regarding the citizenship question," Neuman answered: "Mainly the—mainly a copy of the—of the letter from the Obama Administration, Justice Department, to the Census Bureau on the

---

[1] Unless otherwise specified, all references are to the docket in No. 18-cv-2921 (S.D.N.Y.). The government sent a copy of D. Ct. Docs. 601 and 601-1 through 601-12 to this Court on June 3, 2019.

4

issue of adding a question on the ACS." *Id.* at 39-40. Neuman was not asked whether he provided anything else to Gore during their meeting.

During his deposition, Neuman was presented with a draft letter that he had produced in discovery (Neuman Letter), which purported to be a letter from DOJ to the Census Bureau requesting reinstatement of a citizenship question. D. Ct. Doc. 601-8, at 58-60; see D. Ct. Doc. 601-5, at 5-6 (copy of Neuman Letter). Neuman observed that the Neuman Letter "is very different than the letter that ultimately went from DOJ," D. Ct. Doc. 601-8, at 60, and he denied having been any "part of the drafting process of the letter" that was "sent by [DOJ] to the Commerce Department in December 2017," *id.* at 38. Neuman was not asked whether he shared the Neuman Letter with anyone. But the government also had produced a copy of the Neuman Letter to respondents in discovery before Gore's deposition, noting that it had been "collected from John Gore" "in hard copy." D. Ct. Doc. 601-5, at 4. Respondents did not ask Gore any questions about the Neuman Letter.

c. Following a bench trial, the district court entered judgment for respondents on their statutory claims, but ruled against them on their equal-protection claim. Pet. App. 1a-353a. This Court granted the government's petition for a writ of certiorari before judgment on February 15, 2019. Following expedited briefing, oral argument was heard on April 23.

2. a. On May 30, 2019, the private respondents—the New York Immigration Coalition (NYIC), CASA de Maryland, Inc., the American Arab Anti-Discrimination Committee, ADC Research Institute, and Make the Road New York (collectively, NYIC)—moved the dis-

5

trict court for an order to show cause why the government should not be sanctioned. D. Ct. Doc. 595. The State of New York and the other governmental respondents did not join the motion. NYIC claimed to have discovered "new evidence that contradicts sworn testimony of Secretary Ross's expert advisor A. Mark Neuman and senior DOJ official John Gore." *Id.* at 1. According to NYIC, that new evidence comprises (a) Gore's statement to staffers of a congressional subcommittee that Neuman gave him a copy of the Neuman Letter and (b) two files found in the personal effects of Dr. Thomas Hofeller, a private citizen and Republican redistricting expert who passed away last year. *Ibid.*

One of those files is an unpublished 2015 study discussing "the practicality of the use of citizen voting age population (CVAP) as a basis for achieving population equality for legislative redistricting." D. Ct. Doc. 595-1, at 55. The other, created two years later in August 2017, comprises a single paragraph discussing two cases about the VRA from 2006 and 2009. See *id.* at 123. That paragraph appears verbatim in the Neuman Letter—but not the Gary Letter. Compare *ibid.* with *id.* at 120.

According to NYIC, the "new evidence reveals that" Hofeller "played a significant role in orchestrating the addition of a citizenship question to the 2020 Decennial Census." D. Ct. Doc. 595, at 1. NYIC complained that "[b]oth Neuman and Gore concealed Dr. Hofeller's role in crafting the October 2017 draft letter [*i.e.*, the Neuman Letter] and the VRA enforcement rationale it advanced." *Ibid.* NYIC also alleged that "neither Neuman nor Gore disclosed that Neuman gave [the Neuman Letter] to Gore," and that "Gore's testimony that he initially drafted the DOJ letter to Commerce requesting the citizenship question was materially misleading

6

given that the December 2017 DOJ letter was adapted
from the Neuman DOJ Letter, including, in particular,
Dr. Hofeller's VRA rationale." *Id.* at 3.

b. During his deposition, Neuman discussed Ho-
feller at length. Neuman said "Tom Hoffler" was some-
one he spoke to "about a potential citizenship or immi-
gration question on the 2020 census." D. Ct. Doc. 601-8,
at 3. Neuman explained that Hofeller (whose name is
misspelled in the deposition transcript) "was known in
the redistricting community" and was "a point person
for redistricting" in Republican circles. *Id.* at 6, 16. Ac-
cording to Neuman, Hofeller was "pretty important, be-
cause in the past Tom Hof[el]ler was able to get mem-
bers of Congress to support funding for the [Census]
Bureau." *Id.* at 10.

Neuman said that he probably spoke to Hofeller
about a census citizenship question around five times
during the presidential transition and up to a dozen
times afterward. D. Ct. Doc. 601-8, at 7, 44. Neuman
explained that those conversations primarily concerned
block-level data, which Hofeller was "obsess[ed]" with
"because block level data means that you can draw the
most accurate districts." *Id.* at 45. Hofeller told Neu-
man that a census citizenship question would generate
"block level citizen voting age population data," which
would be useful "to ensure one person, one vote." *Id.* at
19-20. Neuman denied, however, discussing with Ho-
feller the use of census citizenship data "for reappor-
tionment purposes," including "whether undocumented
immigrants or non-citizens should be included in the
state population counts for reapportionment purposes."
*Id.* at 23. All told, Neuman's discussion of his conversa-
tions with Hofeller occupy more than 30 transcript
pages. See *id.* at 3, 6-28, 30-32, 43-46, 49-51.

7

c. The district court declined to grant NYIC's request for an order to show cause, and instead advised the private respondents that if they wished to move for sanctions, they should file a motion and supporting brief no later than July 12, 2019. D. Ct. Doc. 605, at 1.

## ARGUMENT

Private respondents—but not New York or the other governmental respondents—contend (Mot. 1) that Hofeller "concocted" the VRA rationale in the Gary Letter and "wrote a portion of an early Justice Department draft letter articulating the VRA rationale for adding the [citizenship] question." On that basis, they seek (Mot. 7) a "limited time-bound remand to the district court to engage in expedited factfinding." Private respondents' contention is meritless, and their request for a remand should be denied.

1. a. NYIC's conspiracy theory is implausible on its face. Although its theory has shifted somewhat since the filing in the district court—it no longer claims that the Gary Letter "bears striking similarities to Dr. Hofeller's 2015 study," D. Ct. Doc. 595, at 3; cf. D. Ct. Doc. 601, at 1-2—NYIC identifies the following chain supposedly linking Hofeller to Secretary Ross's decision:

1. Hofeller authored a 2015 study, never published, in which he observed that "[a] switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," D. Ct. Doc. 595-1, at 63, and that "[u]se of CVAP would clearly be a disadvantage for the Democrats," *id.* at 61.

2. Two years later, Hofeller created a file on his hard drive comprising a single paragraph:

8

> We note that in these two cases, one in 2006 and one in 2009, courts reviewing compliance with requirements of the Voting Rights Act and its application in legislative redistricting, have required Latino voting districts to contain 50% +1 of "Citizen Voting Age Population (or CVAP). It is clear that full compliance with these Federal Court decisions will require block level data that can only be secured by a mandatory question in the 2020 enumeration. Our understanding is that data on citizenship is specifically required to ensure that the Latino community achieves full representation in redistricting.

D. Ct. Doc. 595-1, at 123.

3. The Neuman Letter, which Neuman gave to Gore, contains that same paragraph. See D. Ct. Doc. 595-1, at 120; D. Ct. Doc. 601-5, at 5-6.

4. Gore later drafted the Gary Letter, which formally requested reinstatement of a citizenship question because census citizenship data would be useful for VRA enforcement in light of ACS citizenship data's well-known flaws. Pet. App. 567a-568a. The Gary Letter includes neither the paragraph in the Hofeller file nor any other text from the Neuman Letter.

5. The Secretary issued his March 2018 decisional memorandum, relying in part on the Gary Letter's description of the problems with ACS citizenship data for VRA enforcement.

From those alleged facts, NYIC asserts that Secretary Ross must have added the citizenship question *not* (as he said) because the resulting data would be responsive

9

to DOJ's formal request, but because he secretly was doing Hofeller's bidding to help "Republicans and Non-Hispanic Whites" and harm "Democrats" by enabling States to redistrict based on CVAP instead of total population. D. Ct. Doc. 595-1, at 61, 63. Even assuming the Hofeller files are admissible, but see Fed. R. Evid. 802, 901(a), NYIC's chain of logic fails at every step.

First, NYIC errs in attributing a discriminatory motive to Hofeller's 2015 study. Nowhere in that study did Hofeller suggest that he intended to harm any racial minority. Instead, the study was his attempt to predict, as an objective matter, the consequences of a potential ruling in favor of the appellants in *Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016), which this Court had not yet decided. Such a ruling would have required Texas to draw districts based on CVAP instead of total population. See *id.* at 1123. After exhaustively analyzing the demographic makeup of the existing districts and counties in Texas, the 2015 study observed:

> The 97 GOP districts have sufficient CVAP populations to actually form 103.2 districts, while the 53 Democrat districts only have sufficient CVAP population to comprise 46.8 districts. Use of CVAP would clearly be a disadvantage for the Democrats.

D. Ct. Doc. 595-1, at 61. That is an empirical observation about the impact of switching from total-population to CVAP-based districts, not an expression of intent to harm Democrats, much less Hispanics. Similarly, the study observed:

> There are presently 35 districts with [Hispanic CVAP] percentages over 40. As a whole, those 35 districts only contain sufficient [Hispanic CVAP] populations to comprise 30.1 districts.

10

D. Ct. Doc. 595-1, at 60-61. That, too, is an empirical observation, not an expression of intent to harm Hispanics. NYIC's claims (Mot. 2) of "an unconstitutional, racially discriminatory motive" in the 2015 study are thus baseless.

Second, the 2017 paragraph that appears in the Neuman Letter, which not even NYIC claims expresses a discriminatory motive, has no relation to the 2015 study (other than their alleged author). They were written years apart and deal with different issues: one is about the population base for redistricting, the other is about block-level data for VRA compliance. The two documents are thus unrelated in time and scope, and no reasonable reader could conclude that the latter was written in stealth service of the former. That breaks the chain between any purported improper motive expressed in the 2015 study and the paragraph that appears in the Neuman Letter.

Third, there is no connection between the Neuman Letter and the Gary Letter drafted by Gore. Even a cursory comparison reveals that the Gary Letter bears no resemblance to any part of the Neuman Letter, including the paragraph found in the Hofeller files. Compare Pet. App. 564a-569a with D. Ct. Doc. 601-5, at 5-6. Nor could any reasonable reader conclude that the Hofeller paragraph "sets forth the Government's publicly-stated VRA enforcement rationale." Mot. 5. The government's VRA rationale in the Gary Letter centers on four flaws in ACS citizenship data that would be cured by census citizenship data. Pet. App. 567a-568a. The paragraph in the Neuman Letter says nothing of the sort. The only thing the two documents have in common is that both purport to be letters addressed from DOJ to the Census Bureau—and even on that triviality, the

11

Neuman Letter is addressed to a different person and contains no signature. Tellingly, despite having had the Neuman Letter for months—and quizzing Neuman about it in his deposition, see D. Ct. Doc. 601-8, at 58-64 —NYIC has until now never suggested that it bore any resemblance to the Gary Letter.

Fourth, there is no basis to conclude that anything Hofeller wrote influenced Secretary Ross's decisional memorandum. The most NYIC can muster is that the Secretary "was aware" that Neuman met with Gore. Mot. 5, 9. But that fact was hardly a secret; Gore and Neuman freely testified that they had met. D. Ct. Doc. 601-7, at 38-39; D. Ct. Doc. 601-8, at 33-41, 53, 56. The Secretary's awareness of a meeting between Neuman and Gore does not even arguably show that he was stealthily acting to further the secret goals of Hofeller, a private citizen.

Moreover, had the Secretary wanted to reinstate a citizenship question to the 2020 decennial census for the sole purpose of enabling districts to be drawn on the basis of CVAP rather than total population, he did not need to rely on a secret unpublished study from Hofeller. The *administrative record itself* contains a request to add the question in part for that purpose. The Attorney General of Louisiana requested reinstatement of a citizenship question because, in his view, drawing districts without considering CVAP "dilutes the votes of all legally-eligible voters by improperly counting those ineligible to vote when determining the population for representative districts." Administrative Record 1079. When the Secretary and his staff later met with him in March 2018, "AG Landry noted that states have a lot of flexibility when it comes to redistricting, and having accurate data about citizen voting age population would

12

better inform the state legislatures charged with carrying out the task of redistricting." Administrative Record 1203. The State of Texas advanced a similar argument before this Court in *Evenwel*. See 136 S. Ct. at 1126 (noting "Texas'[s] separate assertion that the Constitution allows States to use alternative population baselines, including voter-eligible population").

Yet the Secretary did *not* rely on that rationale in his decisional memorandum. Instead, he relied on DOJ's explanation—which respondents, despite hundreds of pages of briefing, have never challenged—that citizenship data from the ACS has substantial limitations. It is implausible that the Secretary would affirmatively choose not to adopt the reasons provided by the Attorney General of Louisiana in a public letter and discussions memorialized in the administrative record, or the reasons urged by the State of Texas in a publicly filed brief in this Court—yet secretly adopt essentially the same reasons expressed in a years-old unpublished document found among the personal effects of a deceased private citizen. NYIC's conspiracy theory is thus nonsensical even on its own terms.

b. Remand also is improper because NYIC's request comes too late. NYIC had every opportunity to learn all of the information it now claims is "new," yet failed to do so. It is not entitled to a do-over.

NYIC either knew or easily could have learned that Neuman gave Gore a copy of the Neuman Letter. The government produced a copy of that letter in discovery before both Gore and Neuman's depositions, and expressly told respondents that it had been "collected from John Gore" "in hard copy." D. Ct. Doc. 601-5, at 4. So NYIC knew (1) Neuman had the letter; (2) Neuman met Gore and gave him documents; and (3) Gore

13

had the letter.  If NYIC had not already deduced that
Neuman gave the letter to Gore, it easily could have
learned that fact with simple, obvious questions. To Gore:
"Who gave you this letter?"  To Neuman: "Did you give
this letter to anyone?"  NYIC asked neither.  Neuman
*was* asked what he gave to Gore, and he replied that he
"mainly" provided an Obama-era DOJ document.  D. Ct.
Doc. 601-8, at 39-40.  Unasked was the obvious follow-
up: "*What else* did you give to Gore?"  A party's incom-
plete deposition questioning provides no basis to reopen
fact development long after trial is complete.

NYIC incorrectly insists (Mot. 9-10) that there re-
main a series of "outstanding questions" that must be
resolved, including:  "Who at Commerce knew that the
VRA rationale came from Dr. Hofeller?  Who at Com-
merce asked Dr. Hofeller to spell out that rationale in a
draft DOJ letter?  Who at Commerce knew about Dr.
Hofeller's conclusion that the citizenship question
would enable redistricting that is 'advantageous to Re-
publicans and Non-Hispanic Whites'?"  As an initial
matter, those questions are irrelevant because they
contain built-in assumptions that are false—"the VRA
rationale" in the Gary Letter and the Secretary's deci-
sional memorandum did *not* "c[o]me from Dr. Hofeller";
and neither Hofeller nor Neuman "spell[ed] out" any-
thing "in a draft DOJ letter" because nothing they cre-
ated or provided served as a draft of the Gary Letter.

More important, NYIC could have discovered the an-
swers to every single one of those questions about Ho-
feller's (peripheral) role had it exercised some dili-
gence.  Neuman testified at length about Hofeller and
their discussions about the citizenship question, CVAP,
and block-level data.  If NYIC had questions on those
topics, it should have asked them.  It did not.  Indeed,

14

respondents (correctly) found Neuman's role so tangential that they did not designate or seek to admit into evidence even a single line of his deposition transcript. And it was respondents who insisted on proceeding to trial immediately after Neuman's deposition. Having deliberately made that strategic litigation choice, NYIC should not be heard to complain now.

Moreover, it appears that the law firm representing NYIC has had the Hofeller files since February or March, if not earlier. See Doc. 167-1, at 2, *Kravitz* v. *United States Dep't of Commerce*, No. 18-cv-1041 (D. Md. June 14, 2019) (law firm received physical drives on March 13, 2019); D. Ct. Doc. 601-12, at 4 (files were subpoenaed in February after Hofeller's estranged daughter alerted an advocacy group to the files "[l]ate last year"). If those files were as important as NYIC's lawyers now claim they are, counsel should have alerted the government and this Court to them months ago—and not mere days before a final decision in this case.

c. Remand is inappropriate for the further reason that none of the supposedly new "evidence" is relevant to this case. NYIC contends (Mot. 8) that the new evidence "indicates that Commerce understood that adding a citizenship question would enable redistricting methods harmful to voters of color." But that is a completely different injury and theory of liability from what respondents have maintained throughout this litigation. Until NYIC's recent eleventh-hour filings, respondents had maintained that their injuries arose from the mere presence of the citizenship question on the ground that it would result in an undercount of certain noncitizen populations. Not once did they assert that they would be injured because the citizenship question might ena-

15

ble States to use "redistricting methods harmful to voters of color." *Ibid.* A remand to develop facts to support a theory of injury that respondents did not raise is unwarranted.

Moreover, respondents could not have asserted that theory of injury anyway. For one thing, they would not have had standing, for the injury is entirely speculative: it will not materialize unless sovereign States independently choose in the future to redistrict based on CVAP rather than total population. That also would make any injury not fairly traceable to the federal government. Even setting aside those flaws, such a theory would fail on the merits, too. This Court has found that redistricting based on citizen voting-age population is constitutionally permissible under some circumstances. See *Burns* v. *Richardson*, 384 U.S. 73, 93-94 (1966). Indeed, "[t]he Constitutions of Maine and Nebraska authorize the exclusion of noncitizen immigrants" from their apportionment base (though it appears that neither State does so). *Evenwel*, 136 S. Ct. at 1125 n.3. And when recently asked to hold that redistricting based on CVAP is impermissible, this Court pointedly declined to do so. *Id.* at 1133; see *id.* at 1143-1144 (Alito, J., concurring in the judgment); cf. *id.* at 1133 (Thomas, J., concurring in the judgment) ("The Constitution * * * leaves States significant leeway in apportioning their own districts to equalize total population, to equalize eligible voters, or to promote any other principle consistent with a republican form of government."). Respondents could not claim to be injured by the citizenship question merely because it might someday enable States to choose a redistricting method that, under *Evenwel* and *Burns*, remains constitutional.

16

In passing, NYIC asserts (Mot. 2) that the Hofeller connection "suggests an unconstitutional, racially discriminatory motive," presumably a reference to NYIC's failed equal-protection claim. See Pet. App. 331a-334a. But NYIC has not even arguably shown any racially discriminatory motive on the part of Secretary Ross. During the decisionmaking process, the Secretary communicated with dozens of stakeholders, ranging from staunch supporters of the citizenship question to those who vehemently opposed it. *Id.* at 549a. It would be absurd to attribute all of their private motives to the Secretary. As the district court correctly observed, "point[ing] primarily to the motivations of 'those who influenced' Secretary Ross in the decisionmaking process"—such as Kris Kobach, Steve Bannon, and then-Attorney General Sessions—is insufficient "to impute their discriminatory purpose to" the Secretary. *Id.* at 333a (citation omitted); see *id.* at 333a-334a. It follows *a fortiori* that the allegedly discriminatory motives of Hofeller—whom the Secretary is not alleged to have contacted during his decisionmaking process—cannot be attributed to the Secretary either.

That said, NYIC's motion suggests that it might belatedly attempt to revive the equal-protection claim in the lower courts on the basis of the Hofeller files. In fact plaintiffs in *Kravitz, supra,* have done just that, and the district court in Maryland recently granted their motion for an indicative ruling under Federal Rule of Civil Procedure 62.1(a), stating that the Hofeller files raise "a substantial issue" potentially warranting relief on the equal-protection claim under Rule 60(b)(2). Doc. 174, at 1, *Kravitz, supra,* No. 18-cv-1041 (June 19, 2019). The court did not rule "that it would grant the [Rule 60(b)(2)] motion," Fed. R. Civ. P. 62.1(a)(3), indicating

17

that it anticipates yet more litigation on the equal-protection issue. Doc. 174, at 1, *Kravitz*, *supra*. The government addressed the equal-protection claim in its brief here "in the event respondents or other district courts attempt to rely on those claims." Gov't Br. 54.

Accordingly—and to avoid addressing the issue in an emergency posture—the Court may wish to address the equal-protection claim in its opinion to make clear that neither respondents' original evidence nor the Hofeller files demonstrate any racial animus on the part of Secretary Ross. Indeed, a finding that the Secretary's decision cannot be set aside as pretextual, see *id.* at 40-45, necessarily forecloses a claim that it may be set aside as pretextual for a discriminatory reason.

2. NYIC also tries to bolster its conspiracy theory with allegations of "false or misleading testimony or representations" on the part of Gore and Neuman. Mot. 5, 10. Those allegations are baseless.

NYIC's only allegation against Gore (Mot. 5-6) is that Neuman's having given Gore a copy of the Neuman Letter supposedly "contradicts Gore's deposition testimony in this case that he was the one who wrote the initial draft of the DOJ letter." Mot. 6. NYIC presumably refers to the following exchange:

> Q. Is it fair to say that you wrote the first draft of the letter from the Department of Justice to the Census Bureau requesting a citizenship question on the 2020 census questionnaire?
>
> A. Yes.

D. Ct. Doc. 595-1, at 106. Gore's answer was true: he did in fact write the first draft of *the Gary Letter*. NYIC has adduced no evidence to the contrary. NYIC's claim

18

that Gore lied conflates the Gary Letter with the Neuman Letter, an entirely different document.

NYIC fares no better with its allegations against Neuman, who is not a governmental employee and was represented by private counsel throughout this litigation. NYIC asserts that Neuman told three falsehoods: (1) he said "he was not 'part of the drafting process of the DOJ letter' requesting the addition of a citizenship question"; (2) he "denied that an October 2017 meeting between him and Gore was about a 'letter from DOJ regarding the citizenship question'"; and (3) he "testified that Dr. Hofeller advised him that adding the question would 'maximize' representation for the 'Latino community.'" Mot. 5-6 (brackets and citations omitted).

The first statement is unequivocally true: Neuman did not play a role in drafting *the Gary Letter*. As explained above, NYIC's contrary assertion rests on a willful conflation of the Neuman Letter with the Gary Letter. As for the second statement, NYIC has mischaracterized Neuman's testimony. Neuman left no doubt that his meeting with Gore was "about the possible addition of a citizenship or immigration question to the 2020 census." D. Ct. Doc. 601-8, at 33. He further clarified that the meeting was not specifically about a "letter from DOJ," but more generally about "how Census interacts with the Justice Department," and he agreed that "the timing" of his meeting with Gore "dovetails with what you and I were discussing earlier" about "a meeting * * * *about a letter from DOJ*." *Id.* at 53 (emphasis added). NYIC could not possibly have been misled about the nature of the meeting between Gore and Neuman. And NYIC has not explained what is supposedly false about the third statement; it is perfectly consistent for Hofeller to have told Neuman one thing while having

19

written something else in his unpublished 2015 study.
Moreover, NYIC again has misrepresented Neuman's
testimony; he *denied* that the statement "was some-
thing that [Hofeller] suggested" and instead made clear
that the "point about maximization is *my* word. I want
Latino representation to be maximized." *Id.* at 49 (em-
phasis added).

3. a. A remand for factfinding at this late hour also
would prejudice the government. NYIC's contention
(Mot. 7) that "2020 Census forms can be finalized with-
out additional congressional appropriations as late as
October 31" is unsupported by the record. The witness
upon whose testimony NYIC relies made clear that
"[u]nder the current budget, * * * changes to the paper
questionnaire after June of 2019 * * * would impair the
Census Bureau's ability to timely administer the 2020
census," and that a delay until October would be feasi-
ble only with "exceptional resources." J.A. 905-906.
And the same witness previously testified that "changes
to the paper questionnaire after June of 2019" would be
infeasible "[w]ithout appropriate funding adjustments,"
D. Ct. Doc. 502-2, at 214, and that October was a viable
possibility only "[w]ith exceptional effort and additional
resources," D. Ct. Doc. 502-4, at 98. The district court
thus correctly found that for all practical purposes, "the
Census Bureau needs to finalize the 2020 questionnaire
by June of this year." Pet. App. 12a.

b. The Court also should reject NYIC's alternative
request (Mot. 11 n.3) to delay decision "pending the dis-
trict court's resolution of [NYIC's] sanctions motion."
NYIC has not filed a sanctions motion; the district court
did not grant its previous request, see D. Ct. Doc. 605,
at 1, and NYIC has until July 12 to decide whether to
file a new motion, *ibid.* This Court should not hold its

20

decision for a possible sanctions motion in the district
court that has not yet been filed and that NYIC is under
no obligation to file. Moreover, any motion for sanctions
based on alleged discovery misconduct not only would
be meritless, see pp. 17-19, *supra*, but also would be a
collateral issue that has no bearing on the disposition of
this case on the merits.

Nor should the Court grant NYIC's alternative re-
quest (Mot. 11 n.3) to dismiss the writ as improvidently
granted. As the petition for a writ of certiorari before
judgment observed (at 16), "to the government's
knowledge, this is the first time the judiciary has ever
dictated the contents of the decennial census question-
naire," and "[i]n light of the immense nationwide im-
portance of the decennial census, if the district court's
ruling is to stand, it should be this Court that reviews
it." Those observations remain true regardless of
NYIC's farfetched conspiracy theory; indeed, indulging
its belated request to dismiss this case would effectively
allow the district court's judgment to stand with no ap-
pellate review at all.

## CONCLUSION

Respondents' motion should be denied.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

JUNE 2019

**ATTACHMENT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, *et al.*, | |
| Plaintiffs, | |
| v. | No. 8:18-cv-1041-GJH |
| U.S. DEPARTMENT OF COMMERCE, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | |
| Plaintiffs, | |
| v. | No. 8:18-cv-1570-GJH |
| WILBUR L. ROSS, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

**DEFENDANTS' SURREPLY TO PLAINTIFFS' RULE 60(b)(2) MOTION FOR RELIEF FROM FINAL JUDGMENT & REQUEST FOR INDICATIVE RULING UNDER RULE 62.1(a)**

## INTRODUCTION

Having failed to "connect the dots between the President and [then-Kansas Secretary of State Kris] Kobach's views" and "the Secretary's final decision," Plaintiffs continue to provide more "dots" without the requisite "connect[ions]." *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 712 (D. Md. 2019). In support of their Rule 60(b) motion, Plaintiffs floated a new theory: a deceased private citizen named Dr. Thomas Hofeller left behind several hard drives and thumb drives, one of which contained an unpublished 2015 study (concerning the use of citizen voting age population (CVAP) rather than total population for redistricting) that allegedly evinced discriminatory animus against Hispanics, and this alleged animus somehow meandered its way through four people (Hofeller, A. Mark Neuman, John Gore, and Secretary Ross) and four documents (the 2015 Hofeller study, the Neuman Letter, the Gary Letter, and the Secretary's decisional memorandum) to infect the Secretary's final decision. Defendants have debunked that theory, both at each link in the "causal" chain and in the aggregate.

In reply, Plaintiffs raise yet another theory—as meritless as its predecessors—involving an entirely new player: Christa Jones, a career Census Bureau official, communicated with Hofeller in 2015, thus somehow "refut[ing] Defendants' contention that no link between Hofeller and the Secretary can be shown." Pls.' Reply at 3. That bizarre claim fails on multiple levels. *First*, the fact that a career Census Bureau employee communicated with Hofeller about topics unrelated to his secret 2015 study during the Obama Administration is probative of nothing, much less any connection between Hofeller's allegedly discriminatory motives and the Secretary's final decision. *Second*, Plaintiffs previously argued, and this Court found, that the Census Bureau—where Jones works for the Deputy Director—"*repeatedly, consistently, and unanimously recommended against adding a citizenship question* to the 2020 Decennial Census." *Kravitz*, 366 F. Supp. 3d at 699 (emphasis added). It would make no sense to transfer Hofeller's allegedly discriminatory intent to the Secretary through the Census Bureau's

recommendation *against* including the citizenship question. *Finally*, even that illogical leap would still not substantiate Plaintiffs' theory that "the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus." *Kravitz* 366 F. Supp. 3d at 754. After all, the alleged discrimination would occur only if *States* decided, for discriminatory reasons, to redistrict using CVAP rather than total population—a decision over which Secretary Ross exercises no authority whatsoever.

Plaintiffs' newest attempt to establish the provenance of their "newly discovered evidence" is similarly meritless. Their arguments on this issue only further underscore that they failed to ask appropriate deposition questions to elicit their desired information, and their newest declarations do nothing to refute that their attached exhibits remain unauthenticated, hearsay, and inadmissible.

Plaintiffs also incorrectly claim that "relief extending beyond June 30, 2019 will not automatically cause unfair prejudice to Defendants" because census questionnaires can be finalized as late as October 31, 2019. Pls.' Reply at 19. That contention is wrong and contradicted by the record, which clearly demonstrates that "changes to the paper questionnaire after June of 2019[ ] would impair the Census Bureau's ability to timely administer the 2020 census." PX-1194 at 1023:2–19. Indeed, Plaintiffs dilatory tactics underscore the inequities in the relief they now seek. For they now concede that they have known about this new "evidence" *for months*, attaching a declaration and deposition testimony demonstrating that their co-counsel acquired the Hofeller materials three months ago. That was almost a month *before* this Court's final judgment, which means Plaintiffs had ample opportunity to bring this supposedly "new" information to the Court's attention *before* the last minute and *before* the Supreme Court heard oral argument in the related New York case. Plaintiffs' delay highlights the prejudice to Defendants from granting their eleventh-hour request and their motion should be denied on this basis alone.

At the end of the day, Plaintiffs have offered yet another convoluted path to impute the purportedly discriminatory motives of others to the Secretary that is just as meritless as its predecessors. This time, the chimerical scheme to discriminate against Hispanic voters was purportedly developed during the Obama Administration by Hofeller and transferred to a career Census Bureau official long before Secretary Ross took office. But as with Plaintiffs' Kobach-President theory that the Court already rejected, and as with Plaintiffs' Hofeller-Neuman-Gore theory that Defendants have refuted, this new Hofeller-Jones theory brings Plaintiffs no closer to "demonstrating [that] the Secretary was actually persuaded to make his decision based on discriminatory animus." *Kravitz*, 366 F. Supp. 3d at 712.

## ARGUMENT

**I.    Plaintiffs' "evidence" concerning career Census Bureau official Christa Jones is as flawed and irrelevant as their other "newly discovered evidence."**

While Plaintiffs initially stress that the private communications between Hofeller and career Census Bureau official Christa Jones[1] "refute[] Defendants' contention that no link between Hofeller and the Secretary can be shown," Pls.' Reply at 3, they never explain this bold assertion. That is likely because the Hofeller-Jones communications show nothing at all. They do not prove any connection between Hofeller's allegedly discriminatory motives and Jones (or the Census Bureau), and they certainly do not prove any connection between the Census Bureau—which repeatedly, consistently, and unanimously recommended *against* a citizenship question—and the Secretary.

Plaintiffs first identify a 2015 email from Jones to Hofeller that is utterly unremarkable. In that email, Jones notes a Federal Register notice about the Census Bureau's 2015 Content Test—which tests the wording and placement of census questions—and she says that "[p]ublic comments

---

[1] Jones is Chief of Staff to Deputy Director Ron Jarmin. Between the December 2017 Gary Letter and the Secretary's March 2018 decision to include a citizenship question, Jones was Chief of Staff to then-Acting Director Jarmin.

[are] highly useful in this context," so it may "be an opportunity to mention citizenship."  Pls.' Reply Ex. A-21.  This makes sense because the Federal Register notice specially solicited comments on "ways to enhance the quality, utility, and clarity of the information to be collected."  Proposed Information Collection, Comment Request, 2015 National Content Test, 79 Fed. Reg. 71377-01 (Dec. 2014).  This also makes sense because Plaintiffs argued, and the Court found, that this was the *exact type of testing* that the Secretary should have conducted before including a citizenship question on the 2020 Census.  *See Kravitz*, 366 F. Supp. 3d at 710–11, 747 (criticizing the lack of pretesting and concluding that "the Secretary gave no consideration whatsoever to the specific wording of the proposed citizenship question or the impact of overall questionnaire design").  It is audacious for Plaintiffs to now argue that Jones's email to Hofeller—noting an opportunity for *public* comment on a Content Test for which *Plaintiffs themselves* advocated—somehow imputes Hofeller's allegedly discriminatory motives to Jones (or anyone else) over two years before Secretary Ross took office.

Plaintiffs next identify a similarly unremarkable two-email chain from 2010 to show that Jones "was also on emails discussing redistricting with Hofeller and various other Republican operatives." Pls.' Reply at 3 (citing Pls.' Reply Ex. A-19).  The subject of this email chain is "Redistricting Article"; Hofeller commented that the unattached and unknown article is "[a] little slanted, but it touches many of the bases," and Michael Smith replied that he "can live with it."  Pls.' Reply Ex. A-19.  That is it. Far from evidencing any connection between Hofeller's allegedly discriminatory motives and Jones, the email conveys almost no information at all.  It does not describe the content of the "Redistricting Article."  It does not convey Hofeller's substantive views on redistricting (or whether they align with Plaintiffs' new discriminatory-motive theory).  And it does not convey Jones's views on anything, since she was merely "cc'd" as a passive recipient of the email.  In fact, other than exposing Plaintiffs' guilt-by-association approach to evidence, this email has no relevance at all.

Plaintiffs also attach, but barely discuss, three other mundane emails from Jones to Hofeller: one from 2015 inviting Hofeller to dinner at Ramparts Tavern, a restaurant in suburban Alexandria, Pls.' Reply Ex. A-22, and two others from 2010 discussing general aspects of the 2010 Census, Pls.' Reply Exs. A-18, A-20. Plaintiffs do not even attempt to argue that these emails demonstrate Hofeller's allegedly discriminatory redistricting motives or Jones's assent to any similar ideas. Indeed, even a cursory review of the Jones-Hofeller emails—again, all of which were sent during the Obama Administration and thus pre-date Secretary Ross's tenure by years—reveals absolutely no information about Hofeller's alleged interest in using CVAP for redistricting to disadvantage Hispanics, let alone any evidence that Jones (or anyone else in government) knew, understood, or agreed with these purported motives.

Plaintiffs' attempt to link the (innocuous) views of Jones and the Census Bureau to Secretary Ross is even more fatuous, most obviously because "the Census Bureau repeatedly, consistently, and unanimously recommended *against* adding a citizenship question to the 2020 Decennial Census." *Kravitz*, 366 F. Supp. 3d at 699 (emphasis added). This included not only Jones, but Jones's immediate boss—then-Acting Director Ron Jarmin—who "emailed Gary . . . to convey the Census Bureau's determination that 'the best way to' achieve DOJ's stated goal 'would be through utilizing a linked file of administrative and survey data,'" not a citizenship question. *Id.* (quoting PX-71 (AR 3289)). It would make no sense to impute Hofeller's allegedly discriminatory intent to the Secretary on the theory that this motive reached the Secretary through the Census Bureau's recommendation *against* a citizenship question. The record is clear that the Secretary then independently examined and *overruled* the Census Bureau's recommendation.[2]

---

[2] This is true even under the "cat's paw principle" of discriminatory motive that Plaintiffs previously raised, *see* Pls.' Corrected Conclusions of Law, at ¶ 271, ECF No. 151-2, which imparts liability where a "nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker

Plaintiffs' contrary conclusion relies on the non sequitur that Jones participated "in the review and approval of the Commerce Department's revisions to the list of 35 questions," and "was also involved in the search for stakeholders who would support the citizenship question." Pls.' Reply at 3. Unsurprisingly, Plaintiffs do not (and cannot) explain how the "review and approval of the Commerce Department's revisions to the list of 35 questions" is connected in any way to Hofeller's purportedly discriminatory motive to use CVAP in redistricting. And Plaintiffs' make much of Jones "search[ing] for stakeholders who would support the citizenship question," like "Mark Kirkorian and Steven Camarotta of the Center of Immigration Studies," Pls.' Reply at 3. But the reason for her search is explained by then-Acting Director Jarmin earlier in the exact email chain Plaintiffs cite:

> We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking to find someone thoughtful who can speak to the pros of adding such a question or perhaps addressing the fundamental data need some other way (e.g., admin records).

AR 8325. Jones, in other words, was acting at the direction of Jarmin, who, as noted above, *opposed* the citizenship question. There is nothing nefarious about seeking to present both sides of an issue for the Secretary's consideration. Indeed, Jones also facilitated calls with Hermann Habermann and Robert Groves, two former Census Bureau officials who *opposed* the citizenship question. *See* AR 1638. Yet Plaintiffs do not impute Habermann and Groves's views to Jones, the Census Bureau, or the Secretary.

---

into taking action against the plaintiff," *Kregler v. City of New York*, 987 F. Supp. 2d 357, 365 (S.D.N.Y. 2013) (citation omitted). As Defendants have argued, this doctrine does not apply to the equal protection component of the Due Process Clause, but even if it did, Plaintiffs' theory would fail. *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011) ("Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased [individual]."); *Kregler v. City of New York*, 987 F. Supp. 2d 357, 368 (S.D.N.Y. 2013) ("[Plaintiff's] theory that [Person A] gave information to [Person B] that was tainted by [impermissible] animus, and that [Person B] in turn provided information to [the decisionmaker] which was also tainted, strains the cat's paw theory beyond existing case law.").

This Court already rejected a less-attenuated version of the same imputed-animus arguments Plaintiffs advance now: there was no equal protection violation even when the Court found that Plaintiffs adduced "some evidence" that Kobach, who communicated directly with Secretary Ross, "harbor[ed] discriminatory animus towards noncitizens" and that his "desire for a citizenship question may have been motivated by that animus." *Kravitz*, 366 F. Supp. 3d at 754 (deemphasized). If this direct Kobach-Secretary connection was not enough for liability, then the convoluted Hofeller-Secretary "connection"—traced through either Neuman and Gore, or Jones—cannot impose liability either.

In any event, this discussion is entirely academic because Hofeller's views on the use of CVAP in redistricting (discriminatory or not) have nothing to do with census response rates, let alone Plaintiffs' theory that "the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus." *Kravitz* 366 F. Supp. 3d at 754. Plaintiffs counter that their equal protection claim hinges on Secretary Ross's intent to deprive Hispanics of political representation more generally,[3] and "the citizenship question could enable this outcome by excluding certain populations from the census count *and* by excluding them from the redistricting." Pls.' Reply at 5. This misses the point entirely.

If Plaintiffs' theory is—as it has been from the beginning—that the Secretary harbored a discriminatory motive to *depress the census response rates* of certain households, then the Secretary would be a proper defendant. But that theory cannot be established with reference to Hofeller's "discriminatory" motive to *use CVAP for redistricting*. If, on the other hand, Plaintiffs' theory is that the citizenship question could help States exclude Hispanics in redistricting, then the Court may not

---

[3] Plaintiffs also mention a discriminatory motive to deprive noncitizens of political representation. Pls.' Reply at 5. But as Defendants previously explained, noncitizens are not a protected class for equal-protection purposes. *See* Defs.' Post-Trial Br. ¶ 529, ECF 150.

impose liability on the Secretary because there is no discriminatory effect unless *States* use the citizenship data in discriminatory ways. And if States do so, Plaintiffs could sue their respective States (or the relevant State officials), not the Secretary. *See* Defs.' Opp'n at 8; Pls.' Reply at 4–5 (citing *N.C. State Conference of NAACP* for the proposition that a *legislature's* practice of targeting voters "constituted racial discrimination" "[e]ven if done for partisan ends"). The tension between these two discriminatory-motive theories is further demonstrated by Hofeller's claimed need for *accurate* census data in redistricting, which would be endangered by a depressed response rate. *See* Defs.' Opp'n Ex. D, Neuman Dep. 56:7–20 (Neuman describing a conversation with Hofeller where he explained that "after the long-form data went away in 2000," the "quality of block level citizen voting age population had now diminished"); 138:3–16 (Neuman describing a conversation with Hofeller where he explained that "a good census is good for what he does"). So Plaintiffs cannot surreptitiously reframe the discriminatory-motive inquiry as an abstract intent to deprive Hispanics of political representation.

## II. Plaintiffs' latest attempt to produce "newly discovered" admissible evidence is unavailing.

Defendants previously explained that Plaintiffs' information is not "new" because Plaintiffs could have discovered it with due diligence. Defs.' Opp'n at 18–22. Plaintiffs' counter with only further proof that they failed to ask appropriate deposition questions to elicit their desired information, and they still fail to identify a single question that Neuman misleadingly answered in light of the "new" Hofeller documents. *See* Pls.' Reply at 13–15. Plaintiffs' motion should be rejected for this reason alone.

Defendants also explained that Plaintiffs failed to authenticate the unpublished 2015 study or the draft paragraph (or any of the other Hofeller-related documents attached to their motion), either through an attorney declaration or otherwise. Defs.' Opp'n at 22–25. In recognition of that reality, Plaintiffs now attempt to authenticate these documents through the May 17, 2019 deposition testimony of Hofeller's estranged daughter and the declaration of an employee of a digital forensics

firm (the Matthews Declaration).  Plaintiffs' belated attempts to authenticate their "new evidence" again miss the mark.

As an initial matter, Stephanie Hofeller's deposition in an unrelated state court case is inadmissible hearsay, and cannot be used as a basis to authenticate Plaintiffs' alleged "newly discovered evidence."  Plaintiffs claim that her deposition testimony is admissible under Federal Rule of Evidence 804(b)(1) because the defendants in that state court redistricting challenge had the same motive as Defendants to develop her testimony.  In support of that claim, Plaintiffs rely upon the Fourth Circuit's decision in *Horne v. Owens-Corning-Fiberglass Corp.*, 4 F.3d 276, 283 (4th Cir. 1993).  Pls' Reply at 16, n.15.  But *Horne* actually confirms that the deposition transcript is inadmissible hearsay.  In *Horne*, the Fourth Circuit explained that Rule 804(b)(1) applies where there is a similarity in proceedings rather than a privity between the parties in separate proceedings.  *Horne*, 4 F.3d at 283 ("Rather than pointing to factual and legal differences in proceedings, such as those detailed in *Lohrmann [v. Pittsburg Corning Corp.*,782 F.2d 1156 (4th Cir. 1995)], Horne contends that the other claimants are not predecessors in interest because they have no relationship to Horne.")  Here, there can be no reasonable dispute that there are numerous factual and legal differences between a challenge to the inclusion of a citizenship question on the decennial census, at issue in this case, and a state court challenge to redistricting in North Carolina, which was the subject of Ms. Hofeller's deposition.  *See Lohrmann*, 782 F.2d at 1161 (holding that a deposition taken in an earlier case concerning hazards to workers exposed to raw asbestos was not admissible under Rule 804(b)(1) in a case brought by a pipefitter alleging health effects from exposure to asbestos after it had been processed).  Accordingly, Plaintiffs may not rely upon Ms. Hofeller's deposition testimony to authenticate any of Plaintiffs' alleged newly discovered evidence.

But even if Ms. Hofeller's deposition transcript could satisfy a hearsay exception, at most, Plaintiffs have established that hard drives and thumb drives were found in Hofeller's home after his

death. They have not established the authenticity of any documents *in* the devices allegedly found in

Hofeller's home. For example, all the Matthews Declaration establishes is that more than three

months ago, his firm received from Arnold & Porter—counsel for plaintiffs in the New York census

case—certain external hard drives and thumb drives sent by Ms. Hofeller. *See generally* Matthews Decl.

¶¶ 1–17, ECF No. 167-1. The Matthews declaration cannot (and does not purport to) establish the

authenticity of the *contents* of those hard drives and thumb drives. Nor does Ms. Hofeller's deposition.[4]

All that Ms. Hofeller's deposition establishes is that she found assorted hard drives and thumb drives

in the house owned by her parents, and that she sent them to Arnold & Porter on March 13, 2019—

more than three months ago (and almost a month before the Court entered final judgment in this

case). Pls.' Reply Ex. A-4, S. Hofeller Dep. 13:15–14:13.

For example, Ms. Hofeller testified that she could recognize "a couple" of the devices from

when she was living with her parents, but did not identify which ones. *Id.* at 24:16–24. She further

acknowledged she "didn't spend a lot of time looking at [her] father's work files," *id.* at 49:25–40:11;

*id.* at 83:12–15, and she provided no testimony to explain how she would have been familiar with any

of these documents. Indeed, she testified that her father's business associate, Dale Oldham, had taken

one laptop from her father's house, and that she couldn't say whether he had taken everything that

belonged to him. *Id.* at 73:2–12. In short, Plaintiffs belated attempts to authenticate their "new

evidence" fare no better than their original efforts.

Similarly, Plaintiffs have failed to establish the admissibility of the Kobach and Gore

transcribed interview summaries, as these summaries reflect hearsay within hearsay under Rule 805.

Plaintiffs contend that the summaries are admissible under Rule 803(8)(A)(iii) because they are "factual

findings from a legally authorized investigation." Pls' Reply at 17. But Plaintiffs wholly ignore Rule

---

[4] For this reason, the Matthews Declaration cannot authenticate any of the documents
allegedly found on the portable hard drives and attached as Exhibits A-1 to A-22 to his declaration.

803(8)(B), which also requires that the source of the information (or other circumstances) show that the evidence is trustworthy.   As reflected in Exhibit H to Defendants' opposition, however, the Department of Justice has identified numerous material factual inaccuracies contained in the summary of Gore's transcribed interview—inaccuracies that Plaintiffs do not even attempt to dispute—that seriously call into question the veracity of these summaries.   With respect to Kobach's transcribed interview, Defendants do not have access to that transcript, so we have no way of knowing whether the summary is accurate.   But given the numerous misstatements in Gore's summary, and the fact that this summary was prepared by the same majority staff as Gore's summary, it would be reasonable to conclude that similar errors occurred.   Avoiding such uncertainty is precisely why the rule against hearsay exists.

Plaintiffs' argument that Kobach's testimony summarized by the majority staff is admissible under Rule 804(b)(1) is also meritless.   First, the transcribed interview is not under oath, and it is not a trial, hearing, or lawful deposition given under Rule 804(b)(1)   *See* Fed. R. Evid. 804(b)(1) (stating that former testimony is an exception to the hearsay rule where it was given at a trial, hearing, or lawful deposition); Weinstein's Federal Evidence (2d ed.), § 804.04[1][a] (explaining that statements are sufficiently trustworthy under Rule 804(b)(1) because "the statement was given under oath, is usually in writing, was given under circumstances suggesting the need for care and accuracy, and was subject to an adequate opportunity for cross examination").   Second, Plaintiffs do not even suggest that Defendants had an opportunity to develop Kobach's testimony, either during the Oversight Committee's transcribed interview or elsewhere.   Nor could they, since the government did not participate in Kobach's transcribed interview at all.   Accordingly, Plaintiffs have failed to meet their

burden of establishing the admissibility of either the Kobach or Gore transcribed interview summaries.[5]

### III.    Defendants would suffer unfair prejudice if Plaintiffs were granted relief.

Defendants also previously explained that Plaintiffs' motion should be denied because their requested relief would cause unfair prejudice to Defendants.  Defs.' Opp'n at 25–26.  One of several reasons for this unfair prejudice is that Defendants would be effectively foreclosed from appellate review of this Court's decision before the June 30, 2019 deadline for finalizing census questionnaires.  *Id.* at 26.  In response, Plaintiffs do nothing to dispel Defendants' concerns.  *See* Pls.' Reply at 18–20.  Most startlingly, however, Plaintiffs now claim that "relief extending beyond June 30, 2019 will not automatically cause unfair prejudice to Defendants" because census questionnaires can be finalized as late as October 31, 2019.  Pls.' Reply at 19.

That novel proposition is contradicted by the record in this and parallel litigation.  As Judge Furman recognized, "time is of the essence because the Census Bureau needs to finalize the 2020 questionnaire by June of this year."  *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 517 (S.D.N.Y. 2019).  The undisputed record confirms this reality.  As Dr. John Abowd—the Census Bureau's Chief Scientist—testified, "under the current budget" "changes to the paper questionnaire after June of 2019[ ] would impair the Census Bureau's ability to timely administer the 2020 census." PX-1194 at 1023:2–19.  It was only "[w]ith exceptional effort and *additional* resources" that the questionnaire could be finalized in October 2019.  *See* 30(b)(6) Dep. Designations 438:13–439:8, ECF No. 103-9 (emphasis added).  Moreover, the original vendor selected to print census questionnaires

---

[5] Plaintiffs further claim that the excerpts of Gore's transcript contained in the summary are admissible under Rule 801(d)(2)(B), arguing without any support that the Commerce Department has adopted Gore's statements as true.  Pls.' Reply at 17.  Plaintiffs do not explain how that manifestation has been demonstrated by the Commerce Department, or how the Commerce Department would even know Gore's statements are accurate.  The Gore summary therefore reflects inadmissible hearsay within hearsay.

filed for bankruptcy, forcing the Government Publishing Office to procure new bids for the printing contract.[6] The winning bid for this contract was based on a June 2019 contractual deadline to finalize the questionnaires because the new printer needs sufficient time to acquire additional production capacity. So an October 2019 deadline is even more infeasible now than when Dr. Abowd testified that it would require "exceptional effort and additional resources." *Id.*

Finally, Plaintiffs' latest filing now confirms the inequities of the relief that they seek, since it is now clear that their co-counsel in the New York census cases waited almost *three months*—if not longer—before bringing the Hofeller documents to the Court's attention. *See* Matthews Decl. ¶ 4 (acknowledging receipt on March 13, 2019); Pls.' Reply Ex. A-4, S. Hofeller Dep. 13:15–14:13 (Stephanie Hofeller testifying that she sent her father's hard drives to New York plaintiffs' counsel on March 13, 2019). Indeed, it is now clear that Plaintiffs could have accessed this information at least one month *before* the Court entered judgment in this case. Thus, the current time crunch is of Plaintiffs' own making. This only further highlights the unfair prejudice of granting their eleventh-hour request for relief.

## CONCLUSION

Nothing in Plaintiffs' reply, or the new documents attached thereto, warrant extraordinary relief under Rule 60(b). The Court should deny Plaintiffs' Rule 60(b) motion.

---

[6] *See* United States Government Publishing Office, "GPO Awards New Contract for 2020 U.S. Census Materials," www.gpo.gov/who-we-are/news-media/news-and-press-releases/gpo-awards-new-contract-for-2020-US-Census-material (Jan. 8, 2019); United States Census Bureau, "Census Bureau's Statement on 2020 Census Printing and Mailing Contract," www.census.gov/newsroom/press-releases/2018/2020-printing-cenveo.html (Aug. 3, 2018).

DATED: June 17, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

*/s/ Stephen Ehrlich*
GARRETT COYLE
STEPHEN EHRLICH
COURTNEY ENLOW
MARTIN M. TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 305-9803
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*